**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARY CRUMPTON, individually and on behalf of all others similarly situated, *Plaintiff,* v. OCTAPHARMA PLASMA, INC., a Delaware corporation, *Defendant.* | Case No. 1:19-cv-08402 Hon. Virginia M. Kendall |

**PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION
TO STRIKE DEFENDANT'S FIRST AND SECOND AFFIRMATIVE DEFENSES**

**INTRODUCTION**

This is a lawsuit brought by Mary Crumpton, a former donor at one of Defendant Octapharma, Inc.'s ("Octapharma" or "Defendant") plasma donation centers. Ms. Crumpton alleges—and Octapharma admits—that Octapharma scanned her finger as part of the check-in process at one of its donation centers, and on later visits to the center. (Dkt. 16, at 8.) The Parties' pleadings diverge on many other matters, including the core issue of whether Octapharma's finger scanning violated Illinois' Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.* However, this Motion to Strike focuses on two affirmative defenses Octapharma claims exempt it from BIPA altogether. It is flat wrong, and these insufficient affirmative defenses should be stricken from Octapharma's Answer under Rule 12(f).

In its First Affirmative Defense ("First Defense"), Octapharma claims that the federal Food, Drug & Cosmetics Act ("FDCA") preempts Section 15(b) of BIPA. Yet Octapharma does not cite any aspect of the FDCA that explicitly or implicitly preempts BIPA—because none exist. Nor does Octapharma plead facts to support that complying with both the FDCA and Section 15(b) is impossible—nor could it. *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010) (describing the types of federal preemption). This defense should be stricken.

Octapharma's Second Affirmative Defense ("Second Defense") appears to raise three defenses in one. Octapharma claims that the biometric data it collects is exempt from BIPA because (1) Octapharma is subject to HIPAA, and (2) it collects such data from patients in a health care setting. 740 ILCS 14/10 (excluding information obtained from a "patient in a health care setting" or "information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996"). Here, not only does the Answer demonstrate that Octapharma's biometric identifiers are *not*

1

collected from "patients" or in a "health care setting," but its donation centers are not even subject to HIPAA—as Octapharma has argued before. *See Levorsen v. Octapharma Plasma, Inc.*, No. 2:14-CV-325, 2014 WL 6751172, at *5 (D. Utah Dec. 1, 2014), *rev'd and remanded on other grounds*, 828 F.3d 1227 (10th Cir. 2016). These defenses should be stricken, as well.

Last, Octapharma also claims in its Second Defense that the data it collects is used to "further validate scientific testing or screening" and exempt from BIPA. 740 ILCS 14/10. While not pleaded clearly, Octapharma appears to argue that collecting biometric identifiers to re-identify plasma donors is akin to "validat[ing] scientific testing or screening." *Id.* But the "screening" contemplated by BIPA must be comparable to other procedures listed in that exemption, like X-rays, mammograms, and MRIs. *See id.* Thus, the identifiers that are exempted are those that are evaluative or diagnostic, and related to a health care service. Octapharma's argument (that screening for *identification* purposes is exempt) risks eliminating most BIPA coverage, including for the very customer identification technology that led to BIPA's enactment. *See* 740 ILCS 14/5(a)-(c); 95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 249 (statement of Rep. Ryg). This defense must be rejected and stricken, too.

For these reasons, the Court should strike Octapharma's First and Second Defenses. Further, because no amendment can salvage these faulty defenses, the Court should not grant Octapharma leave to amend them.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Crumpton is a former donor at an Octapharma plasma donation center. (Answer, dkt. 16, at 25, ¶ 27.)[1] Octapharma required Plaintiff to scan of her finger to enroll in its member

---

[1] The cited allegations are drawn from Octapharma's Answer, including its defense-supporting allegations and responses to the Complaint. *See Trustees of Auto. Mechanics Local No. 701 Union & Indus. Pension Fund v. Krumpholz*, 2012 WL 1245661, at *1 (N.D. Ill. Apr. 13, 2012).

database, and on subsequent donation center visits. (*Id.* at 25, ¶¶ 28–29.) Specifically, as a part of Octapharma's donor identification system, the company requires "each donor to insert his or her finger into a scanning device at a kiosk that operates Haemonetics software. The system generates a ... template of the identifying characteristics of the inserted finger. The ... template is retained in connection with the donor's [donation history] from that visit, [and] cross-references with that donor's subsequent visits to Octapharma." (*Id.* at 22, ¶ 12.)

