**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY CRUMPTON, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | Case No. 1:19-cv-08402 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| OCTAPHARMA PLASMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OCTAPHARMA PLASMA, INC.'S ANSWER TO FIRST AMENDED CLASS ACTION COMPLAINT AND AFFIRMATIVE DEFENSES[1]**

Octapharma Plasma, Inc. ("Octapharma"), by and through its counsel, and for its Answer and Affirmative Defenses to the First Amended Class Action Complaint ("Amended Complaint"), states as follows:

**NATURE OF THE ACTION**

1.     Defendant Octapharma operates a nationwide chain of blood plasma donation centers with locations throughout the State of Illinois, including in Cook County.

**ANSWER:     Octapharma admits the allegations in Paragraph 1 of the Amended Complaint.**

2.     When consumers donate plasma at Octapharma, they are required to scan their fingerprints and enroll in Octapharma's customer membership database.

**ANSWER:     Octapharma admits that plasma donors are required to provide a scan of their finger and enroll in Octapharma's donor database before donating plasma for**

---

[1] Pursuant to this Court's Memorandum Order dated January 19, 2021 (Dkt. 58), this Court struck Octapharma's First Affirmative Defense and portions of its Second Affirmative Defense. However, Octapharma reserves its right to challenge the Memorandum Order striking the Affirmative Defenses.

the first time.

3.      While most membership management programs use conventional methods for verifying customers (like identification cards), Octapharma's customers are required to have their fingerprints scanned.

**ANSWER:      Octapharma lacks knowledge of the facts sufficient to admit or deny what other plasma donation companies implement for their membership programs. Octapharma admits that its donors provide a scan of their finger to verify their identity and ability to be a donor.**

4.      Unlike identification cards—which can be changed or replaced if stolen or compromised—fingerprints are unique, permanent biometric identifiers associated with a consumer. This exposes consumers to serious and irreversible privacy risks. For example, if a fingerprint database is hacked, breached, or otherwise exposed, consumers have no means by which to prevent identity theft and unauthorized tracking.

**ANSWER:      Octapharma denies the allegations in Paragraph 4 of the Amended Complaint.**

5.      Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), specifically to regulate companies that collect, store and disseminate Illinois citizens' biometrics, such as fingerprints.

**ANSWER:      Paragraph 5 calls for a legal conclusion to which no answer is required.**

6.      Despite this law, Octapharma disregards its customers' statutorily protected privacy rights and unlawfully collects, stores, uses and discloses their biometric data in violation of the BIPA. Specifically, Octapharma has violated the BIPA because it did not:

- Properly inform Plaintiff and the Class members in writing of the specific purpose and length of time for which their fingerprints were being collected, stored, and used, as required by the BIPA;

- Provide a publicly available retention schedule and guidelines for permanently

2

destroying Plaintiff's and the Class's fingerprints, as required by the BIPA;

- Receive a written release from Plaintiff or the members of the Class to collect, capture, or otherwise obtain fingerprints, as required by the BIPA; nor

- Receive consent from Plaintiff and the Class members to disclose their biometric data.

**ANSWER:** **Octapharma denies the allegations in Paragraph 6 of the Amended Complaint.**

7.      Indeed, not only did Octapharma collect and store its customers biometric data in violation of BIPA, it also unlawfully disclosed their biometric data to a third party: Haemonetics Corporation ("Haemonetics"), the vendor of the software running on Octapharma's finger scanning terminals.

**ANSWER:** **Octapharma admits that it has a license agreement with Haemonetics Corporation. Octapharma admits that for a period, Haemonetics stored information relating to the donor's finger scan templates. Further answering, on or about August 1, 2019, new donor information began to be stored by Octapharma. Octapharma denies the remaining allegations in Paragraph 7 of the Amended Complaint.**

8.      Accordingly, this Complaint seeks an order: (i) declaring that Defendant's conduct violates the BIPA; (ii) requiring Defendant to cease the unlawful activities discussed herein; and (iii) awarding liquidated damages to Plaintiff and the proposed Class.

**ANSWER:** **Octapharma admits that this Amended Complaint seeks damages and injunctive relief but denies that Plaintiff and the proposed Class are entitled to any such relief.**

## PARTIES

9.      Plaintiff Mary Crumpton is a natural person and citizen of the State of Illinois.

**ANSWER:** **Octapharma lacks knowledge of the facts sufficient to admit or deny the allegations in Paragraph 9 of the Amended Complaint.**

10.      Defendant Octapharma is a corporation existing under the laws of the State of Delaware with its headquarters located at 10644 Westlake Drive, Charlotte, North Carolina 28273.

Octapharma has also been registered to conduct business in Illinois with the Illinois Secretary of State since July 6, 2009 (as File No. 66649199).

**ANSWER: Octapharma admits the allegations in Paragraph 10 of the Amended Complaint.**

## JURISDICTION AND VENUE

11.     This matter was removed from the Circuit Court of Cook County, Illinois (*See* dkt. 1.)

**ANSWER: Octapharma admits the allegations in Paragraph 11 of the Amended Complaint.**

12.     The removing defendant, Octapharma Plasma, Inc., asserted that jurisdiction was proper under 28 U.S.C. 1332. (*See id*.)

**ANSWER: Octapharma admits the allegations in Paragraph 12 of the Amended Complaint. Further answering, by Orders dated May 8, 2020 and July 29, 2020 (Dkts. 31 and 50) this Court determined that Plaintiff has Article III standing to pursue her Section 15(a) and (b) claims.**

## FACTUAL BACKGROUND

### I.     The Biometric Information Privacy Act.

13.     In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new [consumer] applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS 14/5(b). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing, yet unregulated technology. *See* 740 ILCS 14/5.

**ANSWER: Paragraph 13 calls for legal conclusions to which no answer is required.**

14.     In late 2007, a biometrics company called Pay By Touch—which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions—filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature

4

because suddenly there was a serious risk that millions of fingerprint records—which, are unique biometric identifiers, can be linked to people's sensitive financial and personal data—could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who had used that company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that unique biometric identifiers could now be sold to unknown third parties.

**ANSWER:** **Paragraph 14 calls for legal conclusions to which no answer is required.**

15. Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted the BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

**ANSWER:** **Paragraph 15 calls for legal conclusions to which no answer is required.**

16. The BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it *first*:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information."

