**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MARY CRUMPTON, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | No. 19-cv-08402 |
| v. | Hon. Virginia M. Kendall |
| OCTAPHARMA PLASMA, INC., a Delaware corporation, | |
| *Defendant*. | |

**<u>PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF</u>**
**<u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>**

## <u>TABLE OF CONTENTS</u>

I.      **INTRODUCTION**.................................................................................................1

II.     **FACTUAL AND PROCEDURAL BACKGROUND** .....................................3

      A.    **Illinois' Biometric Information Privacy Act** ....................................3

      B.    **Plaintiff's Allegations and Defendant's Finger-Scanning Donor Management System** ..........................................................................5

      C.    **Litigation, Negotiation, and Settlement** ..........................................6

III.    **TERMS OF THE SETTLEMENT AGREEMENT**.......................................8

      A.    **Class Definition** ..................................................................................8

      B.    **Settlement Payments** ..........................................................................9

      C.    **Prospective Relief** ..............................................................................9

      D.    **Payment of Settlement Notice and Administrative Costs** ..............10

      E.    **Payment of Attorneys' Fees, Costs, and Incentive Award** .............10

      F.    **Release of Liability**...........................................................................11

IV.    **THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES** ...........................................................11

      A.    **The Numerosity Requirement is Satisfied** .....................................12

      B.    **Common Issues of Fact and Law Predominate**..............................12

      C.    **The Typicality Requirement is Satisfied** ........................................14

      D.    **The Adequacy Requirement is Satisfied** ........................................15

      E.    **A Class Action is a Superior Method of Resolving the Controversy** .............18

      F.    **The Class is Ascertainable**...............................................................21

V.     **PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL** .....22

VI.    **THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL** ..22

A.     **Plaintiff Mary Crumpton and Proposed Class Counsel Have Adequately Represented the Settlement Class** ..................................................24

B.     **The Settlement Was Reached as a Result of Arm's-Length Negotiations Between the Parties** ..........................................................30

C.     **The Settlement Treats All Settlement Class Members Equally** ...................31

D.     **The Relief Secured for the Settlement Class Is Adequate and Warrants Approval** ............................................................................32

       1.     **The cost, risk, and delay of further litigation compared to the Settlement's benefits favors final approval** .............................33

       2.     **The method of distributing relief to the Settlement Class Members is effective and supports preliminary approval** ........................35

       3.     **The terms of the requested attorneys' fees are reasonable** .................37

VII.     **THE PROPOSED NOTICE PLAN SHOULD BE APPROVED IN FORM AND SUBSTANCE** ....................................................................38

VIII.     **CONCLUSION** .........................................................................40

## **TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Amchem Prods., Inc. v. Windsor,*
    *521 U.S. 591 (1997)*..................................................................................................11, 20

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds,*
    *568 U.S. 455 (2013)*......................................................................................................11

*Eisen v. Carlisle & Jacquelin,*
    *417 U.S. 156 (1974)*......................................................................................................38

*Ortiz v. Fibreboard Corp.,*
    *527 U.S. 815 (1999)*......................................................................................................31

*Wal-Mart v. Dukes,*
    *564 U.S. 338 (2011)*................................................................................................12, 13

**United States Circuit Court of Appeals Cases**

*Arreola v. Godinez,*
    *546 F.3d 788 (7th Cir. 2008)*........................................................................................11

*Beaton v. SpeedyPC Software,*
    *907 F.3d 1018 (7th Cir. 2018)*......................................................................................14

*Bell v. PNC Bank, Nat'l Ass'n,*
    *800 F.3d 360 (7th Cir. 2015)*........................................................................................12

*Bryant v. Compass Grp. USA, Inc.,*
    *No. 20-1443, 2020 WL 1695584 (7th Cir. Mar. 20, 2020)*............................................25

*Gautreaux v. Pierce,*
    *690 F.2d 616 (7th Cir. 1982)*........................................................................................23

*Golan v. FreeEats.com, Inc.,*
    *930 F.3d 950 (8th Cir. 2019)*........................................................................................35

*Gomez v. St. Vincent Health, Inc.,*
    *649 F.3d 583 (7th Cir. 2011)*........................................................................................22

*Isby v. Bayh,*
    *75 F.3d 1191 (7th Cir. 1996)*........................................................................................23

*Lane v. Facebook, Inc.,*
    696 F.3d 811 (9th Cir. 2012) ...................................................27

*Mullins v. Direct Digital, LLC,*
    795 F.3d 654 (7th Cir. 2015) ...........................................12, 20, 21

*Patel v. Facebook, Inc.,*
    932 F.3d 1264 (9th Cir. 2019) ...................................................16

*Retired Chi. Police Ass'n v. City of Chi.,*
    7 F.3d 584 (7th Cir. 1993) ...................................................15

*Sosa v. Onfido, Inc.,*
    8 F.4th 631 (7th Cir. 2021) ...................................................17

*Spano v. The Boeing Co.,*
    633 F.3d 574 (7th Cir. 2011) ...................................................14

*Suchanek v. Sturm Foods, Inc.,*
    764 F.3d 750 (7th Cir. 2014) ...............................................13, 20

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) ...................................................23

*Williams v. Rohm & Haas Pension Plan,*
    658 F.3d 629 (7th Cir. 2011) ...................................................37

**United States District Court Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.,*
    No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) ...........................25

*Adkins v. Facebook, Inc.,*
    No. 18-cv-05982-WHA (N.D. Cal. May 6, 2021) ...................................................2

*Barnes v. Air Line Pilots Ass'n, Int'l,*
    310 F.R.D. 551 (N.D. Ill. 2015) ...........................................12, 19, 20

*Bernal v. NRA Grp. LLC,*
    318 F.R.D. 64 (N.D. Ill. 2016) ...........................................19, 20

*Charvat v. Valiente,*
    No. 12-cv-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) ...........................30

*Cornejo v. Amcor Rigid Plastics USA, LLC,*
    No. 1:18-cv-07018 (N.D. Ill. Sept. 10, 2020) ...................................................37

*Crumpton v. Haemonetics Corp.*,
    No. 1:21-cv-1402 (N.D. Ill.) .......................................................................29

*Davis v. Heartland Employment Servs.*,
    No. 19-cv-00680 (N.D. Ill.) ........................................................................18

*Dixon v. Washington & Jane Smith Cmty.-Beverly*,
    No. 17-cv-8033, 2018 WL 2445292 (N.D. Ill. May 31, 2018)....................32

*Hale v. State Farm Mut. Auto. Ins. Co.*,
    No. 12-0660-DRH, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)...............23

*Hudson v. Libre Tech., Inc.*,
    No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060 (S.D. Cal. 2020) ...........34

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010)............................................................23, 26

*In re Google Buzz Priv. Litig.*,
    No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011).............27

*In re Google LLC Street View Elec. Commc'ns Litig.*,
    No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020).......2

*In re Facebook Biometric Info. Priv. Litig.*,
    326 F.R.D. 535 (N.D. Cal. 2018)........................................................19, 34

*In re Facebook Biometric Info. Priv. Litig.*,
    No. 15-cv-3747-JD, 2021 WL 757025 (N.D. Cal. Feb. 26, 2021) .........9, 16, 17

*In re Toyota Motor Corp. Unintended Acceleration Marketing Litigation*,
    No. 8:10ML 02151 JVS, 2013 WL 3224585 (C.D. Cal. 2013) ...................36

*Jackson v. Nat'l Action Fin. Servs., Inc.*,
    227 F.R.D. 284 (N.D. Ill. 2005).................................................................19

*Goldsmith v. Tech. Sols. Co.*,
    No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ...................33

*Kaufman v. Am. Express Travel Related Servs., Co.*,
    No. 07-CV-1707, 2016 WL 806546 (N.D. Ill. Mar. 2, 2016)......................27

*Lopez-McNear v. Superior Health Linens, LLC*,
    No. 19-cv-2390 (N.D. Ill. Apr. 27, 2021) ..............................................32, 37

*Marsh v. CSL Plasma Inc.,*
    503 F. Supp. 3d 677 (N.D. Ill. 2020) .............................................................33

*Martinez v. Nandos Rest. Grp., Inc.,*
    19-cv-07012 (N.D. Ill. Oct. 27, 2020) ........................................................32

*Muir v. Nature's Bounty (DE), Inc.,*
    No. 15 C 9835, 2018 WL 3647115 (N.D. Ill. Aug. 1, 2018) ...........................14

*Osada v. Experian Info. Sols., Inc.,*
    290 F.R.D. 485 (N.D. Ill. 2012) .............................................................15, 16

*Quiroz v. Revenue Prod. Mgmt., Inc.,*
    252 F.R.D. 438 (N.D. Ill. 2008) .................................................................16

*Ramirez v. GLK Foods, LLC,*
    No. 12-C-210, 2014 WL 2612065 (E.D. Wis. June 11, 2014) ........................20

*Schulte v. Fifth Third Bank,*
    No. 09-CV-6655, 2010 WL 8816289 (N.D. Ill. 2010) ....................................31

*Schulte v. Fifth Third Bank,*
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ......................................................35, 36

*Snyder v. Ocwen Loan Servicing, LLC,*
    No. 14 c 8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019) ..............23, 24, 31

*Starr v. Chi. Cut Steakhouse,*
    75 F. Supp. 3d 859 (N.D. Ill. 2014) ...........................................................15

*Toney v. Quality Res., Inc.,*
    323 F.R.D. 567 (N.D. Ill. 2018) .................................................................21

*Thome v. Novatime Tech., Inc.,*
    No. 19-cv-6256 (N.D. Ill. Mar. 8, 2021) ...............................................2, 9, 28

*Wright v. Nationstar Mortg. LLC,*
    No. 14 C 10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) ........................30

*Young v. Rolling in the Dough, Inc.,*
    No. 1:17-CV-07825, 2020 WL 969616 (N.D. Ill. 2020) ..............................26, 30

*Ziemack v. Centel Corp.,*
    163 F.R.D. 530 (N.D. Ill. Sep. 25, 1995) ....................................................15

**State Supreme Court Cases**

*Rosenbach v. Six Flags Ent. Corp.,*
    129 N.E. 3d 1197 (Ill. 2019) ........................................................5

**State Appellate Court Cases**

*McDonald v. Symphony Bronzeville Park LLC,*
    174 N.E. 3d 578 (Ill. App. Ct.) ...........................................17

