**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

MARY CRUMPTON, individually and on
behalf of the Settlement Class,

                    Plaintiff,

    v.

OCTAPHARMA PLASMA, INC., a
Wisconsin limited liability company,

                    Defendant.

No. 19-cv-8402

Hon. Virginia M. Kendall

**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW
FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

## TABLE OF CONTENTS

I.     **INTRODUCTION**....................................................................................................1

II.    **BACKGROUND** ...................................................................................................2

     A.    **BIPA and the Underlying Claims** ...................................................3

     B.    **Litigation History and the Work Performed for the Settlement Class**............5

     C.    **The Settlement Secures Excellent Relief for the Settlement Class** .................10

III.   **ARGUMENT**.......................................................................................................11

     A.    **The Requested Attorneys' Fees Are Reasonable, Fall Within the Market Rate for Similar Services, and Should Be Approved** .......................................12

          1.    **Percentage-of-the-fund should be used to determine fees here** ...........14

          2.    **A one-third fee award is appropriate here** .............................................16

               a.    *This case presented serious obstacles to recovery, and Class Counsel litigated the case mindful of the possibility that the Class might recover nothing* .................................................................17

               b.    *Class Counsel achieved an excellent result for the Class*............20

     B.    **The Court Should Approve the Requested Incentive Award.** ........................21

IV.   **CONCLUSION** ...................................................................................................22

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)..................................................................... 12

*Frank v. Gaos,*
    139 S. Ct. 1041 (2019)................................................................. 20

**United States Circuit Court of Appeals Cases**

*Americana Art China, Co., Inc. v. Foxfire Printing & Packaging Inc.,*
    743 F.3d 243 (7th Cir. 2014) ................................................. 14, 20

*Bryant v. Compass Grp. USA, Inc.,*
    No. 20-1443, 2020 WL 1695584 (7th Cir. Mar. 20, 2020)................ 5

*Bryant v. Compass Grp. USA, Inc.,*
    958 F.3d 617 (7th Cir. May 5, 2020) ........................................... 5

*Bryant v. Compass Grp. USA, Inc.,*
    No. 20-1443, 2020 WL 6534581 (7th Cir. June 30, 2020)................ 6

*Cook v. Niedert,*
    142 F.3d 1004 (7th Cir. 1998) ............................................... 15, 21

*Fox v. Dakkota Integrated Sys., LLC,*
    980 F.3d 1146 (7th Cir. 2020) ..................................................... 6

*Golan v. FreeEats.com, Inc.,*
    930 F.3d 950 (8th Cir. 2019) ...................................................... 19

*In re Cont'l Ill. Sec. Litig.,*
    962 F.2d 566 (7th Cir.1992) ...................................................... 13

*In re Google Referrer Header Privacy Litig.,*
    869 F.3d 737 (9th Cir. 2017) ...................................................... 20

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ............................................... *passim*

*Kirchoff v. Flynn,*
    786 F.2d 320 (7th Cir. 1986) ...................................................... 15

*Montgomery v. Aetna Plywood*,
    231 F.3d 399 (7th Cir. 2000) ........................................ 16

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ........................................ 16

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ........................................ 12

*Skelton v. General Motors*,
    860 F.2d 250 (7th Cir. 1988) ........................................ 12

*Sutton v. Bernard*,
    504 F.3d 688 (7th Cir. 2007) .................................... 12, 15

*Taubenfeld v. AON Corp.*,
    415 F.3d 597 (7th Cir. 2005) .............................. 13, 14, 16

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ........................................ 13

## United States District Court Cases

*Adkins v. Facebook, Inc.*,
    No. 18-cv-05982-WHA (N.D. Cal. Nov. 15, 2020) ........................ 20

*Crumpton v. Haemonetics Corp.*,
    No. 1:21-cv-1402 (N.D. Ill.) ........................................ 11

*Davis v. Heartland Emp. Servs.*,
    No. 19-cv-00680 (N.D. Ill. Oct. 25, 2021) ........................... 22

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215 (N.D. Ill. 2016) .................................. 13, 16

*Hale v. State Farm Mutual Auto. Ins. Co.*,
    No. 12-0660-DRH, 2018 WL 6606079 (S.D. Ill. 2018) .................... 15

*Heekin v. Anthem, Inc.*,
    No. 05-1908, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) ............... 14

*In re Cap. One Tel. Consumer Prot. Act Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) .............................. *passim*

*In re Facebook Biometric Info. Privacy Litig.*,
    No. 3:15-CV-03747-JD, 2018 WL 2197546 (N.D. Cal. May 14, 2018) ....... 19

*In re Google LLC Street View Elec. Commc'ns Litig.*,
    No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020) ......................... 20

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015) .................................................................................. 15, 20

*Lopez-McNear v. Superior Health Linens, LLC*,
    No. 19-cv-2390 (N.D. Ill. Apr. 27, 2021) ......................................................................... 22

*Martinez v. Nando's Rest. Grp., Inc.*,
    No. 19-cv-07012 (N.D. Ill. Oct. 27, 2020) ....................................................................... 22

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    678 F. Supp. 2d 806 (E.D. Wis. 2009) ............................................................................. 15

*Norberg v. Shutterfly, Inc.*,
    152 F. Supp. 3d 1103 (N.D. Ill. 2015) ............................................................................. 17

*Williams v. Gen. Elec. Cap. Auto Lease*,
    No. 94-7410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995) ................................................ 15

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ............................................................................. 3, 22

*Thome v. NOVAtime Tech., Inc.*,
    No. 19-cv-6256 (N.D. Ill. Mar. 8, 2021) ......................................................................... 21

**Illinois Supreme Court Cases**

*Rosenbach v. Six Flags Ent. Corp.*,
    2019 IL 123186 ................................................................................................................ 4