Ms. Crumpton filed her lawsuit on December 2, 2019 in state court, alleging claims under Sections 15(a) and 15(b) of BIPA. Octapharma removed the case to federal court. (Dkt. 1.) Octapharma Answered the Complaint on February 3, 2020. (Dkt. 16.) The Answer raised twelve affirmative defenses to Plaintiff's claims, and also provided a lengthy set of allegations used to explain the context of Octapharma's biometric collection practices. (*Id.* at 15–34.) Plaintiff will not set forth all of these allegations here. However, as relevant to the First and Second Defenses:

The First Defense claims that the FDCA preempts BIPA. (Dkt. 16, at 30–31.) Per Octapharma, federal law requires it to collect and maintain identifying records for each plasma donor who comes to its centers. (*Id.* at 17, ¶ 8(b)(i)(1) (citing 21 C.F.R. § 630.10(h)).) It alleges that, prior to collecting plasma, it must make "educational" disclosures to donors about risks of donating. (*Id.* at 18, ¶ 8(b)(i)(4) (citing 21 C.F.R. §§ 630.10(b), 6301.10(g)(2)(ii)(A)–(F), 630.3(h)).) Octapharma also says it "[c]ross-reference[s] each Donor History Record"—*i.e.*, the record of a donor's interactions with the plasma center—"to each unit(s) of [p]lasma associated with the" donor. (*Id.* at 20–21, ¶¶ 8(g)–(h) (citing 21 C.F.R. §§ 600.12, 640.72).)

The Second Defense really raises three separate defenses. One portion of the Second Defense alleges that Octapharma is exempt from BIPA because it is subject to HIPAA, as well as "the Clinical Laboratory Improvement Amendments Act and the Illinois Clinical Laboratory and

3

Blood Bank Act, which [are also] subject to [HIPAA]." (Dkt. 16, at 31, ¶ 60; *see* 740 ILCS 14/10 (excluding from "biometric identifier" any "information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996").) Octapharma also alleges it is exempt from BIPA because the fingerprint data it collects is captured from a patient in a health care setting, since Octapharma conducts plasmapheresis and collects health information from its donors prior to allowing them to give plasma. (Dkt. 16, at 22–23, ¶ 14.)

       The second portion of the Second Defense invokes BIPA's exemption for any "image or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to further validate scientific testing or screening." 740 ILCS 14/10. Per the Answer, Octapharma obtains a "binary image scan template of its donor's finger, which through cross-referencing, further validates that the Source Plasma obtained by Octapharma came from a properly screened donor whose Source Plasma was also properly screened and tested in accordance with scientific standards, and therefore Octapharma is excepted from BIPA." (Dkt. 16, at 31, ¶ 59.) In plain English, Octapharma alleges that it uses fingerprint scanning to identify donors in three ways. First, Octapharma uses the data to enroll new plasma donors in a donor database. (Dkt. 16, at 21–22, ¶¶ 10-12.) Second, Octapharma uses the data to re-identify returning donors, to ensure they are not exceeding the limit of two plasma donations in seven days. (Dkt. 16, at 22, ¶ 13.) Last, Octapharma appears to allege that it uses fingerprint data to cross-reference plasma donors' identities with each unit of plasma donated. (Dkt. 16, at 27, ¶ 32.)