740 ILCS 14/15(b).

5

**ANSWER:**   **Octapharma admits that Plaintiff has cited BIPA, but denies that it violated the same.**

17.    Biometric identifiers include retina and iris scans, voiceprints, scans of hand and face geometry, and—most importantly here—fingerprints. *See* 740 ILCS 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *See id.*

**ANSWER:**   **Octapharma admits that Plaintiff has cited BIPA, but denies that it violated the same.**

18.    The BIPA also establishes standards for how companies must handle Illinois consumers' biometric identifiers and biometric information. *See*, *e.g.*, 740 ILCS 14/15(a), (c)–(d). For instance. the BIPA requires companies to develop and comply with a written policy—made available to the public—establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/15(a).

**ANSWER:**   **Octapharma admits that Plaintiff has cited BIPA, but denies that it violated the same.**

19.    The BIPA also prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information to third parties absent consent for that disclosure (or certain other exceptions not applicable here). *See* 740 ILCS 14/15(d)(1).

**ANSWER:**   **Octapharma admits that Plaintiff has cited BIPA, but denies that it violated the same. Octapharma further denies that the exceptions contained in BIPA, 740 ILCS 14/15(d), are not applicable to its alleged disclosure to third parties.**

20.    The BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information. 740 ILCS 14/15(c).

**ANSWER:**   **Octapharma admits that Plaintiff has cited BIPA, but denies that it violated**

6

the same.

21.     Ultimately, the BIPA is simply an informed consent statute. Its narrowly tailored provisions place no absolute bar on the collection, sending, transmitting or communicating of biometric data. The BIPA simply mandates that entities wishing to engage in that conduct must make proper disclosures and implement certain reasonable safeguards.

**ANSWER:     Octapharma admits that Plaintiff has cited BIPA, but denies that it violated the same.**

## II.     Octapharma Violates the Biometric Information Privacy Act.

22.     By the time the BIPA passed through the Illinois Legislature in mid-2008, many companies who had experimented with using biometric data as an authentication method stopped doing so, at least for a time. That is because Pay By Touch's bankruptcy, described in Section I above, was widely publicized and brought attention to consumers' discomfort with the use of their biometric data.

**ANSWER:     Octapharma lacks knowledge of the facts sufficient to admit or deny the allegations in Paragraph 22 of the Amended Complaint.**

23.     Unfortunately, Octapharma failed to address these concerns. Octapharma collected, stored, used, and disclosed its customers' biometric data in violation of the BIPA.

**ANSWER:     Octapharma denies the allegations of Paragraph 23 of the Amended Complaint.**

24.     Specifically, when customers first donate plasma at Octapharma, they are required to have their fingerprints scanned in order to enroll them in Octapharma's fingerprint database.

**ANSWER:     Octapharma admits only that before donors first donate plasma, they are required to provide a scan of their finger to validate their identity and as their consent by electronic signature. Octapharma denies the remaining allegations in Paragraph 24 of the Amended Complaint.**

25.     Octapharma uses a customer management system that requires customers to use

their fingerprints to authenticate and verify their identity.

**ANSWER:** **Octapharma admits that it uses a FDA-regulated donor management system that requires donors to provide a scan of their finger to authenticate and verify their identity and as their consent by electronic signature, among other reasons.**

26.     Octapharma failed to adequately inform its customers of the complete purposes for which it collects their sensitive biometric data or to whom the data is disclosed.

**ANSWER:** **Octapharma denies the allegations in Paragraph 26 of the Amended Complaint. Further answering, Octapharma admits that it provides its donors with a New Donor Letter that all donors must read and are provided an opportunity to ask questions about it.**

27.     Up until after this lawsuit was filed, Octapharma similarly failed to establish a written, publicly available policy identifying its retention schedule for its customers' biometric data, and guidelines for permanently destroying their fingerprints when the initial purpose for collecting or obtaining their fingerprints is no longer relevant, as required by the BIPA. A customer who donated plasma at Octapharma did so without any knowledge of when their biometric identifiers would be removed from Octapharma's database—or if they ever will be.

**ANSWER:** **Octapharma denies the allegations in Paragraph 27 of the Amended Complaint.**

28.     Finally, Octapharma disclosed its customers' biometric data to Haemonetics, the provider of the software that runs on Octapharma's finger scanning terminals. That is, up until at least July 30, 2019, when a customer first scanned their fingerprints into one of Octapharma's finger scanning terminals, the template that is created from the customer's fingerprint was transmitted to a server owned by Haemonetics, where it was held along with the customer's other donor-related personal information.

**ANSWER:** **Octapharma admits that in order to ensure compliance with positive donor identification regulations, prior to August 1, 2019, its donors' Donation Data was transmitted to and retained by its third-party vendor, Haemonetics.**

8

29.     The Pay By Touch bankruptcy that catalyzed the passage of the BIPA highlights why conduct such as Octapharma's—whose customers are aware that they are providing biometric identifiers but are not aware of to whom or the full extent of the reasons they are doing so—is so dangerous. That bankruptcy spurred Illinois citizens and legislators to realize a critical point: it is crucial for people to understand when providing biometric data who exactly is collecting it, who it will be transmitted to, for what purposes, and for how long. But Octapharma disregards these obligations, and instead unlawfully collected, stored, possessed, used, and disclosed its customers' biometric identifiers and information without proper consent.

**ANSWER:     Octapharma denies the allegations in Paragraph 29 of the Amended Complaint.**

30.     Ultimately Octapharma disregarded its customers' statutorily protected privacy rights by violating the BIPA.

**ANSWER:     Octapharma denies the allegations in Paragraph 30 of the Amended Complaint.**

### FACTS SPECIFIC TO PLAINTIFF CRUMPTON

31.     Plaintiff Crumpton donated plasma at Octapharma between June 2017 and August 2018.

**ANSWER:     Octapharma admits the allegations in Paragraph 31 of the Amended Complaint.**

32.     Octapharma required Plaintiff Crumpton to scan her fingerprint so that it could enroll her in its membership database. Octapharma stored Plaintiff Crumpton's fingerprint data in its database.