*Rottner v. Palm Beach Tan, Inc.,*
    2019 IL App (1st) 180691-U ..............................................17

*Sekura v. Krishna Schaumburg Tan, Inc.,*
    115 N.E. 3d 1080 (Ill. App. Ct.) .......................................17

**State Circuit Court Cases**

*Abusalem v. The Standard Market, LLC,*
    No. 2019 L 000517 ......................................................28, 29

*Carroll v. Crème de la Crème, Inc.,*
    2017-CH-01624 ............................................................2, 27

*Fluker v. Glanbia Performance Nutrition, Inc.,*
    No. 2017-CH-12993 ..........................................................28

*Kusinski v. ADP LLC,*
    2017-CH-12364 .................................................................9

*Licata v. Facebook, Inc.,*
    No. 2015-CH-05427 ..........................................................16

*Marshall v. Lifetime Fitness, Inc.,*
    2017-CH-14262 ............................................................2, 27

*Miracle-Pond v. Shutterfly,*
    2019-CH-07050 ............................................................2, 28

*O'Sullivan, et. al. v. WAM Holdings, Inc.,*
    2019-CH-11575 ................................................................18

*Prelipceanu v. Jumio Corporation,*
    2018-CH-15883 ........................................................2, 9, 28

*Rosenbach v. Six Flags Ent. Corp.*,
　　2016-CH-00013 ...........................................................................................28

*Sekura v. L.A. Tan Enters., Inc.*,
　　2015-CH-16694 ...............................................................................9, 17, 37

*Svagdis v. Alro Steel Corp.*,
　　2017-CH-12566 ...........................................................................................37

*Zepeda v. Intercontinental Hotels Grp., Inc.*,
　　2018-CH-02140 ...........................................................................................37

## Miscellaneous Authority

740 ILCS 14/1 ............................................................................................. *passim*

Ill. House Transcript, 2008 Reg. Sess. No. 276 ................................................4

Fed. R. Civ. P. 23 ....................................................................................... *passim*

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
　　Law360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-
　　powerhouse-edelson-pc ...........................................................................17

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
　　Law360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-
　　Powerhouse-Edelson-PC.pdf ....................................................................17

Grace Dixon Hanson, *Class Action Group Of The Year: Edelson*,
　　Law360 (Dec. 3, 2020), https://www.law360.com/articles/1328395/class-action-group-
　　of-the-year-edelson ...................................................................................17

Joyce Hanson, *Cybersecurity & Privacy Group Of The Year: Edelson*,
　　Law360 (Dec. 8, 2020), https://www.law360.com/articles/1327009/cybersecurity-
　　privacy-group-of-the-year-edelson ...........................................................17

Lauraann Wood, *Illinois Powerhouse: Edelson*,
　　Law360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-
　　edelson .....................................................................................................17

*Law360 Names Practice Groups of the Year*,
　　Law360 (Nov. 29, 2020), https://www.law360.com/articles/1327476/law360-names-
　　practice-groups-of-the-year.......................................................................17

Matt Marshall, *Pay By Touch In Trouble, Founder Filing For Bankruptcy*,
　　Venture Beat, available at http://goo.gl/xT8HZW .........................................3

Meg Marco, *Creepy Fingerprint Pay Processing Company Shuts Down*,
　　Consumerist, available at https://goo.gl/rKJ8oP .................................................3

*Privacy Statement,*
　　Octopharma Plasma, available at https://octapharmaplasma.com/home/privacy (last
　　accessed Nov. 1, 2021) .....................................................................................10

1 Newberg on Class Actions
　　§ 3:56 (5th ed. 2011) ........................................................................................22

2 Newberg on Class Actions
　　§ 4:72 (5th ed. 2011) ........................................................................................20

4 Newberg on Class Actions
　　§ 13:1 (5th ed. 2011) .........................................................................................23
　　§ 13:53 (5th ed. 2011) ..................................................................................35, 36

5 Newberg on Class Actions
　　§ 15:83 (5th ed. 2011) ......................................................................................37

## I.  INTRODUCTION

Nearly two years ago, Plaintiff Mary Crumpton ("Plaintiff") brought this putative class action against Defendant Octapharma Plasma, Inc. ("Defendant" or "Octapharma") under the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.* Plaintiff alleged Octapharma violated BIPA by collecting her and thousands of other Illinois blood plasma donors' fingerprints through its finger-scanning donor identification system without providing them the requisite disclosures or obtaining informed written consent.[1] After intensely litigating this case—which included Plaintiff moving to strike Octapharma's key affirmative defenses, extensive fact discovery (including third-party discovery, the review of tens of thousands of pages of documents, and two depositions), and a formal mediation with the Honorable James F. Holderman (Ret.) of JAMS in Chicago—the Parties have reached a class-wide settlement that, if approved, will provide outstanding monetary relief to the Settlement Class.[2] Octapharma has agreed to pay $9,987,380.00 into a non-reversionary Settlement Fund to be distributed to the Settlement Class comprised of 76,826 Illinois blood plasma donors, who, like Plaintiff, were required to scan their finger at Illinois Octapharma facilities before donating plasma. Each Settlement Class Member who files a valid Claim Form will be entitled to a *pro rata* share of the Settlement Fund, which assuming a claims rate of 10 to 20%, will amount to payments of approximately $400 to $800 each after costs and any fees are deducted.

Compared against other privacy cases, this Settlement provides an exceptional amount of monetary relief to Class Members. Many privacy cases have historically been settled for very

---

[1]    Plaintiff and Octapharma are referred to individually as "Party" and collectively referred to as the "Parties."

[2]    The capitalized terms used in this motion are those used in the Stipulation of Class Action Settlement (the "Settlement" or "Agreement"), attached hereto as Exhibit 1.

little meaningful monetary relief, if any is provided to the class at all, which is a trend that unfortunately continues. *E.g.*, *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL 1288377, at \*11–14 (N.D. Cal. Mar. 18, 2020) (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of Electronic Communications Privacy Act); *Adkins v. Facebook, Inc.*, No. 18-cv-05982-WHA, dkts. 350, 369 (N.D. Cal. May 6, 2021) (approving settlement for injunctive relief only, in class action arising out of Facebook data breach, and granting $6.5 million in attorneys' fees and costs). This has been the case in BIPA settlements, too. *E.g.*, *Carroll v. Crème de la Crème, Inc.*, 2017-CH-01624 (Cir. Ct. Cook Cnty. June 25, 2018) (providing only credit monitoring). Other BIPA settlements have capped monetary relief at a certain amount, with the inevitable remaining settlement funds reverting to the defendant. *E.g.*, *Marshall v. Lifetime Fitness, Inc.*, 2017-CH-14262 (Cir. Ct. Cook Cnty.) ($270 per claimant with credit monitoring, reverting funds to defendant). Even compared against the better BIPA settlements of this size, involving tens of thousands of class members and establishing a non-reversionary settlement fund, this Settlement's $9,987,380 fund for 76,826 class members far exceeds its predecessors. *See, e.g.*, *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately 260,000 class members); *Miracle-Pond v. Shutterfly*, 2019-CH-07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ($6.75 million fund for potentially millions of class members); *Thome v. NOVAtime Tech., Inc.*, No. 19-cv-6256, dkt. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for 62,000 class members, and assignment of insurance policy).

Finally, on top of providing excellent monetary relief, this Settlement preserves all claims against Octapharma's third-party software provider, Haemonetics Corporation, who Plaintiff alleges—and discovery has confirmed—stored the class's biometric data without donors'

knowledge or consent. Haemonetics is *not* released by this Settlement, and Plaintiff and the Class may still pursue their BIPA claims against Haemonetics (either as part of ongoing class litigation against Haemonetics or otherwise). This Settlement provides excellent monetary relief without releasing those separate claims.

Given the relief proposed by the Settlement Agreement, the Court should not hesitate to find that the Settlement is well within the range of possible approval. Accordingly, Plaintiff respectfully requests that the Court grant her motion for preliminary approval in its entirety, certify the proposed Settlement Class, appoint her attorneys as Class Counsel, direct that the proposed Notice be disseminated to the Settlement Class, and set a Final Approval Hearing.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Illinois' Biometric Information Privacy Act

A brief history and overview of BIPA gives further context to the reasonableness of the proposed Settlement. In the early 2000s, a company called Pay By Touch began installing fingerprint-based checkout terminals at grocery stores and gas stations in major retailers throughout the State of Illinois to facilitate consumer transactions. (First Amended Complaint, ("FAC"), dkt. 65 ¶¶ 13–14.) The premise was simple: swipe your credit card and let the machine scan your index finger, and the next time you buy groceries or gas, you won't need to bring your wallet—you'll just need to provide your fingerprint. But by the end of 2007, Pay By Touch had filed for bankruptcy. (*Id.* ¶ 14.) When Solidus, Pay By Touch's parent company, began shopping its database of Illinois consumers' fingerprints as an asset to its creditors, a public outcry erupted.[3] Though the bankruptcy court eventually ordered Pay By Touch to destroy its database

---

[3]    *See, e.g.*, Meg Marco, *Creepy Fingerprint Pay Processing Company Shuts Down*, CONSUMERIST, available at https://goo.gl/rKJ8oP (last accessed Nov. 1, 2021); Matt Marshall, *Pay By Touch In Trouble, Founder Filing For Bankruptcy*, VENTURE BEAT, available at http://goo.gl/xT8HZW (last accessed Nov. 1, 2021).

of fingerprints (and their ties to credit card numbers), the Illinois legislature took note of the grave dangers posed by the irresponsible collection and storage of biometric data without any notice, consent, or other protections. *See* Ill. House Transcript, 2008 Reg. Sess. No. 276.

Recognizing the "very serious need" to protect Illinois citizens' biometric data—which includes retina scans, fingerprints, voiceprints, and scans of hand or face geometry—the Illinois legislature unanimously passed BIPA in 2008 to provide individuals recourse when companies fail to appropriately handle their biometric data in accordance with the statute. (*See* FAC ¶ 15; 740 ILCS 14/5.) Thus, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ."