**Illinois Circuit Court Cases**

*Carroll v. Crème de la Crème*,
    No. 2017-CH-01624 (Cir. Ct. Cook Cnty.) ...................................................................... 16

*Miracle-Pond v. Shutterfly*,
    2019-CH- 07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ...................................................... 21

*Prelipceanu v. Jumio Corp.*,
    2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ...................................................... 21

*Roach v. Walmart, Inc.*,
    No. 19-CH-01107 (Cir. Ct. Cook Cnty. Ill. June 16, 2021) ............................................ 21

## **Miscellaneous Authority**

740 ILCS 14 ......................................................................................................... *passim*

5 William Rubenstein, NEWBERG ON CLASS ACTIONS
§ 15.83 (5th ed.) ............................................................................................16

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
7 J. Empirical L. Stud. 811 (2010) ............................................................... 15

Fed. R. Civ. P. 23 .................................................................................................. 12

*Privacy Statement*,
https://octapharmaplasma.com/home/privacy ................................................ 11

Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs:
An Empirical Study*, 53 UCLA L. Rev. 1303 (2006) ........................................ 2

## I.     INTRODUCTION

Plaintiff Mary Crumpton ("Plaintiff") brought this putative class action lawsuit, alleging that Defendant Octapharma Plasma, Inc. ("Defendant" or "Octapharma") collected her and thousands of other Illinois plasma donors' fingerprints, which it used to identify them in violation of the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.* Following significant litigation—which included briefing on Plaintiff's Article III standing, Plaintiff moving to strike two of Octapharma's key affirmative defenses, securing tens of thousands of pages of written discovery from both Octapharma and two of its relevant third-party software providers, a Rule 30(b)(6) deposition of Octapharma, and an eight-hour mediation with the Honorable James F. Holderman (Ret.) of JAMS Chicago—Class Counsel was able to secure a remarkably strong settlement. Specifically, the agreement creates a non-reversionary $9,987,380 Settlement Fund, and each Class Member who submits a valid claim will receive a cash payment estimated to be $400 to $800, after any fees and cost are deducted.[1]

The Settlement provides non-monetary relief, too. Octapharma has formally agreed to comply with BIPA's retention policy and consent requirements going forward and has agreed to delete the biometric data of all past Illinois donors who have not visited an Octapharma facility in over three years. Moreover, the Settlement preserves all of the Class's separate BIPA claims against Octapharma's third-party software provider, Haemonetics Corporation, who Plaintiff alleges—and discovery has confirmed—stored the Class's biometric data without their knowledge or consent. That means, the Class stands to receive additional monetary relief, on top of this Settlement, for Haemonetics' collection of the same biometric data, if they are successful

---

[1]     A copy of the parties' Stipulation of Class Action Settlement ("Settlement" or "Agreement") is attached hereto as Exhibit 1. Except as otherwise indicated, all defined terms used herein shall have the same meanings ascribed to them in the Settlement Agreement.

in ongoing class litigation against Haemonetics.

In light of this excellent result, Class Counsel now respectfully moves the Court to award one-third of the Settlement Fund (less the amount paid for notice and the proposed incentive award) as attorneys' fees and expenses for a total of $3,283,907. The requested fee award accurately reflects the fee arrangement that a Class Member would have entered into with Class Counsel had they made an *ex ante* bargain before heading into litigation like this, given the risks in the case. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). Moreover, the requested percentage fee award is well in line with common fund fee awards in BIPA cases in this District (*see* Exhibit 2, Chart 1 (listing 33.3% fee awards in BIPA cases in the Northern District)), and is in fact less as a percentage than that commonly awarded in BIPA cases, (*see id.*, Chart 2 (listing 35% fee awards), Chart 3 (listing 40% fee awards)). As explained further below, Class Counsel's request is reasonable and should be approved.

Plaintiff's requested $5,000 incentive award is similarly reasonable. Incentive awards in class action settlements frequently exceed $10,000. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1348 (2006) (finding that "[t]he average award per class representative was $15,992"). Plaintiff's requested award reflects her participation throughout this case, including in the investigation of the action, litigation, discovery, and the settlement process, and is comfortably in line with what has been awarded in several similar BIPA cases in this District. (*See* Exhibit 2, Chart 4 (listing incentive awards ranging from $5,000 to $10,000 in BIPA cases).) Plaintiff's requested fees and incentive award are reasonable and warrant the Court's approval.

## II. BACKGROUND

A brief summary of the underlying facts and law will lend context to the instant motion

and demonstrate the reasonableness of the requested fees and incentive award.

### A. BIPA and the Underlying Claims

BIPA is landmark privacy law in Illinois, and one of the country's only meaningful regulations on the collection and use of biometric data. Recognizing the "very serious need" to protect Illinois citizens' biometric data—which includes retina scans, fingerprints, voiceprints, and scans of hand or face geometry—the Illinois legislature unanimously passed BIPA in 2008 to provide individuals recourse when companies failed to appropriately handle their biometric data in accordance with the statute. (*See* dkt. 65 ¶ 15; 740 ILCS 14/5.) Thus, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ."

740 ILCS 14/15(b). BIPA also establishes standards for how companies must handle Illinois consumers' biometric identifiers and biometric information. For example, BIPA requires companies to develop and comply with a written policy establishing a retention schedule and guidelines for permanently destroying biometric information. 740 ILCS 14/15(a). Further, BIPA prohibits companies from disclosing or disseminating biometric data except with consent or under limited circumstances. 740 ILCS 14/15(d). As a means of enforcement, BIPA provides a civil private right of action and allows for the recovery of statutory damages in the amount of

$1,000 for negligent violations—or $5,000 for willful violations—plus costs and reasonable attorneys' fees to any person "aggrieved by a violation" of the statute. *See* 740 ILCS 14/20.