       Thereafter, per the Seventh Circuit's ruling in *Bryant v. Compass Group USA, Inc.*, 958 F.3d 617 (7th Cir. 2020), this Court held that Crumpton had Article III standing to pursue her Section 15(b) claims, but not her Section 15(a) claims. (Dkt. 31.) Ms. Crumpton has moved to

4

sever and remand the Section 15(a) claims to state court—this Motion focuses on the application of Octapharma's First and Second Defenses to her Section 15(b) claims.

## ARGUMENT

"[A]n affirmative defense must satisfy a three-part test to survive a motion to strike under Rule 12(f): (1) the matter must be properly pleaded as an affirmative defense; (2) the matter must be adequately pleaded under the requirements of Federal Rules of Civil Procedure 8 and 9; and (3) the matter must withstand a Rule 12(b)(6) challenge." *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1039 (N.D. Ill. 2014) (internal quotations omitted). For a motion to strike an affirmative defense, the Answer's well-pleaded allegations are presumed true, and reasonable inferences are to be drawn in the opposing party's favor. *See Krumpholz*, 2012 WL 1245661, at *1. The Court may rely on the Answer, documents attached to it, "documents that are critical to" the Answer, and information subject to judicial notice. *Cf. Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). If a Court finds the defense to be so insufficient that no amendment can save it, it is appropriate to strike the defense without leave to amend. *Id.*

Octapharma's First and Second Defenses are beyond salvaging. The First Defense, preemption, contains effectively no support in law at all. The Second Defense (BIPA exemption) fares no better, relying on a position contrary to arguments Octapharma has made in at least two other cases, and attempting to stretch a BIPA exemption far past its breaking point. These defenses should be stricken without leave to amend.

**I.     The FDCA Does Not Preempt BIPA § 15(b)**

There are three types of federal preemption: express, field, and conflict. *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019). "The touchstone of preemption analysis is the intent of Congress." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir.

5

2016). However, courts must analyze Congressional intent "through a lens that presumes that [] state law has not been preempted." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013). Octapharma does not specify the type of preemption it believes applies, Fed. R. Civ. P. 8(b), (c), though the First Defense loosely suggests FDA regulations requiring the collection of plasma donor identity information cannot be reconciled with BIPA, and that the FDCA as a whole occupies the field of plasma center regulation. (Dkt. 16 at 31, ¶ 56.) As such, Plaintiff will analyze all three types of preemption to demonstrate that none apply here.

Express preemption, meant to be the "easiest" to apply, occurs where "Congress clearly declares its intention to preempt state law." *Mason*, 596 F.3d at 390. Here, there is nothing in the FDCA—that Octapharma points to in its Answer or otherwise—indicating that Congress unequivocally intended to preempt state privacy statutes regulating the collection of biometric identifiers. While the statue does contain preemption clauses, they are narrowly limited to state laws regulating food, non-prescription drugs (though notably not prescription drugs), cosmetics, and medical devices. *See* 21 U.S.C. § 343-1; 21 U.S.C. § 360k; 21 U.S.C. § 379r; 21 U.S.C. § 379s. Given the lack of clear preemption language, the Act cannot be said to expressly preempt state privacy laws or laws specifically regulating the collection of biometric identifiers.

Field preemption fares no better. This is a "rare" form of preemption occurring "when federal law occupies a field of regulation so comprehensively that it has left no room for supplementary state legislation." *Nelson*, 928 F.3d at 651-52 (internal quotations omitted). Here, even if aspects of Octapharma's operations implicate the FDCA, nothing in the law's text or history suggests an intent to regulate everything plasma donation centers do, to the exclusion of the States. Rather, as the Supreme Court has held, this history is "dispositive ... of implicit intent" *not* to preempt, if anything. *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471

6

U.S. 707, 714 (1985) (citing FDA's statement in 38 Fed.Reg. 19365 (1973)). That missing intent is reflected by the absence of field occupying language, or a preemption clause, in the part of the FDCA specific to plasma collection. *See* 42 U.S.C. § 262; *Nelson*, 928 F.3d at 652 (Congress's choice "to displace state law only in certain specified, express preemption provisions" showed lack of intent to "displace *all* state regulation of student loans[,]" as did lack of field occupying language). A contrary interpretation requires believing the FDCA is not a statute enacted "to bolster consumer protection against harmful products[,]" *Wyeth v. Levine*, 555 U.S. 555, 574 (2009), but one meant to control everything FDCA-affected businesses do in all instances.