**ANSWER:     Octapharma admits that it required Plaintiff to provide a scan of her finger for enrollment in Octapharma's donor database. Octapharma denies the allegations in Paragraph 32 of the Amended Complaint.**

33.     Each time Plaintiff Crumpton donated plasma, she was required to scan her fingerprint.

**ANSWER:     Octapharma admits the allegations in Paragraph 33 of the Amended Complaint.**

34.     Octapharma never informed Plaintiff of the specific limited purposes or length of time for which it collected, stored, or used her fingerprint.

**ANSWER:     Octapharma denies the allegations in Paragraph 34 of the Amended Complaint.**

35.     Similarly, Octapharma never informed Plaintiff Crumpton of any biometric data retention policy it developed, nor whether it will ever permanently delete her fingerprint.

**ANSWER:     Octapharma denies the allegations in Paragraph 35 of the Amended Complaint.**

36.     Plaintiff Crumpton never signed a written release allowing Octapharma to collect or store her fingerprint.

**ANSWER:     Octapharma denies that it was obligated to provide a separate release. Octapharma further admits that it provides its donors with a New Donor Letter that all donors must read and are provided an opportunity to ask questions about. The New Donor Letter specifically explains to its donors, prior to their finger ever being scanned, that the information Octapharma collects from their finger scan is a numerical value converted from the scan and not a fingerprint, that no picture of their fingerprint is ever retained, that the numerical value is stored by Octapharma securely, and that it is used to identify them as a donor and validate them for future donations.**

37.     Octapharma transmitted Plaintiff Crumpton's biometric data to Haemonetics to be stored on Haemonetics' server without ever obtaining Plaintiff Crumpton's consent for such disclosure.

**ANSWER:     Octapharma admits only that in order to ensure compliance with positive donor identification regulations, prior to August 1, 2019, its donors' Donation Data was transmitted to and retained by its third-party vendor, Haemonetics. Octapharma denies the remaining allegations in Paragraph 37 of the Amended Complaint.**

10

38.     Plaintiff Crumpton has continuously and repeatedly been exposed to the risks and harmful conditions created by Octapharma's violations of the BIPA alleged herein.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 38 of the Amended Complaint.**

39.     Plaintiff Crumpton now seeks liquidated damages under BIPA as compensation for the injuries Octapharma has caused.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 39 of the Amended Complaint.**

## CLASS ALLEGATIONS

**Class Definition**: Plaintiff Mary Crumpton brings this action pursuant to 735 ILCS 5/2-801 on behalf of herself and a Class of similarly situated individuals, defined as follows:

All residents of the State of Illinois who had their fingerprints collected, captured, received, otherwise obtained, or disclosed by Octapharma while residing in Illinois.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**ANSWER:**     **Octapharma admits that Plaintiff attempts to define a "class" as set forth in this Class Definition Paragraph, but otherwise denies that a class is appropriate under Rule 23.**

40.     **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. Defendant has collected, captured, received, or otherwise obtained biometric identifiers or biometric information from at least

11

hundreds of individuals who fall into the definition of the Class. Ultimately, the Class members will be easily identified through Defendant's records.

**ANSWER:** **Octapharma denies the allegations in Paragraph 40 of the Amended Complaint.**

41. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a) whether Defendant collected, captured, or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

b) whether Defendant properly informed Plaintiff and the Class of its purposes for collecting, using, and storing their biometric identifiers or biometric information;

c) whether Defendant obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Class's biometric identifiers or biometric information;

d) whether Defendant has disclosed or re-disclosed Plaintiff's and the Class's biometric identifiers or biometric information to any third parties;

e) whether Defendant has sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

f) whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction, whichever occurs first;

g) whether Defendant complied with any such written policy (if one existed);

h) whether Defendant used Plaintiff's and the Class's fingerprints to identify them;

i) whether the violations of the BIPA were committed negligently; and

j)   whether the violations of the BIPA were committed willfully.

**ANSWER:**   **Octapharma denies the allegations in Paragraph 41 of the Amended Complaint, including subparagraphs a-j.**

42.   **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

**ANSWER:**   **Octapharma denies the allegations in Paragraph 42 of the Amended Complaint.**

43.   **Superiority**: This class action is appropriate for certification because class proceedings are superior to all others available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive

13

supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**ANSWER:** **Octapharma denies the allegations in Paragraph 43 of the Amended Complaint.**

### FIRST CAUSE OF ACTION
### Violation of 740 ILCS 14/15(a)
### (On Behalf of Plaintiff and the Class)

44.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

**ANSWER:** **Octapharma adopts and incorporates its answers to the preceding allegations as if fully set forth herein.**

45.     The BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention (and—importantly—deletion) policy. Specifically, those companies must: (i) develop a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the consumer); (ii) make the policy available to the public; and (iii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

**ANSWER:** **Paragraph 45 calls for a legal conclusion to which no answer is required.**

46.     Unfortunately, Octapharma failed to comply with these BIPA mandates.

**ANSWER:** **Octapharma denies the allegations in Paragraph 46 of the Amended Complaint.**

47.     Octapharma is a corporation and thus qualifies as a "private entity" under the BIPA. *See* 740 ILCS 14/10.

**ANSWER:** **Paragraph 47 calls for a legal conclusion to which no answer is required.**

48.     Plaintiff and the Class are individuals who had their "biometric identifiers" collected and possessed by Octapharma (in the form of their fingerprints), as explained in detail in

Section II. *See* 740 ILCS 14/10. Octapharma also collected and possessed information based on

Plaintiffs and the Class's fingerprints used to identify them, which is "biometric information." *Id.*

**ANSWER:** **Octapharma denies the allegations in Paragraph 48 of the Amended Complaint.**

49.    Despite collecting and possessing Plaintiffs and the Class's biometric identifiers

and biometric information. Octapharma failed to develop, make publicly available, and comply

with a retention schedule or guidelines for permanently destroying its customers' biometric

identifiers and biometric information, in violation of 740 ILCS 14/15(a).

**ANSWER:** **Octapharma denies the allegations in Paragraph 49 of the Amended Complaint.**

50.    By collecting. possessing, storing, using, and failing to timely delete Plaintiff's and

the Class's biometric identifiers and biometric information as described herein, Octapharma

violated Plaintiffs and the Class's rights to privacy in their biometric identifiers or biometric

information as set forth in the BIPA. 740 ILCS 14/1, et seq.