740 ILCS 14/15(b). BIPA also establishes standards for how companies must handle Illinois consumers' biometric data, requiring companies to develop and comply with a written policy establishing a retention schedule and guidelines for permanently destroying biometric data. 740 ILCS 14/15(a). BIPA also prohibits companies from disclosing or disseminating biometric data except with consent or under limited circumstances. 740 ILCS 14/15(d). To enforce the statute, BIPA provides a civil private right of action and allows for the recovery of statutory damages in the amount of $1,000 for negligent violations—or $5,000 for willful violations—plus costs and reasonable attorneys' fees. *See* 740 ILCS 14/20.

As the Illinois Supreme Court assessed the legislature's intent in passing BIPA, the statute:

> vests in individuals and customers the right to control their biometric information by requiring notice before collection and giving them the power to say no by withholding consent. . . . These procedural protections are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused. When a private entity fails to adhere to the statutory procedures . . . the right of the individual to maintain her biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized. This is no mere technicality. The injury is real and significant.

*Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019) (internal citations and quotations omitted).

### B. Plaintiff's Allegations and Defendant's Finger-Scanning Donor Management System

Plaintiff is a former blood plasma donor at one of Octapharma's plasmapheresis facilities located in Illinois. (FAC ¶ 31.) She alleges that, when she first visited Octapharma to donate plasma, Octapharma required her—and all other plasma donors—to scan her fingerprint to enroll her in Octapharma's donor management system, and to subsequently use her fingerprint to be identified before each blood plasma donation. (*Id.* ¶¶ 32–33.) Plaintiff alleges that, in requiring her to do so, Octapharma collected her biometric fingerprint information, stored it in its database, and further disclosed it to third-party Haemonetics Corporation—the provider of the software running on Octapharma's donor management system—to be stored on Haemonetics' server. (*Id.* ¶¶ 31–33.) Plaintiff alleges that Octapharma failed to comply with BIPA's requirements when it collected her fingerprint data. (*Id.* ¶¶ 31–33.) Specifically, she alleges that Octapharma violated section 15(a) of BIPA by (i) failing to develop a data-retention policy and guidelines for permanently destroying biometric data, (ii) failing to publicly disclose any such policy, and (iii) failing to comply with any such policy. (*Id.* ¶¶ 27, 35, 45–46, 49–50.) Plaintiff further alleges

5

that Octapharma violated section 15(b) of BIPA by collecting, using, and storing its donors'
biometric data without obtaining informed written consent. (*Id.* ¶¶ 36, 54, 57–60.) And finally,
Plaintiff alleges that Octapharma violated section 15(d) of BIPA by disclosing her and other
donors' biometric data to Haemonetics without obtaining consent to do so. (*Id.* ¶¶ 28, 37 64, 67–
69.) Octapharma, for its part, denies that it has engaged in any wrongdoing or that it is subject to
BIPA. (*See* Def.'s Am. Ans., dkt. 66.)

### C.     Litigation, Negotiation, and Settlement

Plaintiff originally filed this putative class action against Octapharma on December 2,
2019, in the Circuit Court of Cook County, Illinois, alleging that Octapharma had violated
sections 15(a) and (b) of BIPA. Octapharma then removed the case to this Court (dkt. 1), and
answered the complaint, denying liability and asserting twelve affirmative defenses (dkt. 16).

On June 18, 2020, Plaintiff moved to strike Defendant's first and second affirmative
defenses, including that BIPA is preempted by federal law and that Octapharma is exempt from
BIPA because (i) certain of its records-keeping obligations are subject to HIPAA, (ii) the
biometric data it collected was from "patient[s] in a health care setting," and (iii) the biometric
data was used to "further validate scientific testing or screening." (Dkt. 43.) After full briefing,
on January 19, 2021, the Court granted Plaintiff's motion in part, striking Defendant's first
affirmative defense (federal preemption) with prejudice, and striking parts of its second
affirmative defense (related to HIPAA and validating scientific testing or screening) without
prejudice. (Dkt. 58.) The Court denied Plaintiff's motion with respect to Defendant's "patient in
a health care setting" defense. (*Id.*)

On February 5, 2021, Plaintiff filed an amended complaint based on what she learned in
discovery, adding a claim against Defendant under section 15(d) of BIPA for the disclosure of

her and the class's biometric data to Haemonetics Corporation without their consent. (*See* FAC.)
Defendant answered Plaintiff's amended complaint on February 26, 2021, denying liability and
again asserting several affirmative defenses.

Throughout the case, the Parties engaged in significant written and oral fact discovery.
The Parties first exchanged initial disclosures pursuant to the Mandatory Initial Discovery Pilot
("MIDP") program, with Plaintiff serving her disclosures on March 3, 2020, and Defendant
serving its disclosures on June 8, 2020, and a supplement to its initial disclosures on June 18,
2021. On June 15, 2020, Plaintiff served her first set of written discovery requests on Defendant,
who initially responded and produced documents on August 27, 2020, and made eight
supplemental document productions thereafter, between October 22, 2020 and July 12, 2021.
Defendant also served written discovery requests on Plaintiff on August 7, 2020, to which
Plaintiff timely responded.

In Defendant's discovery responses and production, it identified third parties
Haemonetics Corporation and Fulcrum Biometrics, Inc.—two providers of the relevant software
involved in the finger-scanning devices at issue—prompting Plaintiff to serve third-party
subpoenas to both entities. Both Haemonetics and Fulcrum Biometrics responded to Plaintiff's
subpoena and produced relevant documents. After reviewing their production, Plaintiff served a
second set of written discovery requests to Defendant, to which Defendant timely responded.

With written discovery largely complete, the Parties commenced oral discovery.
Defendant deposed Plaintiff Mary Crumpton on June 8, 2021, and Plaintiff deposed one of
Defendant's Rule 30(b)(6) representatives on June 23, 2021. Plaintiff also noticed the
depositions of two Octapharma employees and served a subpoena for the deposition of
Haemonetics Corporation, which was scheduled to take place on September 14, 2021.

Meanwhile, following the Court's January 19, 2021 ruling on Plaintiff's motion to strike (dkt. 58), the Parties began to explore the potential for a class-wide settlement. (Declaration of Schuyler Ufkes ("Ufkes Decl."), attached hereto as Exhibit 2, at ¶ 3.) Plaintiff served her initial settlement demand to Defendant on June 2, 2021, and after several telephone conferences between counsel for the Parties, the Parties agreed in early August 2021 to participate in a formal mediation. (*Id.*) On August 26, 2021, the Parties attended a full-day, formal mediation session via Zoom with the Honorable James F. Holderman (Ret.) of JAMS in Chicago. (*Id.*) The Parties settlement negotiations lasted throughout the day—and into the next day for Octapharma's corporate representatives joining from in Heidelberg, Germany, given the time difference—with the Parties ultimately executing a binding Memorandum of Understanding at the end of the session that evening. (*Id.*) The Parties then prepared and negotiated the final terms of the settlement over the next month and a half, resulting in the final executed Settlement Agreement now before the Court. (*Id.*)

## III.     TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement are set forth in the Stipulation of Class Action Settlement, and are briefly summarized here:

### A.     Class Definition

The proposed Settlement Class includes all persons who scanned their finger and provided an Illinois address at an Octapharma plasma donation facility located in Illinois between December 2, 2014 and February 4, 2020. (Agreement § 1.26.) Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this action and members of their families, (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, (3) persons who

properly execute and file a timely request for exclusion from the Settlement Class, and (4) the

legal representatives, successors, heirs, or assigns of any such excluded persons (*Id.*)

## B. Settlement Payments

The Settlement provides that Octapharma will establish a $9,987,380.00 non-reversionary

Settlement Fund from which each Settlement Class Member who submits a valid claim will be

entitled to a *pro rata* portion after payment of Settlement Administration Expenses, attorneys'

fees and costs, and any incentive award, if approved by the Court. (*Id.* §§ 1.12, 1.28, 1.29,

2.1(a).) Based on claims rates in similar BIPA class settlements, which typically range between

10-20%,[4] Class Counsel estimate that each Class Member who submits a claim will receive a net

payment of approximately $400 to $800. Any uncashed checks or electronic payments unable to

be processed within 90 days of issuance will, subject to Court approval, be provided to the

American Civil Liberties Union of Illinois, earmarked to support its Government Accountability

and Personal Privacy efforts (a non-profit organization that advocates to protect Illinoisans'

privacy rights) as *cy pres* recipient, or any alternative *cy pres* recipient the Court may select. (*Id.*

§ 2.1(h).) No portion of the Settlement Fund will revert back to Defendant. (*Id.* § 1.28.)

## C. Prospective Relief

On February 4, 2020—about a month after Plaintiff filed this suit—Octapharma

implemented a nationwide Biometric Data Policy that (1) informs donors that Octapharma

collects and stores their biometric data, the purposes for which it collects their biometric data,

---

[4]    *See In re Facebook Biometric Info. Priv. Litig.*, No. 15-cv-3747-JD, 2021 WL 757025, at
*1 (N.D. Cal. Feb. 26, 2021)* (22% claims rate, class size of 6.9 million); *Sekura v. L.A. Tan
Enters., Inc.*, 2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016) (15% claims rate, class size of
37,822); *Kusinski v. ADP LLC*, 2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) (13%
claims rate, class size of 320,000); *Thome*, No. 19-cv-6256, dkt. 90 (10% claims rate, class size
of 62,000); *Prelipceanu*, 2018-CH-15883 (5% claims rate, class size of 260,000).

and to whom it discloses their biometric data, (2) requires that donors provide written consent before providing their finger scan, and (3) establishes a retention and deletion policy for biometric data, which is available on Octapharma's website.[5] Under the Settlement, Octapharma has formally agreed maintain its informed written consent program and publicly-available retention and deletion policy for biometric data going forward. (Agreement § 2.2.) Finally, Octapharma has agreed to destroy the biometric data of past Illinois donors in its possession who have not visited an Octapharma facility in three or more years. (*Id.*)

### D.     Payment of Settlement Notice and Administrative Costs

Defendant has agreed to pay from the Settlement Fund all expenses incurred by the Settlement Administrator in, or relating to, administering the Settlement, providing Notice, creating and maintaining the Settlement Website, receiving and processing Claim Forms, dispersing Settlement Payments, and any other related expenses. (*Id.* § 1.24.)