As the Illinois Supreme Court assessed the legislature's intent in passing BIPA, the statute:

> vests in individuals and customers the right to control their biometric information by requiring notice before collection and giving them the power to say no by withholding consent. . . . These procedural protections are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused. When a private entity fails to adhere to the statutory procedures . . . the right of the individual to maintain her biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized. This is no mere technicality. The injury is real and significant.

*Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 34 (internal citations and quotations omitted).

This case arises from Plaintiff's experience donating blood plasma at one of Octapharma's facilities in Aurora, Illinois. She claims that Octapharma required her—and all other plasma donors across all of its Illinois facilities—to scan her fingerprint on a fingerprint scanner to enroll in Octapharma's donor identification system, so that Octapharma could identify her by fingerprint prior to each donation. (Dkt. 65 ¶¶ 32–33.) In doing so, Plaintiff alleges that Octapharma not only collected, stored, and used her fingerprint information, but also transmitted it to its third-party software provider Haemonetics Corporation to be stored on Haemonetics' servers. (*Id.* ¶¶ 32–33, 37.) In collecting her fingerprint, Plaintiff alleges that Octapharma violated section 15(a) of BIPA by (i) failing to develop a retention policy and guidelines for permanently destroying biometric data, (ii) failing to publicly disclose any such policy, and (iii) failing to comply with any such policy (by actually deleting the data). (*Id.* ¶¶ 6–7, 23–28, 35, 49–50.) Plaintiff further alleges that Octapharma violated section 15(b) of BIPA by collecting, using,

and storing her and other donors' biometric data without obtaining their informed, written consent. (*Id.* ¶¶ 6, 26, 34, 36, 53–54, 57.) Finally, Plaintiff alleges that Octapharma violated section 15(d) of BIPA by disclosing her biometric data to third-party Haemonetics without her consent. (*Id.* ¶¶ 28, 37, 63–64, 67.)

### B.     Litigation History and the Work Performed for the Settlement Class

Plaintiff Crumpton originally filed her putative class action complaint in the Circuit Court of Cook County, Illinois, on December 2, 2019. Defendant then timely removed the case, (dkt. 1), and answered the complaint on February 3, 2020. (Dkt. 16.)

During the Parties' first status hearing about a week later, the Court questioned whether Plaintiff had Article III standing to pursue her BIPA claims in federal court and requested briefing on the issue. (Dkt. 21.) In Plaintiff's brief, Class Counsel explained that although it was Octapharma's burden to establish federal jurisdiction as the removing party, Plaintiff has Article III standing because the collection and disclosure of her biometric data in violation of BIPA are concrete privacy injuries that have been codified by the legislature, as opposed to mere technical violations of a statute. (Dkt. 24.) After both Parties submitted their briefs, the Court took the issue under advisement pending the resolution of an appeal in *Bryant v. Compass Grp. USA, Inc.*, No. 20-1443, where the Seventh Circuit would decide essentially the same Article III issue. (Dkt. 27.) In the *Bryant* appeal, Class Counsel submitted a brief *amica curiae* on behalf of Plaintiff Crumpton, urging the Seventh Circuit to adopt their position. *See* Brief of Amica Curiae, No. 20-1443, 2020 WL 1695584 (7th Cir. Mar. 20, 2020). On May 5, 2020, the Seventh Circuit initially held that BIPA plaintiffs have Article III standing to pursue claims under section 15(b) for the unlawful collection of their biometric data, but not under section 15(a) for the failure to establish a publicly-available retention policy. *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 626 (7th

Cir. May 5, 2020). Following that decision, Plaintiff promptly moved this Court to sever and remand her section 15(a) claim to state court, while retaining federal jurisdiction over her section 15(b) claim. (Dkt. 34.) Before ruling on Plaintiff's motion to sever and remand, the Seventh Circuit amended its opinion in *Bryant* to clarify that Bryant lacked Article III standing for her section 15(a) claim because she only alleged a failure to develop a retention policy—she did not further allege a failure to comply with such a retention policy, which the Seventh Circuit expressly did not consider in its Article III analysis. *Bryant v. Compass Grp. USA, Inc.*, No. 20-1443, 2020 WL 6534581, at *1 (7th Cir. June 30, 2020). Given the amendment to the *Bryant* opinion along with Plaintiff Crumpton's allegation that Octapharma both failed to establish *and comply with* a BIPA-compliant retention policy, this Court found that Plaintiff has Article III standing to pursue all of her BIPA claims in federal court and, accordingly, denied Plaintiff's motion to sever and remand as moot.[2] (Dkt. 50.)

      With the jurisdictional issues settled, Plaintiff then took the atypical step of moving to strike Octapharma's unique affirmative defenses: that BIPA is preempted by federal law and that the biometric data it collected is exempt from BIPA's definition of "biometric identifier" on three separate grounds. (Dkt. 43.) Plaintiff first argued that BIPA is not preempted by the federal Food, Drug & Cosmetics Act ("FDCA"), as Octapharma claimed, because nothing in the FDCA explicitly or implicitly preempts BIPA, and it is possible to comply with both statutes. (Dkts. 43, 51.) Plaintiff further argued that Octapharma is not exempt from BIPA under any of the three exclusions to "biometric identifier" claimed by Octapharma. (*Id.*) First, Octapharma claimed that

---

[2]    The Seventh Circuit in *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1154–55 (7th Cir. 2020), later confirmed that the approach this Court took—finding Article III standing for both Plaintiff's section 15(a) and 15(b) claims, in light of her allegation that Octapharma failed to comply with a retention policy—was correct.