What's more, of course, nothing in the FDCA implies that Congress intended to occupy the field in the area of biometric privacy—there are not even provisions of the FDCA that reference biometric or consumer privacy. Further, the law contains at least four preemption provisions, but none relate to privacy or biometrics, and all four have exemptions. *See* 21 U.S.C. § 343-1(b); 21 U.S.C. § 360k(b); 21 U.S.C. §§ 379r(b), (d), (e); 21 U.S.C. § 379s(b). *Nelson*, 928 F.3d at 652. There is also no field occupying language about privacy. *Nelson*, 928 F.3d at 652. It does not even appear Octapharma's finger scanners would (as alleged) fall under the FDCA's definition of a "device[,]" as they are not used in the treatment of disease, nor affect the body's structure or function. *See* 21 U.S.C. § 321(h). Field preemption can and should be rejected, too.

That leaves conflict preemption, which occurs when it would be impossible for a party to comply with both federal and state law. *Mason*, 596 F.3d at 390. "[M]ere differences between state and federal regulation of the same subject are not conclusive of preemption ... the crucial inquiry is whether [state law] differs from [federal law] in such a way that achievement of the congressional objective ... is frustrated. *Aux Sable Liquid Prod. v. Murphy*, 526 F.3d 1028, 1034 (7th Cir. 2008) (internal quotations omitted) (alterations in original).

7

Again, this is no basis for preemption. Nothing in BIPA Section 15(b) (the only claim at issue) is "impossible" to comply with alongside the FDCA and its regulations—the FDCA does not prohibit obtaining written consent before collecting biometric data, or address biometrics at all. Octapharma points to regulations requiring it to obtain "proof of the donor's identity[,]" (dkt. 16 at 17 ¶ 8(b)(i)(1)), but the FDA does not require it to use biometric identifiers to establish donor identity. 80 Fed. Reg. 29,869 (May 22, 2015). ("[W]e have not specified the means of establishing proof. We believe that photographic identification, a valid driver's license, validated biometric means, or other means can be useful in establishing ... identity.") Far from being impossible to comply with the FDCA and BIPA, Octapharma could simply not collect biometric identifiers, and rely on other donor information it *already* collects. (Dkt. 16 at 21 ¶ 10.) It could also *just comply with BIPA* and obtain prior written consent before collecting biometric data. *Patriotic Veterans*, 736 F.3d at 1049 ("[T]hat a state has more stringent regulations than a federal law does not constitute conflict preemption.") Thus, BIPA is no obstacle to the FDCA's objectives, far from the "'major damage' to clear and substantial federal interests" required for conflict preemption. *Id.* The FDCA does not preempt BIPA on this basis.

This Court should strike Octapharma's First Defense without leave to amend.

**II.    None of BIPA's Exclusions Apply to Octapharma**

Octapharma's Second Defense is also deficient—on every basis raised. Frankly, the effort needed to parse the various defenses raised in the Second Defense suggests that Octapharma's strategy is to throw things at the wall to see what sticks, violating the spirit (if not the letter) of Fed. R. Civ. P. 8(b)(1)(A). But potpourri pleading aside, the Second Defense fails on the merits because (i) Octapharma is not subject to HIPAA, (ii) Octapharma does not serve patients in a health care setting, and (iii) Octapharma does not use fingerprints for purposes of

8

scientific "testing" or "screening." *See* 740 ILCS 14/10 (providing exemptions from BIPA definition of "[b]iometric identifier" for reasons related to HIPAA, health care, and scientific testing and screening). As such, the Second Defense should be stricken in its entirety.