**ANSWER:** **Octapharma denies the allegations in Paragraph 50 of the Amended Complaint.**

51.    On behalf of herself and the Class, Plaintiff seeks: (1) injunctive and equitable relief

as is necessary to protect the interests of the Plaintiff and the Class by requiring Octapharma to

comply with the BIPA' s requirements for the possession and deletion of biometric identifiers and

biometric information as described herein; (2) liquidated damages of $5,000 for each of

Octapharma's willful and/or reckless violations of 740 ILCS 14/15(a) pursuant to 740 ILCS

14/20(2) or, in the alternative, liquidated damages of $1,000 for each negligent violation of 740

ILCS 14/15(a) pursuant to 740 ILCS 14/20(1); and (3) reasonable attorneys' fees and costs and

expenses pursuant to 740 ILCS 14/20(3).

**ANSWER:** **Octapharma denies the allegations in Paragraph 51 of the Amended**

Complaint.

WHEREFORE, Defendant Octapharma Plasma, Inc., respectfully requests that the Court enter judgment in its favor against Plaintiff and for all such other relief this Court deems fair and proper.

## SECOND CAUSE OF ACTION
### Violation of 740 ILCS 14/15(b)
### (On Behalf of Plaintiff and the Class)

52.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

**ANSWER:**     **Octapharma adopts and incorporates its answers to the preceding allegations as if fully set forth herein.**

53.     The BIPA requires companies to obtain informed written consent from consumers before acquiring their biometric data. Specifically, the BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless [the entity] first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; *and* (3) receives a written release executed by the subject of the biometric identifier or biometric information . . .." 740 ILCS 14/15(b) (emphasis added).

**ANSWER:**     **Paragraph 53 calls for a legal conclusion to which no answer is required.**

54.     Unfortunately, Octapharma failed to comply with these BIPA mandates.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 54 of the Amended Complaint.**

D0303\397532\262202374

55.     Octapharma is a corporation and thus qualifies as a "private entity" under the BIPA. *See* 740 ILCS 14/10.

**ANSWER:**     **Paragraph 55 calls for a legal conclusion to which no answer is required.**

56.     Plaintiff and the Class are individuals who had their "biometric identifiers" collected by Octapharma (in the form of their fingerprints), as explained in detail in Section II. *See* 740 ILCS 14/10. Octapharma also collected and possessed information based on Plaintiff's and the Class's fingerprints used to identify them, which is "biometric information." *Id.*

**ANSWER:**     **Octapharma denies the allegations in Paragraph 56 of the Amended Complaint.**

57.     Octapharma violated 740 ILCS 14/15(b)(3) by failing to obtain written releases from Plaintiff and the Class before it collected, used, and stored their biometric identifiers and biometric information.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 57 of the Amended Complaint.**

58.     Octapharma violated 740 ILCS 14/15(b)(1) by failing to inform Plaintiff and the Class in writing that their biometric identifiers and biometric information were being collected and stored.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 58 of the Amended Complaint.**

59.     Octapharma violated 740 ILCS 14/15(b)(2) by failing to inform Plaintiff and the Class in writing of the specific purpose and length of term for which their biometric identifiers or biometric information was being collected, stored, and used.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 59 of the Amended Complaint.**

60.     By collecting, storing, and using Plaintiff's and the Class's biometric identifiers

and biometric information as described herein, Octapharma violated Plaintiff's and the Class's

rights to privacy in their biometric identifiers or biometric information as set forth in the BIPA,

740 ILCS 14/1, *et seq.*

**ANSWER:**   **Octapharma denies the allegations in Paragraph 60 of the Amended Complaint.**

61.      On behalf of herself and the Class, Plaintiff seek: (1) injunctive and equitable relief

as is necessary to protect the interests of the Plaintiff and the Class by requiring Defendant to

comply with the BIPA's requirements for the collection, storage, and use of biometric identifiers

and biometric information as described herein; (2) liquidated damages of $5,000 for each willful

and/or reckless violation of 740 ILCS 14/15(b) pursuant to 740 ILCS 14/20(2) or, in the

alternative, liquidated damages of $1,000 for each negligent violation of BIPA pursuant to 740

ILCS 14/20(1); and (3) reasonable attorneys' fees and costs and expenses pursuant to 740 ILCS

14/20(3).

**ANSWER:**   **Octapharma admits only that Plaintiff seeks certain relief on behalf of herself and a proposed Class, but otherwise denies that Plaintiff or a proposed Class is entitled to any relief.**

          **WHEREFORE, Defendant Octapharma Plasma, Inc., respectfully requests that the**

**Court enter judgment in its favor against Plaintiff and for all such other relief this Court**

**deems fair and proper.**

### THIRD CAUSE OF ACTION
### Violation of 740 ILCS 14/15(d)
### (On Behalf of Plaintiff and the Class)

62.      Plaintiff incorporates the foregoing allegations as if fully set forth herein.

**ANSWER:**   **Octapharma adopts and incorporates its answers to the preceding allegations as if fully set forth herein.**

63.      The BIPA requires companies in possession of biometric data to obtain consent

from consumers before disclosing their biometric data to a third party. Specifically, the BIPA makes it unlawful for any private entity to "disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless . . . the subject of the biometric identifier or biometric information . . . consents to the disclosure or redisclosure." 740 ILCS 14/15(d)(1).

**ANSWER:**     **Paragraph 63 calls for a legal conclusion to which no answer is required.**

64.     Unfortunately, Octapharma failed to comply with this BIPA mandate.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 64 of the Amended Complaint.**

65.     Octapharma is a corporation and thus qualifies as a "private entity" under the BIPA. *See* 740 ILCS 14/10.

**ANSWER:**     **Paragraph 65 calls for a legal conclusion to which no answer is required.**

66.     Plaintiff and the Class are individuals who had their "biometric identifiers" collected and possessed by Octapharma (in the form of their fingerprints), as explained in detail in Section II. *See* 740 ILCS 14/10. Octapharma also collected and possessed information based on Plaintiff's and the Class's fingerprints used to identify them, which is "biometric information." *Id*.