### E.     Payment of Attorneys' Fees, Costs, and Incentive Award

Defendant has agreed that Class Counsel are entitled to reasonable attorneys' fees in an amount to be determined by the Court by petition. (*Id.* § 8.1.) Proposed Class Counsel has agreed to limit its request for fees to 35% of the Settlement Fund, with no consideration from Defendant and no "clear-sailing agreement" so Defendant may challenge the amount requested. (*Id.*) Defendant has also agreed to pay Plaintiff an incentive award in the amount of $5,000 from the Settlement Fund, subject to Court approval, in recognition of her efforts as Class Representative. (*Id.* § 8.2.) Plaintiff will move for these payments via a separate request after preliminary approval.

---

[5]     *See Privacy Statement,* available at https://octapharmaplasma.com/home/privacy (last accessed Nov. 1, 2021)

### F.    Release of Liability

In exchange for the relief described above, the Settlement Class Members will release Octapharma Plasma, Inc., and its related entities from all claims relating to Octapharma's alleged collection, possession, capture, purchase, receipt through trade, obtaining, sale, profit from, disclosure, redisclosure, dissemination, storage, transmittal, and/or protection from disclosure of biometric data through the use of finger scanners or kiosks at Octapharma's Illinois facilities. (*Id.* §§ 1.20, 1.21, 3.) Haemonetics Corporation—the third-party software provider to whom Octapharma allegedly disclosed biometric data—is explicitly excluded from the Settlement and release. (*Id.* § 1.21.)

## IV.    THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES

Before the Court can preliminarily approve the proposed Settlement and direct notice to the Settlement Class, it must certify the class for settlement purposes, which requires a finding that the Court "will likely be able to certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). District courts are given broad discretion to determine whether class certification is appropriate. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

To merit certification, the Settlement Class must first satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *see Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460 (2013). Additionally, because the Settlement provides for monetary relief, the Settlement Class must also satisfy the requirements of Rule 23(b)(3): that (i) common questions of law or fact predominate over individual issues and (ii) a class action is the superior device to resolve the claims. *Amchem*, 521 U.S. at 615–16. Finally, a certified class must be ascertainable; that is, "defined clearly and

based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

As explained below, the proposed Settlement Class satisfies all the Rule 23(a) and 23(b)(3)

prerequisites and is ascertainable, and thus, should be certified for settlement purposes.

### A. The Numerosity Requirement is Satisfied.

A class action may proceed when the proposed class "is so numerous as to render joinder

impractical." Fed R. Civ. P. 23(a)(1). "A plaintiff need not plead or prove the exact number of

class members to establish numerosity under Rule 23(a)(1), and the court may make common

sense assumptions to determine numerosity." *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D.

551, 557 (N.D. Ill. 2015) (citing collected Seventh Circuit cases). While there is no magic

number at which joinder becomes unmanageable, courts have typically found that numerosity is

satisfied when the class comprises forty (40) or more people. *See*, *e.g.*, *id.* (certifying class of 120

members). Here, the Settlement Class includes 76,826 class members, and the numerosity

requirement is easily met.

### B. Common Issues of Fact and Law Predominate.

Rule 23(a)(2) instructs that a class may be certified only if there exist "questions of law

or fact common to the class." Fed. R. Civ. P. 23(a)(2). Where, as here, the class seeks monetary

relief, the common questions must "predominate over any questions affecting only individual

members." Fed. R. Civ. P. 23(b)(3). *See also* *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374

(7th Cir. 2015) ("[T]he question of commonality and predominance overlap in ways that make

them difficult to analyze separately."). Common questions are those "capable of class-wide

resolution" such "that determining the truth or falsity of the common contention will resolve an

issue that is central to the validity of each claim." *Id.* (citing *Wal-Mart v. Dukes*, 564 U.S. 338,

350 (2011)). "What matters to class certification . . . [is] the capacity of a class-wide proceeding

to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (internal quotations omitted). As such, "the critical point is the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (internal quotations omitted). When "the defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found." *Id.* But when "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members," class treatment is appropriate. *Id.*

Here, common issues of law and fact certainly predominate. Plaintiff's and the proposed Settlement Class's claims are based upon the same common contention and course of alleged conduct by Octapharma: that it allegedly violated BIPA by collecting, storing, and disclosing the Settlement Class's biometric data without obtaining informed written consent or establishing and abiding by a publicly-available retention policy. (*See* FAC ¶¶ 49–50, 57–60, 67–69.) This contention raises several issues of law and fact common to the Settlement Class, including: (1) whether the biometric data collected by Octapharma constitutes "biometric identifiers" or "biometric information" (as defined by 740 ILCS 14/10) subject to BIPA; (2) whether Octapharma properly informed Plaintiff and the Settlement Class of its purposes for collecting, using, and storing their biometric data, 740 ILCS 14/15(b); (3) whether Octapharma obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Settlement's Class's biometric data, *id.*; (4) whether Octapharma developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric data, 740 ILCS 14/15(a); (5) whether Octapharma complied with any such written policy (if one existed), (6) whether Octapharma used Plaintiff's and the Settlement Class's fingerprints to identify them, (7) whether Octapharma disclosed Plaintiff's and the

13

Settlement Class's biometric data to Haemonetics, and (8) whether Octapharma's alleged violations of BIPA were committed negligently or recklessly, 740 ILCS 14/20 (providing $1,000 in damages per negligent violation or $5,000 in damages per willful violation). Even Octapharma's prime defense that it is exempt from BIPA because the biometric data it collected was collected from a "patient in a health care setting" can be resolved on a class-wide basis— either all of Octapharma's donors are "patients" under BIPA or they are not, and either Octapharma is a "health care setting" under BIPA or it is not. 740 ILCS 14/10.

Because answering each of these questions would resolve all Class Members' claims in one stroke, and no individualized issues (to the extent there are any) could defeat this overwhelming commonality, predominance is satisfied. *See Muir v. Nature's Bounty (DE), Inc., No. 15 C 9835, 2018 WL 3647115, at *9 (N.D. Ill. Aug. 1, 2018)* (predominance requires that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating individual issues.") (internal quotations omitted).

### C.    The Typicality Requirement is Satisfied.

The next prerequisite—typicality—requires that a class representative has claims that are typical of those of the putative class members. Typicality examines whether there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co., 633 F.3d 574, 586 (7th Cir. 2011)*. Where a named plaintiff's claim "arise[s] from the same events or course of conduct that gives rise to the putative class members' claims," typicality is satisfied. *Beaton v. SpeedyPC Software, 907 F.3d 1018, 1026 (7th Cir. 2018)*. In other words, when the basis of the suit is the defendant's systematic business practices toward the named plaintiff and the members of the proposed class, typicality is generally satisfied.

Here, there is nothing separating Plaintiff's BIPA claim from that of any other member of the Settlement Class. She alleges that, like every other member, that she (i) visited an Octapharma plasmapheresis facility in Illinois, (ii) was required by Octapharma to scan her finger, (iii) was identified by Octapharma's donor management system each time she scanned her finger, (iv) had her fingerprint data transmitted to Haemonetics to be stored, and (v) was never given any BIPA-compliant notices, disclosures, or requests for consent from Octapharma to collect her biometric data. (*See* FAC ¶¶ 31-37.)

Because she was subject to the same conduct and practices by Octapharma as everyone else, Plaintiff's BIPA claims will "stand or fall on the same facts as the claims of the putative class members." *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 534 (N.D. Ill. Sep. 25, 1995). Plaintiff's claims are therefore typical of the Settlement Class's claims.

### D. The Adequacy Requirement is Satisfied.

The final Rule 23(a) prerequisite—adequacy—requires a finding that the class representative has and will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is twofold: "adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest[s] of the class members." *Starr v. Chi. Cut Steakhouse*, 75 F. Supp. 3d 859, 874 (N.D. Ill. 2014) (quoting *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584 (7th Cir. 1993)). To assess adequacy, courts examine whether "the named plaintiff has [(1)] antagonistic or conflicting claims with other members of the class; or (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) has counsel that is competent, qualified, experienced and able to vigorously conduct the litigation." *Osada v. Experian Info. Sols., Inc.*, 290 F.R.D. 485,

490 (N.D. Ill. 2012) (quoting *Quiroz v. Revenue Prod. Mgmt., Inc.*, 252 F.R.D. 438, 442 (N.D. Ill. 2008)) (quotation marks omitted).

Here, both Plaintiff and proposed Class Counsel have and will continue to adequately represent the Settlement Class. Because Plaintiff suffered the same alleged injury as every other member of the Settlement Class—the collection, storage, and disclosure of her biometric data without her informed written consent during the class period (FAC ¶¶ 34–37)—her interest in redressing Octapharma's alleged violations of BIPA is identical to the interests of all other members of the Settlement Class. Thus, Plaintiff does not have any interests antagonistic to those of the Settlement Class. Consequently, Plaintiff's interests are entirely representative of and consistent with the interests of the Settlement Class.

Additionally, proposed Class Counsel Edelson PC have extensive experience in litigating class actions of similar size, scope, and complexity to the instant action. Edelson PC is a national leader in high stakes' plaintiffs' work ranging from class and mass actions to public client investigations and prosecutions. (*See* Firm Resume of Edelson PC, attached as Exhibit 2-A to Ufkes Decl.) The firm holds records for the largest jury verdict in a privacy case ($925 million), the largest consumer privacy settlement ($650 million), and the largest Telephone Consumer Protection Act ("TCPA") settlement ($76 million). (*Id.*) The firm filed the first-ever class action under BIPA against Facebook, *Licata v. Facebook, Inc.*, No. 2015-CH-05427 (Cir. Ct. Cook Cnty. Apr. 1, 2015), secured the first-ever adversarially-certified BIPA class in that case and defended the ruling in the Ninth Circuit, *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1277 (9th Cir. 2019) (upholding adversarial BIPA class certification), *cert. denied Facebook, Inc. v. Patel*, 140 S. Ct. 937 (2020), and obtained final approval of a settlement agreement with Facebook to resolve the case for $650 million. *In re Facebook Biometric Info. Priv. Litig.*, 2021 WL 757025,

at *1 ("Overall, the settlement is a major win for consumers in the hotly contested area of digital privacy."). The firm is responsible for the first-ever BIPA settlement, too, *see Sekura*, 2015-CH-16694, and has paved the way to many of the favorable appellate decisions for BIPA plaintiffs. *Sekura v. Krishna Schaumburg Tan, Inc.*, 115 N.E. 3d 1080, 1098 (Ill. App. Ct.) (pre-*Rosenbach*, holding violation of statute sufficient for plaintiff to be "aggrieved"); *Rottner v. Palm Beach Tan, Inc.*, 2019 IL App (1st) 180691-U (violation of statute sufficient to claim liquidated damages); *McDonald v. Symphony Bronzeville Park LLC*, 174 N.E.3d 578, 586 *appeal allowed,* 163 N.E.3d 746 (Ill. 2021) (holding that the exclusivity provisions of the Illinois Workers' Compensation Act ("IWCA") do not bar employee BIPA claims against employers); *Sosa v. Onfido, Inc.*, 8 F. 4th 631 (7th Cir. 2021) (affirming district court's denial of motion to compel arbitration).