the biometric data it collected was exempt from BIPA because it was "collected, used, or stored for health care treatment, payment, or operations under [HIPAA]." (Dkt. 16.) This defense failed on its face, Plaintiff argued, because the biometric data at issue isn't actually subject to HIPAA, and Octapharma could only point to the fact that it must comply with statutes that also aren't subject to HIPAA. (Dkts. 43, 51.) Second, Octapharma claimed that the biometric data it collected was exempt because it was collected from "patient[s] in a health care setting." (Dkt. 16.) But Plaintiff argued, *inter alia,* that plasma donors are not "patients" but donors who are paid for their plasma and who do not receive any "health care" services from Octapharma. (Dkts. 43, 51.) Finally, Octapharma asserted that the biometric data collected was exempt because it was used to "further validate scientific testing or screening." *See* 740 ILCS 14/10; (dkt. 16.) But Octapharma's answer made clear, Plaintiff argued, that it only uses biometric data to identify its donors; it does not use biometric data for testing or screening the donors for any health condition or disease, as contemplated by BIPA's exemption. (Dkts. 43, 51.)

After fully briefing these novel issues, on January 19, 2021, the Court granted Plaintiff's motion in part, striking Defendant's federal preemption defense with prejudice, and striking its defenses related to HIPAA and validating scientific testing or screening without prejudice. (Dkt. 58.) Plaintiff's motion was only denied as to Defendant's "patient in a health care setting" defense, leaving it an issue for summary judgment and/or trial. (*Id.*)

While the Parties briefed the Article III issue and Plaintiff's motion to strike, they also began written discovery. Plaintiff served her MIDP disclosures on March 3, 2020, and Defendant served its disclosures on June 8, 2020. (Dkt. 48.) Plaintiff then served her first set of interrogatories and requests for production to Defendant on June 15, 2020. (*Id.*) Before Defendant's responses were due, Defendant sent Plaintiff a letter contending that it had no

obligation to respond to Plaintiff's written discovery requests absent a Court order, since Defendant had satisfied its MIDP obligations. (*See* dkt. 48 at 1-2). After an unsuccessful meet and confer to resolve the dispute, Plaintiff moved to compel Defendant's discovery responses on July 24, 2020, (*id.*), and on July 30, 2020, the Court ordered Defendant to respond to Plaintiff's first requests within 28 days and set a fact discovery deadline, (dkt. 53).

Thereafter, the Parties diligently engaged in over a year of fact discovery. Defendant first responded to Plaintiff's first set of discovery requests on August 27, 2020. (Declaration of Schuyler Ufkes ("Ufkes Decl."), attached hereto as Exhibit 3, at ¶ 3.) Upon review, Plaintiff identified several deficiencies in Defendant's responses and served a Rule 26 letter to Defendant describing those deficiencies in detail and requesting a meet and confer to resolve them. (*Id.*) Over the course of the next several months, counsel for the Parties met and conferred countless times over the phone and via email, and as a result of Class Counsel's efforts, Defendant supplemented six of its interrogatory responses and made eight supplemental productions between October 22, 2020 and July 12, 2021, producing in total over 43,000 pages of documents and ESI for Class Counsel's review. (*Id.* ¶¶ 3, 4.) Plaintiff also served a second set of written discovery requests to Defendant on March 30, 2021, to which Defendant timely responded. (*Id.* ¶ 5.)

From Defendant's written discovery, Plaintiff identified two third-party providers of relevant software involved in the biometric donor identification system at issue—Haemonetics, the provider of the donor management software running on the computers connected to the fingerprint scanners, and Fulcrum Biometrics, the provider of the fingerprint scanners themselves—both of whom Plaintiff subpoenaed for documents. (*Id.* ¶¶ 6, 7.) Haemonetics initially responded to the subpoena on September 22, 2020, largely raising blanket objections

and only producing about 600 pages of documents. (*Id.* ¶ 6.) Class Counsel promptly sent Haemonetics a Rule 26 letter on October 15, 2020, detailing the impropriety of its objections and deficient production. (*Id.*) After several meet and confers and email threads between counsel, Haemonetics made a supplemental production on December 3, 2020, producing another 1,400 pages of documents. (*Id.*) As to Fulcrum Biometrics, it responded to Plaintiff's subpoena on February 23, 2021, only after a telephonic meet and confer with Class Counsel, producing over 30,000 pages of documents and ESI for Class Counsel's review. (*Id.* ¶ 7.)

After reviewing the written discovery from Octapharma and Haemonetics, it was clear that Octapharma had disclosed Plaintiff's and the class's biometric fingerprint data to Haemonetics to be stored on its server along with other donor-related personal information. As a result, Plaintiff filed a First Amended Complaint on February 5, 2021, adding a claim against Octapharma under section 15(d) of BIPA for disclosing her and the class's biometric data to Haemonetics without consent. (Dkt. 65.) Defendant answered on February 26, 2021, denying liability and again asserting several affirmative defenses. (Dkt. 66.)