### A. *Octapharma's Biometric Data Collection is not Governed by HIPAA.*

Octapharma's biometric data collection is not subject to HIPAA (and thus exempt from BIPA). Two threshold issues can dispose of Octapharma's argument. First, Octapharma has (correctly) taken Plaintiff's position elsewhere. *Levorsen*, 2014 WL 6751172, at *5; *see also id.* No. 2:14-CV-325, dkt. 10 at 8 (Octapharma arguing that "plasma donation centers do not provide health care services and its donors are not patients" under HIPAA) (internal quotations omitted). As such, Octapharma should be estopped from raising its HIPAA defense here, given that its new position—directly contrary to its position in *Levorsen*, which was accepted by that court—would fundamentally prejudice Plaintiff's case if it were accepted here. *See Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (describing factors to consider in applying the equitable doctrine of judicial estoppel).

Second, whether or not plasma donation is HIPAA-regulated misses the point. Octapharma's Answer does not adequately allege that *fingerprint data* it collects is "collected, used, or stored for health care treatment, payment, or operations" under HIPAA. 740 ILCS 14/10. Instead, the Answer alleges that it's used to track donors. (Dkt. 16 at 21–22 ¶¶ 10–13; *id.* at 27 ¶ 32.) This is insufficient to put it in the realm of material governed by HIPAA.

In any event, the question of whether plasma donation centers' activities related to the collection of Source Plasma requires HIPAA compliance was resolved by the U.S. Department of Health and Human Services ("HHS") in 2000: it said "no." *See* Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82,477 (Dec. 28, 2000) ("[T]he

9

procurement or banking of ... blood ... or any other tissue or human product is not considered to be health care under this rule and the organizations that perform such activities would not be considered health care providers[.]"). The only procedure that Octapharma does is "plasmapheresis"—separating plasma from blood cells, *see* dkt. 16 at 26 ¶ 30—which HHS has excluded from HIPAA coverage. 65 Fed. Reg. at 82,572 (HHS removing provision governing "procurement and banking of human products"). Octapharma does not allege in its Answer that it performs any other services that make it subject to HIPAA, or that the collection of fingerprint data *in itself* requires HIPAA compliance. The Court can and should strike this faulty defense.

Octapharma's Second Defense tries to shift the focus back to two separate laws. "Octapharma is subject to the [federal] Clinical Laboratory Improvement Amendments Act and the Illinois Clinical Laboratory and Blood Bank Act which is Subject to [HIPAA], and therefore Octapharma is excepted from BIPA." (Dkt. 16 at 31, ¶ 60.) This is a red herring. At most, the Illinois Clinical Laboratory and Blood Bank Act merely cites HIPAA to supply several definitions, 210 ILCS 25/2-134–137, and then allows the *permissive* provision of test results "in any manner required or permitted by HIPAA," *id.* at 25/7-102(a)(3). Ultimately, nothing in these laws makes labs affected by them automatically subject to HIPAA in all of their activities. Plaintiff cannot determine from Octapharma's vague Answer which provision of either of these statutes it believes would make its finger scanning activities subject to HIPAA (and exempt from BIPA). Plaintiff can identify none, and nothing otherwise indicates that the fingerprints Octapharma collects are to be treated as information "collected, used, or stored for health care treatment ... under [HIPAA.]" 740 ILCS 14/10. This part of the Second Defense must fail, too.