**ANSWER:**     **Paragraph 66 calls for a legal conclusion to which no answer is required.**

67.     Octapharma violated 740 ILCS 14/15(d) by disclosing Plaintiff's and the Class's biometric identifiers and/or biometric information to a third party, Haemonetics, to be stored on its servers, without obtaining Plaintiff's and the Class's consent for such disclosure.

**ANSWER:**     **Octapharma denies the allegations in Paragraph 67 of the Amended Complaint.**

68.     Octapharma's disclosure of Plaintiff's and the Class's biometric identifiers and/or biometric information to Haemonetics was not made to complete any financial transaction, was

not required by any State or federal law or municipal ordinance, and was not required pursuant to any valid warrant or subpoena.

**ANSWER:** **Octapharma denies the allegations in Paragraph 68 of the Amended Complaint.**

69.    By collecting, possessing, and disclosing Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Octapharma violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in the BIPA, 740 ILCS 14/1, *et seq.*

**ANSWER:** **Octapharma denies the allegations in Paragraph 69 of the Amended Complaint.**

70.    On behalf of herself and the Class, Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of the Plaintiff and the Class by requiring Octapharma to comply with the BIPA's requirements for the possession and disclosure of biometric identifiers and biometric information as described herein; (2) liquidated damages of $5,000 for each of Octapharma's willful and/or reckless violations of 740 ILCS 14/15(d) pursuant to 740 ILCS 14/20(2) or, in the alternative, liquidated damages of $1,000 for each negligent violation of 740 ILCS 14/15(d) pursuant to 740 ILCS 14/20(1); and (3) reasonable attorneys' fees and costs and expenses pursuant to 740 ILCS 14/20(3).

**ANSWER:** **Octapharma admits only that Plaintiff seeks certain relief on behalf of herself and a proposed Class, but otherwise denies that Plaintiff or a proposed Class is entitled to any relief.**

**WHEREFORE, Defendant Octapharma Plasma, Inc., respectfully requests that the Court enter judgment in its favor against Plaintiff and for all such other relief this Court deems fair and proper.**

20

**AFFIRMATIVE DEFENSES**

Defendant, Octapharma Plasma, Inc. ("Octapharma"), by and through its attorneys, and for its Affirmative Defenses to Plaintiff's First Amended Complaint (the "Amended Complaint"), states as follows:

**General Allegations to the First, Second and Third Affirmative Defenses**

1.      Octapharma is a U.S.-based company that collects Source Plasma from donors to create life-saving treatments and therapies for patients in health care settings around the world. Octapharma operates more than 100 donation centers in the U.S., nine (9) of which are operated within the State of Illinois.

2.      Source Plasma is the fluid portion of human blood, comprising water, salts, enzymes, antibodies and other proteins, collected through plasmapheresis from healthy voluntary human donors.

3.      In order to ensure that the supply of Source Plasma is safe to fulfill its critical purpose, companies like Octapharma that collect, test and manufacture Source Plasma for efficacy must meet specific standards and requirements set forth in federal regulations implemented by the U.S. Food and Drug Administration ("FDA").

4.      The FDA regulations (21 C.F.R § 600, *et seq.*) were promulgated pursuant to the Food, Drug and Cosmetic Act ("FDCA") (21 U.S.C. § 301, *et seq.*) and the Public Health Service Act ("PHSA") (42 U.S.C. § 202, *et seq.*), as enacted and subsequently amended by Congress.

5.      Additionally, as Octapharma operates as a clinical laboratory that tests samples from potential Source Plasma donors, Octapharma is subject to the Clinical Laboratory Improvement Amendments Act of 1988 ("CLIA") (42 U.S.C. § 262, *et seq.*). For its Illinois facilities, because it is certified under CLIA, Octapharma is also subject to and licensed under

21

Illinois regulations, promulgated under the Illinois Clinical Laboratory and Blood Bank Act (the "Illinois Laboratory Act", 210 ILCS 25/1, *et seq.*).

6.      Finally, Octapharma is subject to the voluntary industry standards and programs administered by the Plasma Protein Therapeutics Association ("PPTA"). These globally-applied standards and programs ensure the quality and safety of Source Plasma collection and manufacturing processes to protect both donors and patients. Among its initiatives, PPTA launched the Cross Donation Check System database, developed and operated by Haemonetics until January 17, 2021, and thereafter the database developed and operated by Headspring Healthcare, that assists plasma donation centers throughout the United States by enabling participating plasma collection facilities to search other facilities' records in a unified repository to prevent impermissible donor cross-donation across different plasma collection centers, and the National Donor Deferral Registry ("NDDR") database of permanently deferred (prohibited) source plasma donors in North America due to "reactive" test results for HIV, HBV, and HCV that was administered by Haemonetics until January 17, 2021, and thereafter by Headspring Healthcare.

7.      Octapharma holds an FDA Biologics License (License No. 1817 currently in good standing) for its collection of Source Plasma. Octapharma's collection and storage methods allow it to "demonstrate that [its] manufactured product m[et] prescribed requirements of safety, purity, and potency" as required by 21 C.F.R. § 601.20.

8.      Clinical testing of samples collected from potential Source Plasma donors is performed in accordance with scientifically proven methodologies, Octapharma is certified and licensed under CLIA and its Illinois facilities are licensed pursuant to the Illinois Laboratory Act. Octapharma's CLIA and Illinois Laboratory Act licenses are in good standing.

22

**Octapharma Collects the Template from its Donors' Finger Scan to Further the Comprehensive Regulatory Scheme that Protects the U.S. Plasma Supply by Ensuring Donors are Suitable to Donate Plasma.**

9.     At a donor's initial visit, Octapharma obtains proof of the donor's identity from the donor's current, valid photo ID, a postal address where the donor can be contacted after donation, and proof of the donor's Social Security number. (21 C.F.R. § 630.10(h).)