The firm was recognized by Law360 as a "Practice Group of the Year" for 2020 in two categories—Class Action and Cybersecurity[6]—and for three years running as an "Illinois Powerhouse," alongside Kirkland & Ellis, Sidley Austin, Mayer Brown, Dentons, and Jenner & Block.[7] Edelson has been the only plaintiffs' firm, as well the only firm with fewer than 100 attorneys, to make the latter list. Proposed Class Counsel have diligently investigated, prosecuted, and dedicated substantial resources to the claims in this action and will continue to

---

[6]     *Law360 Names Practice Groups of the Year*, LAW360 (Nov. 29, 2020), https://www.law360.com/articles/1327476/law360-names-practice-groups-of-the-year; Grace Dixon Hanson, *Class Action Group Of The Year: Edelson*, LAW360 (Dec. 3, 2020), https://www.law360.com/articles/1328395/class-action-group-of-the-year-edelson; Joyce Hanson, *Cybersecurity & Privacy Group Of The Year: Edelson*, LAW360 (Dec. 8, 2020), https://www.law360.com/articles/1327009/cybersecurity-privacy-group-of-the-year-edelson.

[7]     Lauraann Wood, *Illinois Powerhouse: Edelson*, LAW360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-edelson; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-powerhouse-edelson-pc; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-Powerhouse-Edelson-PC.pdf.

do so throughout its pendency. (Ufkes Decl. ¶ 6.)

Proposed Class Counsel Fish Potter Bolaños, P.C. is a deeply experienced class action and employment law firm. (*See* Declaration of David Fish ("Fish Decl."), attached hereto as Exhibit 3, at ¶ 3.) With respect to BIPA litigation, its attorneys have been involved in over 75 cases and have helped recover tens of millions of dollars for Illinois residents. *See, e.g.*, *O'Sullivan, et. al. v. WAM Holdings, Inc.*, 2019-CH-11575 (Cir. Ct. Cook Cnty.) ($5.85 million); *Davis v. Heartland Emp. Servs.*, No. 19-cv-00680, dkt. 130 (N.D. Ill.) ($5.4 million); *Johnson v Resthaven/Providence Life Servs.*, 2019-CH-1813 (Cir. Ct. Cook Cnty.) ($3 million); *Burlinski v. Top Golf USA,* No. 19-cv-06700, dkt. 103 (N.D. Ill.) ($2.6 million); *Diller v. Ryder Integrated Logistics*, 2019-CH-3032 (Cir. Ct. Cook Cnty.) ($2.25 million); *Jones v. Rosebud Rests., Inc.* 2019 CH 10620 (Cir. Ct. Cook Cnty.) ($2.1 million). Their work has been, and will continue to be, directly beneficial to the claims of Plaintiff and the Settlement Class through the pendency of this action.

Accordingly, because Plaintiff will fairly and adequately protect the interests of the class, and because she and the Settlement Class are amply represented by qualified counsel, the adequacy requirement is satisfied.

### E. A Class Action is a Superior Method of Resolving the Controversy.

Rule 23(b)(3) additionally requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule sets forth four criteria germane to this requirement. All counsel in favor of certification.

The first factor, individual class members' interest in individually controlling the action, Fed. R. Civ. P. 23(b)(3)(A), weighs in favor of certification. There is no indication any Class Member has brought an individual BIPA suit against Octapharma and, given Plaintiff's

allegation that Octapharma did not institute any BIPA-specific policies or develop written materials for individuals addressing their statutory rights, (FAC ¶¶ 26–30.), it's likely that "many class members may be unaware of their rights under [BIPA]." *Bernal v. NRA Grp. LLC*, 318 F.R.D. 64, 76 (N.D. Ill. 2016). Both considerations support the notion that class members' interests in individual suits is minimal. *Id.* Further, while BIPA provides for statutory damages, the relatively modest recovery ($1,000 or $5,000, depending on whether a violation is negligent or reckless), compared to the high costs of retaining adequate counsel "is not likely to provide sufficient incentive for members of the proposed class to bring their own claims." *Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284, 290 (N.D. Ill. 2005) (discussing the FDCPA's $1,000 statutory damages provision); *see also In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 549 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264, *cert. denied*, *Facebook Inc. v. Patel*, 140 S. Ct. 937 ("While not trivial, BIPA's statutory damages are not enough to incentivize individual plaintiffs given the high costs of pursuing discovery on Facebook's software and code base and Facebook's willingness to litigate the case.").

The second factor, the extent and nature of other proceedings, Fed. R. Civ. P. 23(b)(3)(B), also weighs in favor of certification. There are no other known actions that have progressed to any extent addressing the conduct alleged here. Thus, "'the extent and nature of any litigation concerning the controversy already begun by or against class members' is not a factor" counseling against certification. *Bernal*, 318 F.R.D. at 76 (quoting Fed. R. Civ. P. 23(b)(3)(B)).

Third, it is desirable to concentrate the litigation—and to undergo the settlement approval process—in this forum, *see* Fed. R. Civ. P. 23(b)(3)(C), given that this case concerns a proposed class of plaintiffs who scanned their fingers at Octapharma facilities throughout Illinois. *Barnes,*

19

310 F.R.D. at 562 (third factor met where defendant conducted business and the events giving rise to plaintiffs' claims occurred within the court's district); *Ramirez v. GLK Foods, LLC*, No. 12-C-210, 2014 WL 2612065, at *9 (E.D. Wis. June 11, 2014) (events in forum giving rise to lawsuit support concentration in the forum).

Finally, the fourth factor—"the likely difficulties in managing a class action," Fed. R. Civ. P. 23(b)(3)(D)—also weighs in favor of certification, as no management problems ought to arise here. There is clear predominance of common issues, as explained above, and every member of the Settlement Class has been identified through Octapharma's records, with a mailing address for every one of them, streamlining the notice process. *Bernal*, 318 F.R.D. at 76; 2 NEWBERG ON CLASS ACTIONS § 4:72 (5th ed. 2011) ("Courts generally hold that if the predominance requirement is met, then the manageability requirement is met, as well."). Thus, consolidating Class Members' claims in one proceeding will generate economies of time and expense and promote legal uniformity.

More generally, Rule 23's superiority standard requires that the court recognize "the costs *and benefits* of the class device." *Mullins*, 795 F.3d at 663 (emphasis in original). Here, requiring individual cases "would make no sense," because "each class member here would entail the same discovery and require multiple courts to weigh the same factual and legal bases for recovery." *Bernal*, 318 F.R.D. at 76. The class action device, on the other hand, allows the Court to swiftly evaluate common issues surrounding Octapharma's alleged violations of BIPA in a single proceeding, generating a uniform result that will apply to all similarly situated persons. *Suchanek*, 764 F.3d at 759 (stating that "promot[ing] uniformity of decision as to persons similarly situated" is a goal of class actions) (quoting *Amchem*, 521 U.S. at 615). Without class-wide adjudication of these claims, tens of thousands of donors would have to sue

one-by-one to recover on these relatively modest individual claims. *See* 740 ILCS 14/20(1). The cost of litigating BIPA claims on an individual basis—including the cost of discovery, motion practice, and trial—would be prohibitively expensive. Moreover, such individual claims would clog the courts with an influx of separate actions, further delaying the possibility of relief. Rule 23's superiority requirement is therefore satisfied.

### F. The Class Is Ascertainable.

Finally, the proposed Settlement Class definition meets Rule 23's implicit requirement of "ascertainability," which "requires that a class . . . be defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. "Whether a class is ascertainable depends on 'the adequacy of the class definition itself,' not 'whether, given an adequate class definition, it would be difficult to identify particular members of the class,'" although Plaintiff here would meet both standards. *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 581 (N.D. Ill. 2018) (citing *Mullins*, 795 F.3d at 658).

Here, the Settlement Class definition is based solely on objective criteria: either an individual (i) scanned their finger at an Octapharma plasma donation facility located in Illinois, and (ii) provided Octapharma an Illinois address, (iii) between December 2, 2014 and February 4, 2020, or they did not. (Agreement § 1.26.) Moreover, Settlement Class members can be readily identified through Octapharma's records. (*See id.* § 7.2.) Because the class is "defined clearly [and] membership [is] defined by objective criteria," it is ascertainable. *Mullins*, 795 F.3d at 657.

For these reasons, maintenance of this action as a class action is appropriate. The Court should therefore certify the Settlement Class for settlement purposes.

## V.       PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [with the] ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the Court considers proposed Class Counsel's: (1) work in identifying or investigating the potential claim, (2) experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (3) knowledge of the applicable law, and (4) resources that it will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv).

As discussed above,[8] proposed Class Counsel have extensive experience in litigating consumer privacy class actions in general, and BIPA class actions specifically; have thoroughly investigated the claims at issue; and have the resources necessary to conduct this litigation. (*See* Ufkes Decl. ¶ 2.) And because of their efforts here, proposed Class Counsel have secured a Settlement that provides excellent monetary relief and the prospective relief necessary to protect the privacy interests of past, present, and future plasma donors. Thus, the Court should appoint J. Eli Wade-Scott and Schuyler Ufkes of Edelson PC and David Fish of Fish Potter Bolaños, P.C. as Class Counsel.

## VI.      THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

Rule 23(e) requires judicial approval of all proposed class action settlements. The procedure for review of a proposed class action settlement is a familiar two-step process— preliminary and final approval—which was codified under Rule 23(e) relatively recently. Fed. R.

---

[8]        Courts frequently analyze counsel's adequacy under both 23(a)(4) and 23(g), which is why it is discussed twice here. 1 NEWBERG ON CLASS ACTIONS § 3:56 (5th ed.); *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592–93 (7th Cir. 2011), *as modified* (Sept. 22, 2011) (reviewing counsel's adequacy under Rule 23(a)(4) but mentioning the Rule 23(g) factors in its analysis).