With written discovery substantially complete, the Parties began oral discovery. Defendant deposed Plaintiff Mary Crumpton on June 8, 2021. Plaintiff first noticed a Rule 30(b)(6) deposition of Defendant, who designated two corporate representative witnesses to be deposed: one to testify about Octapharma's policies and procedures, and one to testify about the technical aspects of the biometric donor identification system at issue. (Ufkes Decl. ¶ 9.) Plaintiff deposed Defendant's policies and procedures witness on June 23, 2021, and scheduled Defendant's technical witness's deposition for August 31, 2021. (*Id.*) Plaintiff also noticed the depositions of two other Octapharma employees and served a subpoena for the deposition of Haemonetics, which was scheduled to be taken on September 14, 2021. (*Id.*)

Meanwhile, after the Court's January 19, 2021 ruling on Plaintiff's motion to strike—which significantly narrowed the dispositive issues left in the case—the Parties agreed that it was an appropriate time to begin exploring the possibility of resolution. (*Id.* ¶ 10.) Counsel for the Parties engaged in several telephone conferences to discuss settlement before Plaintiff served her initial class-wide settlement demand on June 2, 2021. (*Id.*) After several more phone conferences between counsel—and at a time when the Parties had already completed two key depositions with four more scheduled depositions soon approaching—the Parties agreed in early August 2021 to participate in a full-day, formal mediation session with Judge Holderman. (*Id.*) After submitting detailed mediation briefs to Judge Holderman, the Parties attended mediation on August 26, 2021. (*Id.*) Their negotiations lasted throughout the entire eight-hour session, and ultimately culminated in the Parties executing a binding Memorandum of Understanding that evening, which detailed the material points of their class-wide settlement. (*Id.*) The Parties then spent the next month and a half drafting and negotiating the finer deal points of the final, written settlement agreement, which they executed on October 20, 2021. (*Id.*) Plaintiff then promptly moved for preliminary approval of the settlement, (dkt. 78), which the Court granted on November 4, 2021, (dkt. 81).

### C.     The Settlement Secures Excellent Relief for the Settlement Class

As detailed in Plaintiff's motion for preliminary approval, the relief to the Settlement Class is an outstanding result. The Settlement creates a non-reversionary fund of $9,987,380 for the 76,826 Settlement Class members, which will be split *pro rata* between approved claimants after Court-approved fees and costs. Even if a relatively high 20% of Class Members submit a claim, payments are expected to be over $400 for each valid claimant.

Aside from the monetary relief, the Settlement creates non-monetary benefits as well. Shortly after Plaintiff filed this suit—and no doubt as a result of it—Octapharma published a publicly-available retention and destruction schedule for biometric data on its website[3] and implemented a consent program at all of its plasma donation facilities across the country, ensuring that every donor provides informed written consent prior to the collection and storage of their fingerprint data. The Settlement Agreement formally requires Octapharma to maintain and comply with these policies in Illinois going forward, and further requires Octapharma to delete any biometric data of past Illinois donors who have not visited an Octapharma facility in three or more years. (Agreement § 2.2.) This prospective relief aligns perfectly with the goals of BIPA and the goals of this lawsuit, which are to ensure that Illinois donors—past, current, and future—are protected under BIPA.

Finally, beyond this case, the Settlement explicitly preserves all of Plaintiff's and the Settlement Class's claims against Haemonetics, including their BIPA claims against Haemonetics for its separate collection and storage of the same biometric data without notice or consent. (*Id.* § 1.21.) With this carve out, Plaintiff and the Settlement Class may pursue their separate BIPA claims for additional monetary relief from Haemonetics individually or as part of ongoing class litigation against Haemonetics. *See Crumpton v. Haemonetics Corp.*, No. 1:21-cv-1402 (N.D. Ill.).

## III. ARGUMENT

In light of the results achieved, Class Counsel now moves for an award of attorneys' fees and expenses, and for an incentive award for Plaintiff. Specifically, Class Counsel respectfully

---

[3]     *See Privacy Statement,* available at https://octapharmaplasma.com/home/privacy (last accessed Jan. 13, 2022).

requests that, after deducting notice and administration costs and the proposed incentive award from the Settlement Fund (i.e., the "Net Settlement Fund"),[4] the Court award Class Counsel one-third of the Net Settlement Fund, or $3,283,907, in attorneys' fees and expenses.[5] Plaintiff further requests an incentive award of $5,000. Plaintiff respectfully submits that these amounts are fair and reasonable and should be approved by the Court.

### A. The Requested Attorneys' Fees Are Reasonable, Fall Within the Market Rate for Similar Services, and Should Be Approved.

Rule 23 authorizes courts to "award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In common fund settlements like this one, the attorneys' fee award is typically made as a share of the fund. The common fund doctrine is "based on the equitable notion that those who have benefited from litigation should share its costs." *Skelton v. General Motors*, 860 F.2d 250, 252 (7th Cir. 1988) (citation omitted). By awarding fees payable from the common fund created for the benefit of the entire class, the court spreads litigation costs proportionately among those who will benefit from the fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

The Seventh Circuit has directed district courts in common fund cases to award fees to class counsel based on the "market rate," which must be determined by "approximating the terms that would have been agreed to *ex ante*, had negotiations occurred." *In re Synthroid Mktg. Litig.*, 264 F.3d at 719; *see also Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) ("[W]e have

---

[4]    Courts in the Seventh Circuit do not include notice and administration costs as part of the fund in making percentage-of-the-fund fee awards. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014). Here, the $3,283,907 amount represents one-third of the Net Settlement Fund, that is, after deducting from the Settlement Fund (1) the $130,657 in total estimated notice and administration costs, and (2) the $5,000 proposed incentive award. (*See* Ufkes Decl. ¶ 17.)

[5]    The requested fee amount is inclusive of the $7,692.44 in costs fronted by Class Counsel—i.e., Class Counsel is not requesting costs separately. (*See* Ufkes Decl. ¶ 16.)

consistently directed district courts to do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.") (internal quotes omitted). In other words, the Court must figure out what the Class Members would have agreed to pay Class Counsel in a negotiation at the beginning of this case, in order to create a fee structure that "emulate[s] the incentives a private client would put in place." *In re Synthroid Mktg. Litig.*, 264 F.3d at 719.

In order to determine the applicable market and corresponding market rate for attorneys' fees, courts in this Circuit look at three factors: (1) actual fee contracts that were privately negotiated for similar litigation, (2) data from class-counsel auctions, and (3) information from other cases. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635–36 (7th Cir. 2011) (quoting *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)). In effect, "the object is to simulate the market where a direct market determination is infeasible." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992)).