### B. Octapharma Does Not Care for "Patients" in a "Health Care Setting"

Relatedly, Octapharma cannot use BIPA's exemption for biometric identifiers collected

from a patient "in a health care setting." (Dkt. 16 at 31 ¶ 58.) As noted and as Octapharma has argued elsewhere, Octapharma does not provide "health care." *Cf.* 65 Fed. Reg. 82,572; *see also Levorsen*, No. 2:14-CV-325, dkt. 10 at 8 (Octapharma arguing that "a plasma donation center ... performs the exact opposite function" compared to facilities that "provide some kind of service to the public ... such as ... health care[.]"); *Maley v. Octapharma Plasma, Inc.*, No. 12-13892, 2013 WL 3814248, at *4 (E.D. Mich. July 22, 2013) (Octapharma "does not provide healthcare"); *id.Maley*, dkt. 6, at 11 ("Nor, obviously, is a plasma donation center a professional office of a health care provider ... [T]hey provide no health care."). The Answer itself states that Octapharma collects plasma and may collect health *information* from donors—but it does not actually allege that it provides health care. (*See* dkt. 16 at 21–23.) Thus, the defense should be stricken on substantive grounds or through judicial estoppel. *Grochocinski*, 719 F.3d at 795.

The most that Octapharma says about providing "health care" in its answer is this: "in those instances when red blood cells are administered by Octapharma, Octapharma performs medical treatment in a health care setting[.]" (Dkt. 16 at 31 ¶ 58) Of course, this allegation contradicts Octapharma's arguments in the *Levorsen* and *Maley* cases cited above. But the allegation also fails to establish a basis for this affirmative defense for three more reasons. First, the Answer does not provide information to support or infer that "administ[ering]" red blood cells is actually a form of health care. *See, e.g.*, *Ivery v. RMH Franchise Corp.*, 280 F. Supp. 3d 1121, 1129 (N.D. Ill. 2017) (allegations that "parrot factors" needed to support to a legal argument without further support are conclusory and "not entitled to a presumption of truth"). Second, the allegation is misleading. What Octapharma is referring to—in context—is the process of returning the donor's red blood cells to the donor after collecting the plasma. *See* dkt. 16 at 26 ¶ 30 (Octapharma's allegation that it conducts "plasmapheresis"); *see, e.g.*, Mayo

11

Clinic, *Blood Donor Program*, https://perma.cc/G6JA-D3X7 (last visited June 18, 2020) ("In [plasmapheresis], the liquid portion of the blood (plasma) is collected and the remaining blood components are returned to the donor.").[2] Octapharma is just re-characterizing the process of collecting plasma as health care. Finally, this allegation is insufficient to establish that Octapharma's collection of biometric identifiers (rather than plasma) occurs in a "health care setting"—indeed, nowhere does Octapharma allege that it *collects biometric identifiers* directly in relation to the administration of red blood cells.

Perhaps even more important, Octapharma does not allege that it collects biometric data from "patients," as required to invoke this BIPA exemption to "biometric identifier"—it collects this data from *donors*. Octapharma's Answer repeatedly distinguishes between the two groups, undercutting any notion that its donors are patients. (*See* dkt. 16 at 15 ¶ 1 (Octapharma "collects Source Plasma from donors to create life-saving treatments ... for patients in health care settings"); *id.* at 16 ¶ 6 (Octapharma adheres to various standards to "protect both donors and patients"); *id.* at 22 ¶ 12 (Octapharma takes steps to ensure plasma it collects "from a donor" is safe before being used by "a patient"). This makes sense. Per Octapharma, "a plasma donation center pays members of the public to provide a service to the center. Rather than the establishment providing a service to donors, it is actually the donors who provide a service to the establishment and its customers." *Maley*, No. 12-13892, dkt. 6 at 11; *accord Levorsen*, No. 2:14-CV-325, dkt. 10 at 8. This, along with Octapharma's failure to specifically allege that Plaintiff

---

[2] Plaintiff asks that the Court take judicial notice of the contents of the Mayo Clinic's web page explaining what plasmapheresis is, and any other citations to objective, explanatory Mayo Clinic web pages in this Motion. *See, e.g.*, *Arce v. Chicago Transit Auth.*, 193 F. Supp. 3d 875, 881 (N.D. Ill. 2016), *aff'd,* 738 F. App'x 355 (7th Cir. 2018) (taking judicial notice of Mayo Clinic website's descriptions of Oxycontin and Percocet); *Marquardt v. Saul*, 798 F. App'x 34, 35 (7th Cir. 2020) (citing to Mayo Clinic website to supply general definition of Lupus).