10.     At first, the prospective donor is provided a New Donor Binder that contains various educational materials that a new donor must review. Since at least 2014, the New Donor Binder has contained a New Donor Letter that all donors must read and are provided an opportunity to ask questions about. The New Donor Letter specifically explains to its donors, prior to their finger ever being scanned, that the information Octapharma collects from their finger scan is a numerical value converted from the scan and not a fingerprint, that no picture of their fingerprint is ever retained, that the numerical value is stored by Octapharma securely, and that it is used to identify them as a donor and validate them for future donations. (740 ILCS 14/15 (b).) After the prospective new donor has read and been provided an opportunity to ask questions about the New Donor Binder and New Donor Letter, the New Donor Binder is retained by Octapharma.

11.     Octapharma established a Positive Donor Identification system that positively identifies each donor and that relates each donor directly to each instance that Source Plasma was obtained from that donor, as well as to accumulated records and laboratory data. (21 C.F.R. §§ 600.12, 640.65(b)(3), 630.10(g)(1), 640.72.)

12.     Octapharma's Positive Donor Identification system works by requiring each donor to insert his or her finger into a scanning device at a kiosk that operates FDA-regulated donor management software developed by Haemonetics. The system generates a numerical value or template of the identifying characteristics of the inserted finger. The Positive Donor Information

system template is retained in connection with the donor's Donor History Record from that visit, cross-references with that donor's subsequent visits to Octapharma, and serves to validate the process by which the donor's Source Plasma is collected, screened, tested in accordance with scientifically proven methodologies, and manufactured. This ensures that human proteins that are part of the Source Plasma collected from a donor are safe before being used as medical treatment for a patient. Octapharma used Haemonetics to retain the Positive Donor Identification information and the Donor History Record of its donors until August 2019.

13. Octapharma's Positive Donor Identification system requires a new donor to scan their finger multiple times to track with each segment of their donation visit and to validate their identity at each step. Initially, at enrollment (after being provided and having reviewed the New Donor Letter which discloses the finger scan) the new donor's finger scan is registered; then next at the Kiosk a finger scan along with their birthdate logs them in to the Kiosk, and another upon completion of the questionnaires evidences the donor's electronic signature for honest questionnaire answers; next at Medical Screening another scan is taken before their vitals are taken; and finally, a scan at the physical examination room provides validation of the donor being assessed. Returning donors are required to log in and electronically sign their questionnaire answers at the Kiosk, and then when seen by the Medical Screener using the finger scan.

14. Octapharma verifies that each donor has not exceeded the two Source Plasma donations allowable within a seven-day period by using another software system developed by Haemonetics, the Cross Donation Check System ("CDCS") until January 17, 2021, and thereafter by using the CDCS system developed by Headspring Healthcare. When a donor attempts to donate Source Plasma, identifying information about the donor, including current donation date, for the donor, are inputted into the CDCS. During the screening process, the system provides the last

24

donation date from that donor's history to ensure that the donation limit is not exceeded. Octapharma has implemented policy requirements and procedures for determining the eligibility of a donor for a suitable plasma donation by evidencing that the donor is in good health and free from "relevant transfusion-transmitted infections." (21 C.F.R. §§ 630.10(a) and 630.3(h)).

15.     The instructions and procedures detailed in its policies must be followed and completed with medically acceptable results before a donor can donate plasma at Octapharma. The procedures include performing an in-depth health screening during the donor's initial visit; conducting and reviewing the donor's answers to an in-depth health history questionnaire, travel related questionnaire, and pre-donation health questionnaire; determining the donor is not deferred from donating plasma; performing a physical assessment of the donor's health vitals and characteristics, including temperature, blood pressure, hemoglobin or hematocrit level, pulse and skin condition; evaluating all body modifications, tattoos, piercings and non-surgical scars; performing an initial and annual head-to-toe physical examination; presenting and discussing educational materials; discussing the risks of the plasmapheresis procedure; administering red blood cell immunizations to the donor (where applicable); obtaining written informed consents from the donor; taking blood and plasma samples for testing; as well as performing laboratory tests on those blood and plasma samples and medically evaluating the testing results. (21 C.F.R. §§ 630.10(a)(b), (d)-(g)(2)(ii)(A)-(F); and 630.3(h)).

16.     At subsequent visits by that donor to Octapharma, the donor does not need to undergo the extensive health examination. However, for all instances, Octapharma still performs a health interview, conducts a health screening exam by taking the donor's vital signs, takes blood samples for testing, and obtains Positive Donor Identification, including a finger scan from the donor. All of the donor health information is maintained in that donor's Donor History Record for

25

that visit, and cross-references with the Positive Donor Identification for that visit, along with the donor's overall accumulated Donor History Record. (21 C.F.R. §§ 600.12 and 640.72).

17.     Octapharma consults its records of deferred donors during each instance a donor donates plasma.

18.     Octapharma assures that the interval since the donor's last donation is appropriate using the CDCS.

19.     Octapharma provides educational materials to the donor that explain the "relevant transfusion-transmitted infections" that a donor could transmit to a recipient through transfusion, as well as the identifiable risk factors associated with those infections, to instruct the donor not to donate if those risk factors are known by the donor. (21 C.F.R. §§ 630.10(b) and 630.3(h)).

20.     Octapharma also provides educational materials to the donor that inform of the potential risks and hazards of the Source Plasma collection procedure. (21 C.F.R. § 630.10(g)(2)(ii)(E)).

21.     Octapharma obtains consent from the donor that acknowledges the donor has reviewed the educational materials, has agreed not to donate if there is a known risk of transmitting a "relevant transfusion-transmitted infection," and understands that a sample of their blood will be tested for infections, that the donor could be deemed not suitable and deferred from donating Source Plasma, that the donor has reviewed the risks and hazards associated with donating plasma, and that the donor has been given an opportunity to ask questions, including the information provided in the New Donor Letter, and to withdraw from donating Source Plasma.

22.     This final consent required of the donor is their acknowledgement of Octapharma's Informed Consent to Plasmapheresis. This informed consent is obtained from the donor at their initial visit prior to donation and annually thereafter after the Medical Director or physician

substitute presents and discusses all of the information contained in the form, which summarizes all information and consents previously discussed with the donor and requires the donor's acknowledgement, provided by electronic signature in the presence of the Medical Director or physician substitute on an electronic signature pad connected to the donor management system. (21 C.F.R. §§ 630.10(g)(2)(ii)(A)-(F) and 630.3(h)).