Civ. P. 23(e)(1)-(2) (eff. Dec. 1, 2018); *see* 4 NEWBERG ON CLASS ACTIONS § 13:1 (5th ed.). The

first step—preliminary approval—is a pre-notification inquiry to determine whether the court

"will likely be able to approve the proposal under Rule 23(e)(2)," finding that it is sufficiently

fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(1)(B). In other words, at this stage, the Court

needs to determine whether the proposed settlement is "within the range of possible approval"

such that there is "reason to notify the class members of the proposed settlement and to proceed

with a fairness hearing." *Gautreaux v. Pierce*, 690 F.2d 616, 621 & n.3 (7th Cir. 1982). Once

preliminary approval is granted, class members are notified of the settlement, and the court and

parties proceed to the second step: the final fairness determination. *Id.* at 621.

While "[f]ederal courts naturally favor the settlement of class action litigation," a multi-

factor test must be used to determine whether the proposed settlement is likely to be found fair,

reasonable, and adequate. *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D.

330, 345 (N.D. Ill. 2010) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)) (internal

quotations omitted). Rule 23(e)(2) directs courts to consider whether: (1) the class representative

and class counsel have adequately represented the class; (2) the settlement was negotiated at

arm's-length; (3) the settlement treats class members equitably relative to each other; and (4) the

relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2); *see*, *e.g.*, *Snyder v. Ocwen Loan

Servicing, LLC*, No. 14 c 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019).[9]

---

[9]     Notably, the factors to be considered under the amended Rule 23 "overlap with the
factors previously articulated by the Seventh Circuit, which include: (1) the strength of the
plaintiff's case compared to the terms of the settlement; (2) the complexity, length, and expense
of continued litigation; (3) the amount of opposition to the settlement; (4) the presence of
collusion in gaining a settlement; (5) the stage of the proceedings and the amount of discovery
completed." *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at
*2 (S.D. Ill. Dec. 16, 2018) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d
646, 653 (7th Cir. 2006)); *see also* Fed. R. Civ. P. 23, Advisory Committee's Note to 2018

The proposed Settlement in this case—which creates a $9,987,380.00 non-reversionary fund for the 76,826 class members, allows them to retain their BIPA claims against Haemonetics, and ensures Octapharma will comply with BIPA going froward—easily satisfies these factors.

### A. Plaintiff Mary Crumpton and Proposed Class Counsel Have Adequately Represented the Settlement Class.

The first Rule 23(e)(2) factor considers whether the class representative and class counsel have adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). The focus of this analysis is "on the actual performance of counsel acting on behalf of the class" throughout the litigation and in settlement negotiations. Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment; *see Gumm v. Ford*, No. 5:15-cv-41-MTT, 2019 WL 479506, at *3 (M.D. Ga. Jan. 17, 2019). In considering this factor, courts are to examine whether plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account (i) the nature and amount of discovery completed, whether formally or informally, and (ii) the "actual outcomes" of other, similar cases. Fed. R. Civ. P. 23(e) Advisory Committee's Note to 2018 Amendment. Ultimately, this factor is generally satisfied where the named plaintiff participated in the case diligently, and where class counsel fought hard on behalf of plaintiff and the class throughout the litigation. *See Snyder*, 2019 WL 2103379, at *4.

Here, Plaintiff Crumpton has been involved in nearly every aspect of this case, including by helping her attorneys investigate her BIPA claims, preparing and reviewing both the Class Action Complaint and First Amended Complaint before filing, reviewing and approving her

---

Amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). For this reason, decisions prior to the amendment can still provide guidance to the Court.

MIDP responses, responding to Octapharma's interrogatories, sitting for her deposition, conferring with her counsel throughout the litigation, and reviewing and approving the Settlement Agreement before signing it. (Ufkes Decl. ¶ 5.) Even beyond this case, Ms. Crumpton has sought to protect the interests of her fellow class members, by filing an amicus brief in *Bryant v. Compass Group USA, Inc.*, urging the Seventh Circuit to find that a company's unlawful collection of biometric data without consent is a concrete injury-in-fact supporting Article III standing for BIPA plaintiffs. *See* Brief of Amica Curiae, No. 20-1443, 2020 WL 1695584 (7th Cir. Mar. 20, 2020). Without Ms. Crumpton stepping up to represent the class—in this litigation and elsewhere—and taking on these tasks as the lead plaintiff, the relief secured for the Settlement Class wouldn't have been possible. Given her efforts and aligned interest with the class, there can be no doubt that Ms. Crumpton has only acted in the best interest of the Settlement Class and has adequately represented them.

Likewise, proposed Class Counsel's performance in this case demonstrates that their representation has been beyond adequate, especially when considering (i) the amount and quality of discovery conducted and (ii) the benefits of the Settlement compared to similar privacy settlements, including those under BIPA. First, the considerable amount of written and oral discovery completed by Plaintiff's counsel ensured that they had adequate information to assess the strength of the case and engage in settlement discussions. *See* *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at *8 (N.D. Ill. July 26, 2011) (the standard "is not whether it is conceivable that more discovery could possibly be conducted" but whether the court and parties have enough information "to evaluate the merits of this case"). Once the parties exchanged their MIDP initial disclosures, Plaintiff's counsel pressed forward with written discovery as soon as possible, serving her first set of written discovery requests a week later and

promptly moving to compel timely responses to them. (Dkt. 48.) Defendant first responded to Plaintiff's requests on August 27, 2020, and thereafter made eight supplemental productions, producing over 43,000 pages of documents and ESI in total. Plaintiff's counsel also subpoenaed and received documents from third parties Haemonetics Corporation (the provider of the donor management software running on Octapharma's finger-scanning kiosks) and Fulcrum Biometrics, Inc. (the provider of the "VeriFinger" software that performed fingerprint identification) and served a second set of interrogatories and document requests on Defendant. With written discovery nearly complete, Plaintiff deposed one of Octapharma's Rule 30(b)(6) witnesses on June 23, 2021. After over a year of investigation and discovery, the facts underlying Plaintiff's allegations in this case, though by no means their legal import, are now substantially undisputed: Octapharma used a finger-scanning donor management system to identify its donors without obtaining any written consent forms related to biometric data or making the disclosures mandated by BIPA and sent its donors' biometric data to Haemonetics to be stored. *See Young v. Rolling in the Dough, Inc.*, No. 1:17-CV-07825, 2020 WL 969616, at *5 (N.D. Ill. Feb. 27, 2020) (approving settlement after it was reached as a result of "contested litigation for nearly two years" and the parties had "exchanged sufficient information to fully evaluate the claims and defenses asserted in the case."); *In re AT & T Mobility*, 270 F.R.D. at 350 (approving settlement where "the focus of th[e] litigation appears to be more on legal than factual issues, and there is no indication that [more] formal discovery would have assisted the parties in devising the [p]roposed [s]ettlement [a]greement").

In short, the issues in this litigation have crystallized sufficiently for Plaintiff and her counsel to assess the strengths and weaknesses of their negotiating position (based upon the litigation to date, the anticipated outcomes of further fact discovery and expert discovery, and

additional motion practice) and evaluate the appropriateness of any proposed resolution. *See Kaufman v. Am. Express Travel Related Servs., Co.*, No. 07-CV-1707, 2016 WL 806546, at *10 (N.D. Ill. Mar. 2, 2016) (concluding that "extensive formal discovery, when measured against the cost that would be incurred," would not place the parties in a better position than they are now to determine an appropriate settlement value).

Second, the monetary relief achieved by Plaintiff's counsel in the Settlement excels in comparison to other statutory privacy settlements, including many BIPA settlements. Octapharma has agreed to settle this case for $9,987,380.00 for a class of approximately 76,826 individuals that will be split equally—with no reversion to Octapharma—between claiming Class Members. (*See* Agreement § 1.28.) Assuming a claims rate of 10-20%, the Settlement will result in a *net* payment (meaning after all fees and costs are deducted) of approximately $400 to $800 per Class Member. This amount dwarfs the amounts recovered in many other statutory privacy class actions, particularly against a backdrop where settlements have commonly secured no relief to the Class or only *cy pres* relief. *See*, *e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012) (resolving tens of millions of claims under the Electronic Communications Privacy Act ["ECPA"] for a $9.5 million *cy pres*-only settlement—amounting to pennies per class member—where $10,000 in statutory damages were available per claim); *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3–5 (N.D. Cal. June 2, 2011) (resolving tens of millions of claims, again under the ECPA, for $8.5 million *cy pres*-only settlement). Some BIPA settlements, too, have depressed the amount defendants have to pay with credit monitoring, caps on the amount claiming class members can recover, and reversion of unclaimed funds. *E.g.*, *Carroll*, 2017-CH-01624 (credit monitoring only); *Marshall*, 2017-CH-14262 (paying a cap of $270 to individuals who filed claims and reverting the remainder to

defendant). Even when comparing against other BIPA settlements with class sizes in the tens of thousands of people, like this one, the per-person relief provided by this Settlement far exceeds the rest. *See Prelipceanu*, 2018-CH-15883 ($7 million fund for approximately 260,000 class members); *Miracle-Pond*, 2019-CH-07050 ($6.75 million fund for potentially millions[10] of class members); *Thome*, No. 19-cv-6256, dkt. 90 ($4.1 million fund for approximately 62,000 class members, and assignment of insurance policy); *Rosenbach v. Six Flags Ent. Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. May 14, 2021) (preliminarily approving $36 million fund for approximately 1,110,000 class members, and capping class member payments at $200 or $60 depending on date of finger scan). Using any metric, the relief secured by this Settlement—approximately $400 to $800 per claiming Class Member—is extraordinary, especially for a BIPA case of this magnitude.