Here, although courts generally afford the first factor comparatively less weight in class litigation (and for good reason), Class Counsel notes for completeness that their retainer agreement with Plaintiff Crumpton provides for fees of up to 40% of the total recovery. (*See* Ufkes Decl. ¶ 11.) *See Gehrich v. Chase Bank, N.A.*, 316 F.R.D. 215, 235 (N.D. Ill. 2016) (factoring a similar arrangement into fee analysis, with appropriate caveats); *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 796 (N.D. Ill. 2015) (finding that such contingent fee agreements do not inform the court's *ex ante* negotiation analysis). As to the second factor, Class Counsel are unaware of any class-counsel auctions in this type of case. Most of that data comes from the securities-law context, and courts generally agree that data from those auctions

13

has little bearing outside the securities context. *See, e.g.*, *Heekin v. Anthem, Inc.*, No. 05-1908, 2012 WL 5878032, at *4 n.2 (S.D. Ind. Nov. 20, 2012) (stating, in a case involving an insurer's demutualization, that "auctions in securities actions have little bearing on this case"); *see also In re Cap. One*, 80 F. Supp. 3d at 796 (acknowledging that "data from pre-suit negotiations and auctions tend to be sparse" and declining to rely on any such data). That leaves evidence from similar cases, the third factor, which courts generally agree provides the most compelling evidence of the market. *See Taubenfeld*, 415 F.3d at 600; *In re Cap. One*, 80 F. Supp. 3d at 796-97 ("The Seventh Circuit has relied on the same empirical data [analyzing fee awards in similar class actions where fees were awarded at the end of the case] to determine the 'norm' for fee awards, and this court will do so as well.").

Here, Plaintiff moves the Court to award fees in the amount of $3,283,907, which represents one-third (33.3%) of the Net Settlement Fund.[6] As explained below, the requested fee is fair and reasonable under the Seventh Circuit's market approach, is on the low end of what other courts of this District have found a hypothetical *ex ante* bargain to be in BIPA cases, and fairly compensates Class Counsel for the risk they assumed in taking on this case.

### 1. Percentage-of-the-fund should be used to determine fees here.

Although district courts have discretion to choose either the "percentage-of-the-fund" or the "lodestar" method in awarding attorneys' fees in a common fund case, *Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014), "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class," especially where the percentage accurately reflects the market.

---

[6] The requested fee percentage is also less than the 35% fee percentage stated in the Settlement Agreement and Notice disseminated to the Settlement Class. (*See* Agreement § 8.1; Exhibits 1-A, 1-B, 1-C.)

*Williams v. Gen. Elec. Cap. Auto Lease*, No. 94-7410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26, 1995); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult the market for legal services to arrive at a reasonable percentage); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500-501 (N.D. Ill. 2015) (citing *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)) ("[O]ne common method of choosing between the percentage and lodestar approaches is to look to the calculation method most commonly used in the marketplace at the time such a negotiation would have occurred.").

To determine which fee calculation method is more appropriate, the Court should look to the prevailing method for compensating counsel in similar cases. *See McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814–15 (E.D. Wis. 2009). The normal practice in consumer class actions is, overwhelmingly, "to negotiate a fee arrangement based on a percentage of the plaintiffs' ultimate recovery." *Kolinek*, 311 F.R.D. at 501; *see Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the prevailing method of compensating lawyers for similar services is the contingent fee, then the contingent fee *is* the market rate.") (internal quotes omitted). Because the percentage-of-the-fund approach best mirrors typical contingency agreements, it makes sense that "the vast majority of courts in the Seventh Circuit" use it. *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *7 (S.D. Ill. 2018) (quotation omitted); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 814 (2010) ("Most federal judges chose to award fees by using the highly discretionary percentage-of-the-settlement method.").

Moreover, a percentage-of-the-fund, contingent approach is what the class would have negotiated with class counsel at the outset in a hypothetical *ex ante* bargain; in fact, it has been

used to determine a reasonable fee award in virtually every BIPA class action settlement in both federal and state courts, and in every BIPA settlement in this District, specifically. (*See* Exhibit 2, Charts 1–3 (all 21 cases listed, and numerous others, used the percentage-of-the-fund method).)[7] Accordingly, this Court can confidently apply the percentage-of-the-recovery method here, as every other court in this District has done.

## 2. A one-third fee award is appropriate here.

The Seventh Circuit has instructed district courts to award reasonable attorneys' fees, and that "the measure of what is reasonable is what an attorney would receive from a paying client in a similar case." *Montgomery v. Aetna Plywood*, 231 F.3d 399, 408 (7th Cir. 2000). "[I]n consumer class actions . . . the presumption should . . . be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Gehrich*, 316 F.R.D. at 235 (citing *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014)); *see also* 5 William Rubenstein, Newberg on Class Actions § 15.83 (5th ed.) (noting that, generally, "50% of the fund is the upper limit on a reasonable fee award from any common fund"). Courts consider, against that presumption, the fee awards made in similar cases, the risks that the particular case presented, the quality of the legal work provided, the anticipated work necessary to resolve the litigation, and the stakes of the case. *See Taubenfeld*, 415 F.3d at 600 ("[A]ttorneys' fees from analogous class action settlements are indicative of a rational relationship between the record in this similar case and the fees awarded by the district court."); *see also In re Synthroid Mktg. Litig.*, 264 F.3d at 721.