12

Crumpton herself was a "patient," is fatal to the Second Defense.

Octapharma's Answer provides no basis to conclude that it collects biometric identifiers "in a health care setting," much less from "patients." As a result, these portions of Octapharma's Second Defense should be stricken without leave to amend.

### C. *Octapharma's Finger Scans Do Not "Validate Scientific Testing or Screening"*

Finally, Octapharma's Second Defense claims the data it collects is exempt from BIPA's definition of "biometric identifier[s]." (Dkt. 16 at 31-32; 740 ILCS 14/10.) The exemption reads: "**Biometric identifiers do not include an** X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other ***image or film of the human anatomy used*** to diagnose, prognose, or treat an illness or other medical condition or ***to further validate scientific testing or screening***." 740 ILCS 14/10 (emphasis added). Octapharma's collection of biometric identifiers in order to identify its donors does not "further validate scientific testing or screening" because it makes no claim to be doing any "testing" using biometric data at all.[3] And—following the well-established tool of statutory interpretation to read "like with like"—it is not "screening" for any condition or disease using biometric data. Octapharma will argue that it is "screening" its donors, in that it uses biometric data to identify them, but that interpretation would swallow the law and exempt even the most common BIPA cases. This faulty defense should be stricken.

The term "screening" is undefined in BIPA. "Screen" has two potentially relevant meanings—only one applies. *See County Of Cook v. Illinois Labor Relations Bd. Local Panel*, 347 Ill. App. 3d 538, 547, 807 N.E.2d 613, 621 (2004) ("If the language of the statute permits

---

[3] Octapharma's Answer alleges that it collects fingerprints to identify and track donors. (Dkt. 16 at 21–22 ¶¶ 10–13; *id.* at 27 ¶ 32.) Octapharma cannot rely on the "testing" exemption given the lack of specific or supporting allegations (or inferences to be drawn from them) in its Answer that show it uses fingerprints to validate testing in any way.

two constructions, one of which would render the provision absurd ... and the other of which would render the provision reasonable ... the former construction must be avoided."). The correct meaning is "to test or examine for the presence of something (such as a disease)[.]" (Merriam Webster, "Screen[,]" Entry 2(3)(b)(3), https://perma.cc/DYH8-6X6P (last visited June 18, 2010.) This is the only interpretation that makes sense given the language of the exemption as a whole: mammograms, X-rays, MRIs, and the like, are used in relation to evaluative or diagnostic screening, *i.e.*, the assessment of a specific portion of the human anatomy for the detection of a disease in the same body part.[4] *See Ctr. Video Indus. Co. v. Roadway Package Sys., Inc.*, 90 F.3d 185, 187 (7th Cir. 1996) ("[W]here a general term follows a series of specific terms, the former ... extends only to matters of the same general class or nature as the terms ... enumerated.") These processes are each used to locate and diagnose diseases, which is why they are included in this BIPA exemption generally concerned with the provision of health care services.