23.     Octapharma's policies require having a licensed medical doctor (the "Medical Director") and a physician substitute at every site where Octapharma collects Source Plasma. (21 C.F.R. § 630.5(a) and (c)). The physician substitutes are licensed nurses, who perform the initial and annual physical examination of donors, evaluation of body modification, presenting and discussing educational materials and the identifiable risk factors for transfusion-transmitted infections, and obtaining informed consent. (21 C.F.R. § 630.5(c)). Among Octapharma's staff, only the physician substitute, Medical Director, and management have access to donors' Health History Record information within the donor management system.

24.     Octapharma allows that certain medical determinations may be delegated to its on-site physician substitute in consultation with the Medical Director. However, only the Medical Director at each facility, who is a licensed M.D., can perform certain procedures on individuals at Octapharma's facilities. (21 C.F.R. § 630.30(a)).

25.     Upon completion of these steps, where donor finger scans occur throughout the donor's visit up to the point of becoming eligible to donate Source Plasma and thus entitled to compensation from Octapharma, a compensation card is issued to the donor that is subsequently replenished through the donor management system.

26.     Octapharma deems a donation of Source Plasma suitable upon reviewing its records, the National Donor Deferral Registry records, and the CDCS records to determine the

donor is not a deferred donor, that the interval since the donor's last donation is appropriate, and that the donor's medical history based upon the medical history interview and physical assessment in the first visit, and the health interview and physical screening exam at subsequent visits to validate that the donor is in good health and would not be adversely affected by the donation, that the donor is free of risk factors for transmissible infections, and that the result of tests of the donor's blood is negative or nonreactive. (21 C.F.R. § 630.30(a)).

27.     Octapharma does not release for use any Source Plasma obtained from a donor if any of these factors make the donor's donation unsuitable and reflects in the donor's record that the donor is deferred from future Source Plasma donations.

28.     Octapharma tests each donation to determine the Source Plasma is free of any "relevant transfusion-transmitted infection." (21 C.F.R. §§ 610.40, 630.3, 640.65 and 640.67).

29.     Octapharma always notifies the donor of a deferral or ineligibility to donate Source Plasma based upon a positive or reactive result after testing. In those instances, Octapharma contacts the donor and requests that the donor return to its facility, and Octapharma's licensed physician substitute counsels the donor about the reason for the deferral as being based upon the test result. Octapharma also provides documentation, including information about the test results, so that the donor can take the information to their physician. (21 C.F.R. § 630.40(a) and (b)).

30.     Octapharma does not distribute Source Plasma donated by paid donors for further manufacturing into injectable products until the donor is determined to be eligible to donate and has a record of negative test results on all tests for "relevant transfusion-transmitted infections" on two occasions within the prior 6 months. Octapharma requests that donors return for a second donation within days of their initial donation effort to ensure that the donor is eligible to donate Source Plasma. A donor's suitable plasma donation is placed into an additional quarantine hold

of at least 45 days, during which a subsequent deferral of the donor would preclude distribution of the collected Source Plasma for manufacture. (21 C.F.R. §§ 630.10 and 640.69(e)).

31.     Octapharma labels each unit of donor collected Source Plasma so as to identify it to the individual donor whose identity is obtained through the Positive Donor Identification system. Octapharma also labels each container containing the Source Plasma collected from each individual donor for manufacture or distribution, and then labels each package containing the Source Plasma container, for distribution and use with required information that includes expiration date, lot number and bar code identification for each container. (21 C.F.R. §§ 610.60-610.67, 640.40, 640.69, 640.71).

32.     Octapharma prepares records concurrently with the performance of each step in the manufacture and distribution of Source Plasma, in such a manner that at any time successive steps in the manufacture and distribution of any lot may be traced by an inspector, and ensures its records are legible and indelible, identify the person immediately responsible, include dates of the various steps, and are as detailed as necessary for clear understanding of each step by one experienced in the manufacture of products. (21 C.F.R. §§ 600.12(a) and 606.160).

33.     Octapharma maintains in each donor's Donor History Record, records that include a complete record of each and every 1) donor validation by Positive Donor Identification, 2) examination, 3) serologic or other test result, including for "relevant transfusion-transmitted infections," 4) laboratory data result, 5) interview or questionnaire, 6) informed consent obtained from the donor for the plasmapheresis procedure, and 7) records otherwise used to determine the Eligibility of a donor for each donation or the Suitability of each Source Plasma donation, and/or a full explanation for any Suitability rejection, 8) records of any donor reaction while on the plasmapheresis premises or reported to the center after the donor has left the premises which

includes a full explanation of the reaction, the measures taken to assist the donor, and the outcome of the incident. (21 C.F.R. §§ 600.12, 640.65, and 640.72).

34.     Octapharma cross-references each Donor History Record that includes proof of Positive Donor Identification to each unit(s) of Source Plasma associated with the donor. (21 C.F.R. § 640.72(b)).

35.     Octapharma must and does retain its Donor History Records, proof of Positive Donor Identification, and its concurrently prepared records relating to its manufacture of Source Plasma for the period no less than five years after manufacture has been completed, or six months after the latest expiration date for the individual product, whichever represents a later date, to permit the return of any clinical report of unfavorable reactions from a lot of Source Plasma. (21 C.F.R. §§ 600.12(b)(1) and 606.160).

36.     Octapharma must allow audit inspections and review of its retained Donor History Records by FDA inspectors for purposes of obtaining and maintaining its Biologics License. (21 C.F.R. §§ 600.20, 601.21).

37.     Octapharma maintains the information provided by the donor, including the information gained from a donor's finger scan, in order to fulfill its obligations under the FDA regulations and CLIA as set forth above.

38.     Octapharma does not sell or otherwise trade in any of its donor's information that identifies that donor.

39.     Octapharma takes appropriate steps to safeguard the information that identifies its donors, including the implementation of security measures relating to such data from improper access internally or from an external source.

## First Affirmative Defense

### Octapharma is Excepted from BIPA

40.     Octapharma adopts and incorporates the allegations in Paragraphs 1-39 of the General Allegations as though set forth herein.