Critically, while paying Settlement Class Members hundreds of dollars for their claims against Octapharma, the Settlement does *not* release the third-party software provider, Haemonetics, who Octapharma has admitted stored the very biometric data at issue. (Agreement § 1.21 ("Released Parties shall not include Haemonetics Corporation and/or its parents, affiliates, and subsidiaries.").) Nearly every BIPA settlement to date involving a third-party technology provider storing the biometric data at issue has released the technology provider along with the defendant for *no* evident value at all. *But see Fluker v. Glanbia Performance Nutrition, Inc.*, No. 2017-CH-12993 (Cir. Ct. Cook. Cnty.) (carving out third-party vendor, ADP, from release in BIPA settlement secured by Edelson PC); *Abusalem v. The Standard Mkt., LLC*, No. 2019 L

---

[10]    The settlement papers submitted in *Shutterfly* represented that there were approximately 954,000 class members, but that number only counted Shutterfly *users* in Illinois; it did not include the vast number of *non-users* who appeared in users' photographs uploaded to Shutterfly and who were included in the settlement class definition.

000517 (Cir. Ct. DuPage Cnty.) (carving out third-party vendor, Ceridian HCM, Inc., from release in BIPA settlement secured by Fish Potter Bolaños, P.C.). The monetary relief to the Class is even more exceptional when viewed as a release of one set of BIPA claims, rather than the two sets that most preceding settlements have released. The Class here has the opportunity to recover against Haemonetics through putative class litigation against Haemonetics—which is already ongoing, *see Crumpton v. Haemonetics Corp.*, No. 1:21-cv-1402 (N.D. Ill.)—or otherwise.

Finally, aside from the monetary relief, the non-monetary benefits created by the Settlement also demonstrate Plaintiff's and proposed Class Counsel's outstanding representation of the class. (*See* Agreement § 2.2.) Octapharma has established—no doubt a result of Plaintiff filing this lawsuit—a publicly-available retention and destruction schedule for biometric data and a nationwide consent program at all of its plasma donation facilities requiring donors to provide informed written consent for the collection of their fingerprint data before they can scan their finger. Under the Settlement, Octapharma has formally agreed to maintain and comply with these policies going forward and has further agreed to delete any biometric data of past Illinois donors in its possession who have not visited an Octapharma facility in three years or more. This prospective relief aligns perfectly with both the goals of BIPA and those of this lawsuit, as it will ensure that past, current, and future Illinois donors are protected as the legislature intended.

If the Settlement is approved, the Settlement Class will reap its valuable benefits thanks to Plaintiff's and proposed Class Counsel's hard work pursuing this case and representing their interests. This factor is well satisfied.

**B.     The Settlement Was Reached as a Result of Arm's-Length Negotiations Between the Parties.**

The second Rule 23(e)(2) factor looks to whether the parties negotiated the settlement at arm's-length. Fed. R. Civ. P. 23(e)(2)(B). The answer here is easy: yes. Unlike many class action settlements "in which settlement negotiations begin before discovery even takes place," this case was contested through an adversarial and contentious process. *Charvat v. Valente*, No. 12-cv-05746, 2019 WL 5576932, at *5 (N.D. Ill. Oct. 28, 2019). After actively litigating the case for nearly two years—which included fully briefing Plaintiff's motion to strike, conducting substantial written discovery (both between the Parties and with the two relevant third-party software providers), and taking the depositions of both Plaintiff and a Rule 30(b)(6) representative of Defendant—the Parties agreed that it was an appropriate time to explore meaningful settlement discussions. *See Wright v. Nationstar Mortg. LLC*, No. 14 C 10457, 2016 WL 4505169, at *11 (N.D. Ill. Aug. 29, 2016) (finding no collusion or unfairness where "the parties have vigorously defended their positions throughout the litigation, participated in two prior mediations, and engaged in discovery" prior to reaching settlement). These discussions ultimately led to a full-day, private meditation with Judge James F. Holderman (Ret.) of JAMS Chicago on August 26, 2021. (Ufkes Decl. ¶ 3.) With the assistance of Judge Holderman, the Parties reached agreement on the material points of the settlement at the end of the session and executed a binding Memorandum of Understanding that evening. (*Id.*) The Parties then spent the next month and a half drafting and negotiating the finer deal points of the final Settlement Agreement before executing it on October 20, 2021. (*Id.*) *See Young*, 2020 WL 969616, at *4 (finding the settlement agreement is "clearly" the product of arm's-length negotiations after it was agreed to after a contested motion, extensive discovery and discovery disputes, and a settlement conference).

The arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, provides significant cash payments to Settlement Class Members who submit a simple Claim Form, and contains no provisions that might suggest fraud or collusion, such as "clear sailing" or "kicker" clauses regarding attorneys' fees. *See Snyder*, 2019 WL 2103379, at *4 (approving settlement where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's length negotiation").

For these reasons, there should be no question that the Settlement here was the result of good-faith, arm's-length negotiations and is entirely free from fraud or collusion. *See Schulte v. Fifth Third Bank*, No. 09-CV-6655, 2010 WL 8816289, at *4 n.5 (N.D. Ill. Sept. 10, 2010) (noting that courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered").

### C. The Settlement Treats All Settlement Class Members Equally.

The next Rule 23(e)(2) factor considers whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Here, given that each Class Member has nearly identical BIPA claims for monetary and injunctive relief against Octapharma, the proposed Settlement treats each of them identically. In terms of monetary relief, Octapharma has agreed to create a $9,987,380.00 non-reversionary Settlement Fund, from which each Class Member who submits a valid Claim Form will receive a single, *pro rata* cash payment. (Agreement §§ 1.28, 1.29, 2.1); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (where class members are similarly situated with similar claims, equitable treatment is "assured by straightforward pro rata distribution of the limited fund"). The Settlement also provides for identical prospective relief requiring Octapharma to maintain its nationwide consent

program and retention schedule for biometric data going forward, in a uniform manner.

(Agreement § 2.2.) Further, each Class Member will release the same BIPA claims against

Octapharma, and all will retain their claims against Haemonetics. (*Id.* §§ 1.20, 1.21, 1.22, 3.1.)

Likewise, the provision of a service award to Ms. Crumpton for serving as Class

Representative is consistent with the equitable treatment of class members. The requested $5,000

service award is not only modest relative to the $9.987 million Settlement Fund Ms. Crumpton

has helped secure for the Settlement Class, it also reflects the work she's done for the Settlement

Class, which as described above, included reviewing and approving the pleadings, providing

MIDP responses, conferring with her counsel regularly, answering interrogatories, and sitting for

her deposition. Moreover, an award of this size is squarely in line with, and in many instances

lower than, other service awards given to class representatives in BIPA cases. *See Lopez-McNear*

*v. Superior Health Linens, LLC*, No. 19-cv-2390, dkt. 69 (N.D. Ill. Apr. 27, 2021) (Pallmeyer, J.)

($5,000 service award); *Martinez v. Nandos Rest. Grp., Inc.*, 19-cv-07012, dkt. 63 (N.D. Ill. Oct.

27, 2020) ($7,500 service award) (Ellis, J.); *Dixon v. Washington & Jane Smith Cmty.-Beverly*,

No. 17-cv-8033, dkt. 103 (N.D. Ill. May 31, 2018) ($10,000 service award) (Kennelly, J.). Given

that Ms. Crumpton's efforts were key to securing the $9.987 million Settlement Fund for the

Settlement Class, the modest proposed service award is fully consistent with equity.

Because the Settlement treats each member of the Settlement Class equitably, this factor

is well satisfied.

### D. The Relief Secured for the Settlement Class Is Adequate and Warrants Approval.

The final and most substantive factor under Rule 23(e)(2) examines whether the relief

provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making this determination,

Rule 23 instructs courts to consider several sub-factors, including (i) the cost, risks, and delay of

trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreements made in connection with the proposed settlement. *Id.* As explained below, each of these sub-factors demonstrate that the relief provided by the Settlement is excellent—well beyond adequate—and should be approved.

> 1. **The cost, risk, and delay of further litigation compared to the Settlement's benefits favors final approval.**

In evaluating the adequacy of the relief provided to the class, courts should first compare the cost, risks, and delay of pursing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 amendment.

The Settlement here warrants approval because it provides immediate relief to the Settlement Class while avoiding potentially years of complex litigation and appeals and the risk that comes along with it. *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995) ("As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later."). As discussed above, Octapharma's primary defense is relatively unique in BIPA litigation: that the biometric data it allegedly collected is exempt from BIPA because, according to Octapharma, it was captured from "patient[s] in a health care setting." *See* 740 ILCS 14/10 (excluding from the definition of "biometric identifier" any "information captured from a patient in a health care setting"). While Plaintiff is confident she and other plasma donors were not "patients" of Octapharma and that Octapharma is not a "health care setting" withing the meaning of BIPA, and both discovery and recent case law support Plaintiff's position, *see Marsh v. CSL Plasma Inc.*, 503 F. Supp. 3d 677, 683 (N.D. Ill. 2020), she recognizes there is a not insignificant risk of litigating the issue in this Court and on appeal with de novo review. And though the Court already struck several of

Octapharma's other defenses, including that BIPA is preempted by federal law and that the biometric data Octapharma collected is exempt from BIPA because it was used to "further validate scientific testing or screening" and because certain of Octapharma's records are subject to HIPAA, Defendant was expected to appeal these issues had Plaintiff prevailed at summary judgment or trial. Additionally, Octapharma (like nearly every other BIPA defendant) was likely to argue that the information captured by its fingerprint scanners were not actually "biometric identifiers" or "biometric information" subject to BIPA, but some third category of finger scan information outside of BIPA's purview. Plaintiff again puts little stock in this argument, but it would need to be defeated at summary judgment or trial and remains an issue ungoverned by precedent.

Likewise, the Parties also would have been forced to litigate the issue of class certification adversarially. *See* Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 Amendment (instructing courts to consider the likelihood of certifying the class for litigation in evaluating this sub-factor); *see also Hudson v. Libre Tech., Inc*., No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060, at *6 (S.D. Cal. May 13, 2020) ("Proceeding in this litigation in the absence of settlement poses various risks such as failing to certify a class."). Although Plaintiff believes this case is amenable to class certification given Defendant's uniform conduct, *see In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. at 549 (certifying Rule 23(b)(3) class of Facebook users in Illinois for whom Facebook created and stored a face template), and that she would ultimately prevail on certification issues, that process is by no means risk-free. This Settlement provides excellent relief to the Settlement Class Members now, avoiding years of delay to resolve these questions.