Considering these factors, the Court can confidently find that a hypothetical *ex ante*

---

[7] The one exception is *Carroll v. Crème de la Crème*, No. 2017-CH-01624 (Cir. Ct. Cook Cnty. Ill.), which produced no monetary recovery for the class (i.e. no common fund) and instead provided credit monitoring.

negotiation would have resulted in the 33.3% Class Counsel now seeks; indeed, at least ten courts in this District have awarded the same percentage in similar BIPA cases. (*See* Exhibit 2, Chart 1.) The *ex ante* negotiation could have well resulted in an agreement *higher* than the requested 33.3%, as other numerous Illinois courts, including those in this District, have awarded as much as 35% of the fund in BIPA cases, (*see* *id.*, Chart 2), and others have awarded up to 40% of the fund, (*see* *id.*, Chart 3). Accordingly, the requested 33.3% is more than appropriate and is what the class would have agreed to in an *ex ante* negotiation.

The appropriateness of a 33.3% fee award here is further justified by (1) the substantial risk that Class Counsel took on in accepting the case, and (2) the excellent relief Class Counsel ultimately obtained for the Settlement Class.

> ### a. *This case presented serious obstacles to recovery, and Class Counsel litigated the case mindful of the possibility that the Class might recover nothing.*

In a hypothetical *ex ante* negotiation, it would be apparent to the client that at least a 33.3% contingent fee would be appropriate considering the significant risk Class Counsel took on in litigating a case mired in issues of first impression. Although these risks are inherent in any contingent fee litigation, class actions especially, there are particularly acute risks in BIPA cases: as recently as 2015, there was no interpretation of any of the statute's material provisions. *See Norberg v. Shutterfly, Inc.*, 152 F. Supp. 3d 1103, 1106 (N.D. Ill. 2015) ("The BIPA was enacted in 2008, and to this date, the Court is unaware of any judicial interpretation of the statute."). For starters, at the time of filing, Class Counsel was aware of several untested exceptions to BIPA liability that a plasmapheresis facility like Octapharma might (and did) raise, including that the biometric data it collected from plasma donors is exempt from BIPA's definition of "biometric identifier," because—Octapharma would argue—its donors are "patient[s]" and its facilities are

"health care setting[s]." (Dkt. 16 at 31 ¶ 58.) *See* 740 ILCS 14/10 (excluding from the definition of "biometric identifier" any "information captured from a patient in a health care setting"). At the time of filing, and up until Class Counsel moved to strike this defense, (dkt. 43), no court had interpreted or considered the "patient in a health care setting" exception to BIPA, which was Octapharma's primary defense to escape liability. The risk of litigating the issue further, both in this Court at summary judgment and/or trial and also on appeal, was a not-insignificant risk that Class Counsel was willing to take on for the class from the start.

Further, unlike most BIPA defendants who have no policies whatsoever relating to biometric data, Class Counsel knew at the outset that Octapharma had at least one such policy, and whether it fell short of BIPA's notice and consent requirements wasn't a sure thing. Class Counsel's investigation revealed that Octapharma presented a host of notices and consent forms to donors before they could donate plasma, including a document that described—albeit vaguely—the donor fingerprint-scanning process at issue, when the picture of the fingerprint is deleted, and where the biometric data derived from that picture is stored. Acknowledging the risks that these disclosures could be interpreted by a court as BIPA-compliant (though confident they weren't), or that discovery could reveal additional disclosures presented to other class members across different Octapharma facilities hindering class certification, Class Counsel forged ahead in bringing this suit for Plaintiff and the class.

Even setting aside these pivotal, case-specific questions, there were other major questions common in BIPA litigation that increased the risk of nonpayment. For example, given the functionality of the widely-used fingerprint-scanning technology at issue, Class Counsel pursued this case knowing full well that Octapharma would argue that its fingerprint scanners didn't collect "biometric identifiers" or "biometric information" as defined by BIPA, but rather a

fingerprint "template," consisting of a string of numbers and letters that—it would argue—isn't regulated by the statute at all. (Dkt. 16 at 13 ¶ 46.) This question is the subject of dispute in existing BIPA cases and hasn't yet been resolved by the courts. *Cf. In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-CV-03747-JD, 2018 WL 2197546, at *2–3 (N.D. Cal. May 14, 2018) (denying motion for summary judgment on whether facial scans were biometric data regulated by BIPA). Although Class Counsel puts little stock in this argument, it is an issue ungoverned by precedent, and if Octapharma were to win on it at summary judgment or trial, Plaintiff's case would be defeated entirely, sinking Class Counsel's substantial investment of time and effort in this case. Class certification also remains unanswered, as does the Class's ability to actually recover—post-trial—what would be massive damages against Octapharma. *See, e.g.*, *Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) (statutory award in TCPA class action of $1.6 billion reduced to $32 million). Furthermore, the attempts to gut BIPA in the legislature have been relentless—over the past year, eight such bills have been introduced to amend or repeal BIPA[8]—and it is not unprecedented for legislation to be amended while a class action is pending in a way that threatens the Class's entire recovery. *See Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 629–30 (E.D. Mich. 2017) (evaluating the retroactive effect of legislative amendment on pending class action).

Class Counsel accepted this case understanding that a single loss on any of these fronts would decimate the Class's—and Class Counsel's—ability to get paid. In light of those risks, it is appropriate to award 33.3% of the fund in attorneys' fees. *See In re Cap. One*, 80 F. Supp. 3d

---

[8] *See* H.B. 559, 102nd Gen. Assembly (Ill. 2021); H.B. 560, 102nd Gen. Assembly (Ill. 2021); H.B. 1764, 102nd Gen. Assembly (Ill. 2021); H.B. 3112, 102nd Gen. Assembly (Ill. 2021); H.B. 3304, 102nd Gen. Assembly (Ill. 2021); H.B. 3414, 102nd Gen. Assembly (Ill. 2021); S.B. 56, 102nd Gen. Assembly (Ill. 2021); S.B. 300, 102nd Gen. Assembly (Ill. 2021).

at 805–06 (adding 6% risk premium to attorneys' fees based on risk of non-payment when case was filed); *Kolinek*, 311 F.R.D. at 502 (same).