      Which brings us to the wrong meaning of "screen"— the one Octapharma will advocate for—which is "to make a separation into different groups[.]" (Merriam Webster, "Screen[,]" Entry 2(3)(b)(1), https://perma.cc/DYH8-6X6P (last visited June 18, 2020)). This meaning is not related to the foregoing terms of the exemption and would not make sense in the context of the entire provision, which is concerned with the collection of biometric data to provide health care services. *See Fuesting v. Uline, Inc.*, 30 F. Supp. 3d 739, 742 (N.D. Ill. 2014) (language should "not be considered in isolation, but, instead, must be read in context"). This is why courts use the *noscitur a sociis* canon of construction, as adopting the incorrect, different-groups definition of

---

[4] Plaintiff asks that the Court take judicial notice of the following procedure definitions provided by the Mayo Clinic. Mayo Clinic, "Mammogram," https://perma.cc/7W2T-Q9WH; *id.*, "X-ray," https://perma.cc/B2BK-FQXP; *id.*, "MRI," https://perma.cc/G82C-8AXG; *id.*, "Positron emission tomography," https://perma.cc/L78P-JMCK.

"screen" would exempt some of the clearest BIPA cases and re-write the statute. For example:

- A company that uses fingerprint scanners to facilitate consumer transactions would be exempt, because it uses "scientific ... screening" to screen for consumers who have financial accounts linked with their biometric data versus those who do not. *See* 740 ILCS 14/5(a)-(c); 95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 249 (statement of Rep. Ryg) (describing Pay By Touch bankruptcy that led to passage of BIPA).

- An employer requiring employees to provide fingerprints to clock into work would be exempt, because it uses biometrics to screen for the correct employee's identity. *Compare with Rogers v. CSX Intermodal Terminals, Inc.*, 409 F. Supp. 3d 612, 615 (N.D. Ill. 2019) (dismissing BIPA claim for damages, but holding employee stated BIPA claim against employer who required fingerprint scanning to obtain access to facilities); *Treadwell v. Power Sols. Int'l, Inc.*, 427 F. Supp. 3d 984, 987 (N.D. Ill. 2019) (same, but fingerprint scanning used for timekeeping).

If the Legislature intended to create such a broad BIPA exemption encompassing both meanings of "screening[,]" it would have said so. *Cf. In re Jaffe*, 932 F.3d 602, 606 (7th Cir. 2019) ("[I]f the Illinois legislature wanted to exempt particular interests from the attachment of judgment liens, it had no problem in doing so.") Instead, the Legislature used "screening" at the end of a series of procedures used for evaluative and diagnostic health care. The alternate definition is unworkable and inconsistent with the terms of the exemption, in context. Accordingly, should Octapharma argue that it "screens" donors using biometric data, it should be rejected.

Because none of the defenses raised through the Second Defense apply, the Court should strike them from the Answer. Further, because these defenses are pure questions of law, and cannot be cured through amendment, the Court should not grant Octapharma leave to amend.

## CONCLUSION

For the foregoing reasons, the Court should strike Octapharma's First and Second Affirmative Defenses from its Answer, without leave to amend.

15

                                        Respectfully submitted,

                                        **MARY CRUMPTON,** individually and on behalf of and all others similarly situated,

Date: June 18, 2020                   By: <u>/s/ Daniel J. Schneider</u>
                                                    One of Plaintiff's attorneys

                                        Benjamin H. Richman
                                        brichman@edelson.com
                                        J. Eli Wade-Scott
                                        ewadescott@edelson.com
                                        Daniel J. Schneider
                                        dschneider@edelson.com
                                        EDELSON PC
                                        350 North LaSalle Street, 14th Floor
                                        Chicago, Illinois 60654
                                        Tel: 312.589.6370
                                        Fax: 312.589.6378

                                        David Fish
                                        dfish@fishlawfirm.com
                                        John Kunze
                                        kunze@fishlawfirm.com
                                        THE FISH LAW FIRM, P.C.
                                        200 East Fifth Avenue, Suite 123
                                        Naperville, Illinois 60563
                                        Tel: 630.355.7590
                                        Fax: 630.778.0400

**CERTIFICATE OF SERVICE**

    I, Daniel J. Schneider, an attorney, hereby certify that on June 18, 2020, I caused to be served the above and foregoing document by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system.

                                                                                                   /s/ Daniel J. Schneider