41.     Plaintiff's claims are barred, as are the claims of the putative class, since Octapharma collects, uses, and stores the numerical value template of the finger scan of its donors in connection with each visit the donor makes to Octapharma's facilities and, in all instances, Octapharma's evaluation, determination and counseling of the donor related to their suitability and eligibility to donate plasma, directly implicates health and medical considerations that fall within the "information collected . . . in a health care setting" or "information collected, used, or stored for health care treatment" exceptions to BIPA. 740 ILCS § 14/10. Further, the red blood cell immunization that are administered by Octapharma, constitutes medical treatment in a health care setting. *Id*.  For these reasons, Octapharma is excepted from BIPA.

## Second Affirmative Defense

### Octapharma's Disclosures to Haemonetics are Excepted from BIPA

42.     Octapharma adopts and incorporates the allegations in Paragraphs 1-39 of the General Allegations as though set forth herein.

43.     Plaintiff's claim brought pursuant to Section 15(d) of BIPA are barred, as are the claims of the putative class, since Octapharma collects, uses, and stores the numerical value template of the finger scan of its donors in connection with each visit the donor makes to Octapharma's facilities and, during the period that Octapharma used Haemonetics to retain the Positive Donor Identification information and the Donor History Records of its donors' data, such

disclosure to Haemonetics was required to enable Octapharma to complete the financial compensation transaction requested and authorized by the donor.

44.     Plaintiff's Section 15(d) claims are barred, as are the claims of the putative class, since Octapharma collects, uses, and stores the numerical value template of the finger scan of its donors in connection with the Positive Donor Identification information and the Donor History Records of a donor data, such that any disclosure required to be made by Octapharma to FDA regulators or other authorities to satisfy an audit request would be excepted.

## **Third Affirmative Defense**

45.     Octapharma adopts and incorporates the allegations in Paragraphs 1-39 of the General Allegations as though set forth herein.

46.     Plaintiff's claims are barred, in whole or in part, because Plaintiff and all putative class members consented to the conduct that is alleged to violate BIPA. Octapharma informed its donors that their finger scan would be taken, why it was needed, what happened to the image of their fingerprint, and what they would do with and to protect the data. By providing their finger scan, after having the opportunity to understand and ask questions, upon information and belief, Plaintiff and putative class members voluntarily consented to the practices the Amended Complaint challenges by agreeing to use the finger-scanning option to confirm their identity when seeking to become a donor of Source Plasma.


Only in the alternative, and in addition to the First Affirmative Defense, Second Affirmative Defense and Third Affirmative Defense raised above, Octapharma raises the following Affirmative Defenses in the event that BIPA has any applicability to the information obtained by Octapharma from a donor.

### Fourth Affirmative Defense

Plaintiff and the putative class members have not sustained any injury or damage as a result of any actions allegedly taken by Octapharma and are thus barred from asserting claims against Octapharma.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because the damages sought by Plaintiff and the putative class are barred under the Due Process Clause of the Illinois and Federal Constitutions. The Complaint seeks at least $1,000 in liquidated damages for each alleged BIPA violation, even though neither Plaintiff nor the putative class has suffered any harm as a result of the conduct alleged. The liquidated damages available under BIPA are grossly excessive and disproportionate in light of the absence of any injury or harm to Plaintiff and the putative class members, and therefore any award of liquidated damages to the Plaintiff or putative class members would violate Octapharma's due process rights.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, under the doctrines of ratification and acquiescence. Upon information and belief, Plaintiff and each putative class member approved and, in some cases, participated in the complained-of conduct by using, and agreeing to use, Octapharma's finger-scanning system to provide positive donor identification.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Octapharma did not retain, store, collect, possess, capture, purchase, receive, transmit, or disclose biometric identifiers or biometric information as defined under BIPA.

## **Eighth Affirmative Defense**

Plaintiff's claim for injunctive relief is barred, as are the claims of many members of the putative class, because they are former donors of Octapharma and therefore in no danger of immediate injury as their information has not been accessible by others.

## **Ninth Affirmative Defense**

Plaintiff's claims are barred, in whole or in part, by Octapharma's good faith, and the absence of negligent, intentional, or reckless conduct.

## **Tenth Affirmative Defense**

Plaintiff may not maintain this lawsuit as a class action because the purported claims of the putative class representative are not sufficiently typical of those of the purported class members, common issues of fact and law do not predominate over individual issues and liability and damages cannot be proven on a class-wide basis, the putative plaintiff class representative will not adequately represent the purported plaintiff class, the putative plaintiff class is not ascertainable, the proposed class action would not be manageable, and a class action is not a superior method for adjudication the purported claims sent for in Plaintiff's Amended Complaint.

## **Eleventh Affirmative Defense**

Plaintiff's claims are barred, in whole or in part, by the passing of the applicable statutes of limitations for bringing a cause of action under BIPA.

## **Twelfth Affirmative Defense**

Plaintiff's claims are barred because Octapharma has and/or will have a publicly-available policy regarding the collection, retention and destruction of Plaintiff's positive donor identification information.

Dated: February 26, 2021

Respectfully submitted,

OCTAPHARMA PLASMA, INC.,
Defendant

By: */s/ Daniel T. Graham*
        Daniel T. Graham
        dgraham@clarkhill.com
        Jeffrey M. Sniadanko
        jsniadanko@clarkhill.com
        CLARK HILL PLC
        130 East Randolph Street
        Suite 3900
        Chicago, Illinois 60601
        Ph.: 312.985.5900
        Fax: 312.985.5954 (Graham)

        *Attorneys for Defendant*

D0303\397532\262202374

## CERTIFICATE OF SERVICE

The undersigned, David Reich, a non-attorney, do hereby certify that I caused a copy of the foregoing ***Octapharma Plasma, Inc.'s Answer and Affirmative Defenses to First Amended Class Action Complaint*** to be served on all counsel of record via notice from the Northern District of Illinois's CM/ECF e-filing notification system and via electronic mail on February 26, 2021.

Benjamin H. Richman
brichman@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Alexander Glenn Tievsky
docket@edelson.com
Schuyler Ufkes
sufkes@edelson.com
Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654

David Fish
dfish@fishlawfirm.com
John Kunze
kunze@fishlawfirm.com
The Fish Law Firm, P.C.
200 East Fifth Avenue, Suite 123
Naperville, Illinois 60563

*/s/  David Reich*

D0303\397532\262202374