Even if Plaintiff had succeeded at class certification, summary judgment and/or trial, Plaintiff expects that Defendant would have re-raised its arguments requesting a reduction in damages based on due process in light of the significant potential statutory damages at issue. (Dkt. 66 at 33); *see, e.g.*, *Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) (statutory award in TCPA class action of $1.6 billion reduced to $32 million). Given the significant exposure that Octapharma faced, it is an essentially foregone conclusion that these issues would be pressed on appeal, further delaying relief.

Protracted litigation would also consume significant resources, including the time and costs associated with oral discovery, securing expert testimony on complex biometric and data storage issues, and again, motion practice, trial, and any appeals. It is possible that "this drawn-out, complex, and costly litigation process . . . would provide Class Members with either no in-court recovery or some recovery many years from now[.]" *In re AT & T Sales Tax Litig.*, 789 F. Supp. 2d 935, 964 (N.D. Ill. 2011). Because the proposed Settlement offers immediate—and substantial—monetary relief to the Settlement Class while avoiding the need for extensive and drawn-out litigation, preliminary approval is appropriate. *See*, *e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 2. The method of distributing relief to the Settlement Class Members is effective and supports preliminary approval.

The next sub-factor evaluates whether the settlement's proposed method of distributing relief to the class is effective. Fed. R. Civ. P. 23(e)(2)(C)(ii). An effective distribution method "get[s] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible" while also ensuring that only "legitimate claims" are paid. 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed.). Courts have held that requiring a claimant to fill

out a short and simple claim form is an appropriate way to balance these concerns, especially in settlements with non-reversionary funds. *See In re Toyota Motor Corp. Unintended Acceleration Mktg. Litig.*, 2013 WL 3224585, at *18 (C.D. Cal. June 17, 2013) ("The requirement that class members download a claim form or request in writing a claim form, complete the form, and mail it back to the settlement administrator is not onerous."); *Schulte*, 805 F. Supp. 2d at 591 ("[T]he Court has reviewed the claim form and concludes that it is not unduly burdensome, long, or complex. All information called for on the form is required of the claims administrator in order for it to process claims."); 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed.).

The proposed Settlement here satisfies this factor by relying on well-established, effective methods for processing Class Members' Claim Forms and distributing the proceeds of the Settlement. The Settlement Fund will be distributed to Class Members who submit a short and simple Approved Claim Form, by mail or online, to the Settlement Administrator—an independent third party with extensive experience handling the administration of settlement funds. (Agreement §§ 1.25, 1.5, 2.1, 5.1.) Each person in the Settlement Class will be sent a paper Claim Form in the mail, attached to the direct notice, and will have the option to alternatively file their claim online through the Settlement Website. The online Claim Form also lets Class Members select to receive their Settlement Payment by Venmo, Zelle, Paypal, Prepaid Mastercard, ACH Direct Deposit, or check. (*Id.* § 1.5.) The Settlement Administrator will provide Class Members with resources (including a website, mailing address, and toll-free phone number) to contact the Settlement Administrator or Class Counsel directly, review and process the Claim Forms, and then disperse to Class Members their *pro rata* share of the Settlement Fund upon approval of the Court. (*Id.* §§ 1.29, 2.1, 5.1.) This distribution method is effective and supports approval.

### 3.    The terms of the requested attorneys' fees are reasonable.

The third and final relevant sub-factor[11] considers the adequacy of the relief provided to the class taking into account "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). If the Settlement is preliminarily approved, proposed Class Counsel plans to petition the Court for an award of reasonable attorneys' fees after the Settlement Class has received notice of the Settlement. The Settlement's contemplated method of calculating attorneys' fees (i.e., the percentage-of-the-fund method), and its limit on attorneys' fees (i.e., no more than 35% of the non-reversionary Settlement Fund) is reasonable and predicated on the outstanding relief provided to the Settlement Class. (Agreement § 8.1.) In fact, the percentage-of-the-fund method has been used to determine a reasonable fee award in every BIPA class action settlement creating a common fund to date, and a 35% award will adequately capture the hypothetical *ex ante* agreement that the Settlement Class would have entered into with proposed Class Counsel had they sought them out in the market, given the risks in the case. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011); *e.g.*, *Lopez-McNear*, No.19-cv-2390, dkt. 69 (awarding 35% of fund); *Cornejo v. Amcor Rigid Plastics USA, LLC*, No. 1:18-cv-07018, dkt. 57 (N.D. Ill. Sept. 10, 2020) (awarding 35% of fund); *Sekura*, 2015-CH-16694 (awarding 40% of fund); *Zepeda v. Intercontinental Hotels Grp., Inc.*, 2018-CH-02140 (Cir. Ct. Cook Cnty.) (awarding 40% of fund); *Svagdis v. Alro Steel Corp.*, 2017-CH-12566 (Cir. Ct. Cook Cnty.) (awarding 40% of fund); *see also* 5 NEWBERG ON CLASS ACTIONS § 15:83 (5th ed.) (noting that, generally, "50% of the fund is the upper limit on a

---

[11]    The fourth sub-factor, which requires the parties to identify any side agreements made in connection with the settlement, Fed. R. Civ. P. 23(e)(2)(C)(iv), is not applicable here as the written Settlement Agreement provided to the Court represents the entirety of the Parties' proposed Settlement. (Ufkes Decl. ¶ 4.) Since there are no side agreements to be identified, this sub-factor weighs in favor of preliminary approval.

reasonable fee award from any common fund"). Accordingly, that the Settlement permits the

Court to award 35% of the fund in attorneys' fees is more than appropriate.[12] Finally, if

approved, the Settlement provides that attorneys' fees will be paid within five business days after

final judgment, including any appeals. (Agreement §§ 1.13, 8.1.) These terms are reasonable and

should be preliminarily approved.

For these reasons, Plaintiff and proposed Class Counsel submit that the monetary and

prospective relief provided by the Settlement weighs heavily in favor of a finding that it is fair,

reasonable, and adequate, and well within the range of possible approval. The Court should grant

preliminary approval.

## VII.  THE PROPOSED NOTICE PLAN SHOULD BE APPROVED IN FORM AND SUBSTANCE

Rule 23 and Due Process require that for any "class proposed to be certified for purposes

of settlement under Rule 23(b)(3)[,] the court must direct to class members the best notice

practicable under the circumstances, including individual notice to all members who can be

identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin,*

*417 U.S. 156, 173 (1974)*. Rule 23(e)(1) similarly provides that "[t]he court must direct notice in

a reasonable manner to all class members who would be bound by a [proposed settlement,

voluntary dismissal, or compromise.]" Fed. R. Civ. P. 23(e)(1). Notice may be provided to the

class via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P.

23(c)(2)(B) (eff. Dec. 1, 2018). The substance of the notice to the Settlement Class must describe

in plain language the nature of the action, the definition of the class to be certified, the class

claims and defenses at issue, that class members may enter an appearance through counsel if so

---

[12]     To be clear, Defendant may oppose the amount of attorneys' fees requested by proposed Class Counsel, as there is no "clear-sailing" provision in the Agreement. (Agreement § 8.1.)

desired, that class members may request to be excluded from the Settlement Class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

Here, the Settlement contemplates a comprehensive Notice Plan that will send direct notice to *every* member of the Settlement Class, given that Octapharma has a U.S. mail address for every Settlement Class member and an email address for some. First, Octapharma will provide the Settlement Administrator a list of all names, last known U.S. mail addresses, and email addresses (to the extent available) of all persons in the Settlement Class (the "Class List"). (Agreement § 4.1(a).) Once the Class List is provided, the Settlement Administrator will update the addresses through the National Change of Address database and send direct Notice by e-mail to all members of the Settlement Class for whom a valid e-mail address is identified in Defendant's records. (*Id.* § 4.1(b); *see* Exhibit 1-B.) If no e-mail address is available for any class members, or if any e-mail transmissions result in "bounce-backs," the Settlement Administrator will send those class members direct Notice by First Class U.S. Mail, which will include a fold-over postcard Claim Form attached. (*Id.* § 4.1(b); *see* Exhibit 1-A.) If any Notice by mail is returned as undeliverable, the Settlement Administrator will forward it to any forwarding addresses provided by the U.S. Postal Service, and if none are provided, the Settlement Administrator will perform skip traces to attempt to obtain the most recent addresses for such Settlement Class Members. (*Id.* §§ 4.1(b); 5.1(c).)

All of the Notice documents are written in plain, easily-understood language. To ensure a comprehensive Notice, the email and mail Notice will direct class members to a Settlement Website, which will provide class members 24-hour access to further information about the case, including important court documents and a detailed "long form" Notice document, and will allow class members to submit claims forms online. (*Id.* §§ 1.3, 1.5, 1.30, 4.1(b), 5.1(e); *see*

Exhibit 1-C.) Supporting the mail notices and Settlement Website will be a toll-free telephone line through which class members can contact Class Counsel and the Settlement Administrator to obtain additional information about the Settlement. (*Id.* § 5.1(f).) Finally, Defendant will provide notice of the Settlement to the appropriate state and federal officials as required by the Class Action Fairness Act, 28 U.S.C. § 1715. (*Id.* § 4.1(b)(iv).)

Because the proposed Notice Plan effectuates direct Notice to all Settlement Class Members identified through Octapharma's records and fully apprises Settlement Class members of their rights, it comports with both Rule 23 and Due Process. Consequently, the Court should approve the Parties' proposed Notice Plan.

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order (i) granting preliminary approval of the Parties' proposed Class Action Settlement Agreement, (ii) certifying the proposed Settlement Class for settlement purposes, (iii) approving the form and content of the Notice to the members of the Settlement Class, (iv) appointing Plaintiff Mary Crumpton as Class Representative, (v) appointing J. Eli Wade-Scott and Schuyler Ufkes of Edelson PC and David Fish of Fish Potter Bolaños, P.C. as Class Counsel, (vi) scheduling a final fairness hearing in this matter, and (vii) providing such other and further relief as the Court deems reasonable and just.[13]

---

[13]      Plaintiff intends to submit a proposed Preliminary Approval Order for the Court's convenience and to propose future case deadlines.

Respectfully submitted,

**MARY CRUMPTON,** individually and on behalf of all others similarly situated

Dated: November 3, 2021

By: /s/ Schuyler Ufkes
       One of Plaintiff's attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

David J. Fish
dfish@fishlawfirm.com
FISH POTTER BOLAÑOS, P.C.
200 East 5th Avenue, Suite 123
Naperville, Illinois 60563
Tel.: 630.355.7590
Fax: 630.778.0400