> b. *Class Counsel achieved an excellent result for the Class.*

Given the large number of unresolved questions in this case, and the possibility that the Class would recover nothing at all, the relief secured by Class Counsel is exceptionally strong. It is appropriate, too, for the Court to consider the actual result achieved—both as a function of the quality of Class Counsel's work, and because litigants often consider the ultimate degree of success in determining a fee schedule. *See Americana Art China, Co.*, 743 F.3d at 247. As explained in Plaintiff's motion for preliminary approval, the $9.987 million Settlement Fund secured by Class Counsel will result in individual payments to Class Members of approximately $400 to $800 each, assuming a healthy claims rate between 10-20%. Against a backdrop where many privacy claims under similar statutes settled for pennies on the dollar or no monetary relief at all, this is an exceptional result. *See, e.g.*, *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 139 S. Ct. 1041 (2019) (approving 25% award of attorneys' fees on *cy pres*-only fund with not a penny to class members); *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL 1288377, at *11–14 (N.D. Cal. Mar. 18, 2020) (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of the Electronic Communications Privacy Act); *Adkins v. Facebook, Inc.*, No. 18-cv-05982-WHA, dkts. 350, 369 (N.D. Cal. May 6, 2021) (approving settlement for injunctive relief only, in class action arising out of Facebook data breach, and granting $6.5 million in attorneys' fees and costs).

The Court need not evaluate this Settlement in a vacuum—the per-person monetary relief

here is among the best of any non-reversionary BIPA settlement with tens of thousands of class members to date. *See, e.g.*, *Roach v. Walmart, Inc.*, No. 19-CH-01107 (Cir. Ct. Cook Cnty. Ill. June 16, 2021) ($10 million fund for 21,677 class members); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately 260,000 class members); *Miracle-Pond v. Shutterfly*, 2019-CH- 07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ($6.75 million fund for potentially millions of class members); *Thome v. NOVAtime Tech., Inc.*, No. 19-cv-6256, dkt. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for 62,000 class members, and assignment of insurance policy). The $9.987 million Settlement Fund achieved here for 76,826 class members is an outstanding result.

Ultimately, the relief recovered on behalf of the Settlement Class warrants approving the requested 33.3% of the monetary benefits of the Net Settlement Fund as attorneys' fees.

**B.  The Court Should Approve the Requested Incentive Award.**

The Settlement Agreement also provides for an incentive award of $5,000 to Plaintiff Mary Crumpton for serving as class representative. Incentive awards are appropriate in class actions to compensate individuals for stepping up to protect the interests of a broader class, spending their own time to achieve benefits for the class as a whole. *Cook*, 142 F.3d at 1016.

Here, Plaintiff Crumpton's participation was critical to the case's ultimate resolution. Ms. Crumpton's willingness to commit time to this litigation and undertake the responsibilities involved in representative litigation resulted in a substantial benefit to the class and fully justifies the requested incentive award. Throughout the case, Ms. Crumpton expended time and effort conferring with Class Counsel, providing information to Class Counsel to prepare the pleadings, reviewing the Complaint and First Amended Complaint before filing, reviewing and approving her MIDP responses, answering Defendant's interrogatories, sitting for her deposition, filing an

amicus brief in *Bryant v. Compass Grp. USA, Inc.* for the Seventh Circuit's consideration, and reviewing and approving the Settlement Agreement before signing it. (Ufkes Decl. ¶¶ 18, 19.) These efforts from Ms. Crumpton were necessary to secure the $9,987,380 Settlement Fund for the Class. (*Id.*) She was also willing to attach her name to this litigation against Octapharma and allow it to be transmitted via class notice to more than seventy thousand people, subjecting herself to "scrutiny and attention" which is "certainly worth some remuneration." *Schulte*, 805 F. Supp. 2d 560 at 601.

As a monetary matter, Ms. Crumpton's requested incentive award is eminently reasonable: it's equal to the amounts awarded to plaintiffs in numerous other privacy cases, including BIPA cases, *see Lopez-McNear v. Superior Health Linens, LLC*, No. 19-cv-2390, dkt. 69 (N.D. Ill. Apr. 27, 2021) ($5,000 service award); (Exhibit 2, Chart 4), and a fraction of the amounts often awarded in BIPA class settlements in this District. *See Martinez v. Nando's Rest. Grp., Inc.*, 19-cv-07012, dkt. 63 (N.D. Ill. Oct. 27, 2020) ($7,500 service award in BIPA case); *Davis v. Heartland Emp. Servs., LLC*, No. 1:19-cv-00680, dkt. 130 (N.D. Ill. Oct. 25, 2021) ($10,000 service award in BIPA case); (Exhibit 2, Chart 4). Plaintiff Crumpton's request is more than in line with other incentive awards and should be granted.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff Mary Crumpton respectfully requests that this Court enter an order (1) granting Class Counsel's request for an award of attorneys' fees and expenses in the amount of $3,283,907; (2) awarding Plaintiff Crumpton a $5,000.00 incentive award; and (3) providing such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**MARY CRUMPTON,** individually and on behalf of the Settlement Class,

Dated: January 13, 2022

By: /s/Schuyler Ufkes

One of Plaintiff's attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

David J. Fish
dfish@fishlawfirm.com
FISH POTTER BOLAÑOS, P.C.
200 East 5th Avenue, Suite 123
Naperville, Illinois 60563
Tel.: 630.355.7590
Fax: 630.778.0400