**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

MARY CRUMPTON, individually and on
behalf of the Settlement Class,

                    Plaintiff,

    v.

OCTAPHARMA PLASMA, INC., a
Wisconsin limited liability company,

                  Defendant.

No. 19-cv-8402

Hon. Virginia M. Kendall

**PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF
<u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION............................................................................................................1

II.  BACKGROUND ............................................................................................................4

    A.  Nature of the Litigation ....................................................................................4

    B.  The Claims .........................................................................................................5

    C.  Procedural History ............................................................................................6

III.  TERMS OF THE SETTLEMENT ..............................................................................8

    A.  Class Definition .................................................................................................8

    B.  Monetary Relief .................................................................................................8

    C.  Prospective Relief .............................................................................................9

    D.  Payment of Settlement Notice and Administrative Costs ...............................9

    E.  Attorneys' Fees and Incentive Award ............................................................9

    F.  Release ...............................................................................................................10

IV.  THE CLASS NOTICE FULLY SATISFIED DUE PROCESS ................................. 10

V.  THE SETTLEMENT WARRANTS FINAL APPROVAL........................................ 11

    A.  Plaintiff and Class Counsel have Adequately Represented the Class ........... 13

    B.  The Settlement Is the Product of Arm's-Length, Non-Collusive
        Negotiations ....................................................................................................... 15

    C.  The Settlement Treats Class Members Equally ................................................. 17

    D.  The Relief Secured for the Settlement Class is Adequate and Warrants Final
        Approval ............................................................................................................ 17

        1.  The Relief Provided by the Settlement is Outstanding .......................... 18

        2.  The Cost, Risk, and Delay of Further Litigation Compared to the
            Settlement's Benefits Favors Final Approval ......................................... 21

i

        *3.*     *The Method of Distributing Relief to the Class Members is Effective and Supports Final Approval* ........................................................................ 23

        *4.*     *The Terms of the Requested Attorneys' Fees are Reasonable* .............. 24

    **E.**    **The Remaining Considerations Set Forth by the Seventh Circuit Support Approval of the Settlement** ........................................................................ 25

        *1.*     *The Reaction of the Settlement Class Favors Approval* ......................... 25

        *2.*     *Experienced Counsel's Belief that the Settlement is Beneficial to the Class Weighs in Favor of Final Approval* ............................................... 27

        *3.*     *The Settlement Raises No Red Flags* ...................................................... 28

**VI.**    **CONCLUSION** ................................................................................................. 29

## **TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)...........................................................................................10

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)...........................................................................................17

**United States Circuit Court of Appeals Cases**

*Eubank v. Pella Corp.*,
753 F.3d 718 (7th Cir. 2014) ...........................................................................28

*Gascho v. Global Fitness Holdings, LLC*,
822 F.3d 269 (6th Cir. 2016) ...........................................................................26

*Patel v. Facebook, Inc.*,
932 F.3d 1264 (9th Cir. 2019) .....................................................................22, 27

*Pearson v. NBTY, Inc.*,
772 F.3d 778 (7th Cir. 2014) ...........................................................................12

*Redman v. RadioShack Corp.*,
768 F.3d 622 (7th Cir. 2014) ...........................................................................12

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3rd Cir. 2011) ...........................................................................26

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ...........................................................................13

*Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*,
309 F.3d 978 (7th Cir. 2002) ...........................................................................12

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014) .................................................................. *passim*

**United States District Court Cases**

*Alvarado v. Int'l Laser Prods., Inc.*,
No. 18-cv-7756, dkt. 70 (N.D. Ill. Jan. 24, 2020)............................................25

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
No. 07 CV 2898, 2012 WL 651727 (N.D. Ill. Feb. 28 2012)......................12, 25

*Chambers v. Together Credit Union*,
No. 19-CV-00842-SPM, 2021 WL 1948453 (S.D. Ill. May 14, 2021) ............................13

*Charvat v. Valente*,
No. 12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) ....................................13

*Cooks v. TNG GP*,
No. 2:16-cv-01160-KJM-AC, 2021 WL 5139613 (E.D. Cal. Nov. 4, 2021) ...................16

*Cornejo v. Amcor Rigid Plastics USA, LLC*,
No. 18-cv-7018, dkt. 57 (N.D. Ill) ...................................................................................25

*Crumpton v. Haemonetics Corp.*,
No. 1:21-cv-1402 (N.D. Ill.) .............................................................................................20

*Davis v. Heartland Emp. Servs., LLC*,
No. 1:19-cv-00680, dkt. 130 (N.D. Ill. Oct. 25, 2021) ....................................................25

*Goldsmith v. Tech. Sols. Co.*,
No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995)..........................................21

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ..........................................................................18, 23

*In re Facebook Biometric Info. Priv. Litig.*,
No. 15-CV-03747-JD, 2021 WL 757025 (N.D. Cal. Feb. 26, 2021) ...............................27

*In re Facebook Biometric Info. Priv. Litig.*,
522 F. Supp. 3d 617 (N.D. Cal. 2021) .............................................................................26

*In re Google LLC Street View Elec. Commc'ns Litig.*,
No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)......................3, 18

*In re NCAA Student-Athlete Concussion Injury Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019)........................................................................................13

*In re TikTok, Inc., Consumer Priv. Litig.*,
No. 20-cv-4699, dkts. 122, 161 (N.D. Ill.) ......................................................................26

*Jones v. CBC Restaurants Corp.*,
No. 19-cv-6736, dkt. 53 (N.D. Ill. Oct. 22, 2020) ...........................................................25

*Lea v. Tal Educ. Grp.*,
No. 18-CV-5480 (KHP), 2021WL 5578665 (S.D.N.Y. Nov. 30, 2020)..........................24

*Lopez-McNear v. Superior Health Linens, LLC*,
No. 19-cv-2390, dkt. 69 (N.D. Ill. Apr. 27, 2021) ...........................................25

*McDaniel v. Qwest Commc'ns Corp.*,
No. CV 05 C 1008, 2011 WL 13257336 (N.D. Ill. Aug. 29, 2011) .................................26

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ....................................26, 27

*Schulte v. Fifth Third Bank*,
No. 09-CV-6655, 2010 WL 8816289 (N.D. Ill. Sept. 10, 2010) ......................................16

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ...................................................................10, 21, 27

*Snyder v. Ocwen Loan Servicing, LLC*,
No. 14 c 8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019) .........................12, 13, 14, 16

*Thome v. NOVAtime Tech., Inc.*,
No. 19-cv-6256 (N.D. Ill. Mar. 8, 2021)..........................................................4, 20, 25, 26

**State Appellate Court Cases**

*McDonald v. Symphony Bronzeville Park LLC*,
2020 IL App (1st) 192398.............................................................................................28

*Rottner v. Palm Beach Tan, Inc.*,
2019 IL App (1st) 180691-U .......................................................................................28

*Sekura v. Krishna Schaumburg Tan*, *Inc.*,
2018 IL App (1st) 180175............................................................................................28

*Tims v. Black Horse Carriers, Inc.*,
2021 IL App (1st) 200563............................................................................................22

**State Circuit Court Cases**

*Carroll v. Crème de la Crème, Inc.*,
No. 2017-CH-01624 (Cir. Ct. Cook Cnty., Ill. 2018) ...................................................3, 19

*Kusinski v. ADP LLC*,
2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) ......................................................26

*Lark, et al v. McDonald's USA, LLC, et al.*,
No 17-L-559 (Cir. Ct. St. Clair Cnty. Nov. 29, 2021) ....................................................19

*Licata v. Facebook, Inc.*,
  2015-CH-05427 (Cir. Ct. Cook Cnty. Apr. 1, 2015) ........................................................27

*Marshall v. Lifetime Fitness, Inc.*,
  2017-CH-14262 (Cir. Ct. Cook Cnty.) ..............................................................................19

*Miracle-Pond v. Shutterfly*,
  2019-CH- 07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ......................................................19

*Prelipceanu v. Jumio Corp.*,
  2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020)..................................................19, 26

*Roach v. Walmart, Inc.*,
  No. 19-CH-01107 (Cir. Ct. Cook Cnty. Ill. June 16, 2021)............................................4, 19

*Rosenbach v. Six Flags Ent. Corp.*,
  2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) ........................................................3

*Sekura v. L.A. Tan Enters., Inc.*,
  2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016)........................................................26

## Miscellaneous Authority

4 NEWBERG ON CLASS ACTIONS
  § 13:53 (5th Ed. 2011) ......................................................................................................23

740 ILCS 14 ............................................................................................................... *passim*

Federal Judicial Center,
  *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*
  2010, available at www.fjc.gov/sites/default/files/2012/NotCheck.pdf .......................... 10

Fed. R. Civ. Proc. 23 ................................................................................................. *passim*

Illinois House Transcript, 2008 Reg. Sess. No. 276 .......................................................5

Settlement Website
  https://www.opibipasettlement.com/ (last accessed Feb. 2, 2022) .................................. 11

*Privacy Statement*,
  Octopharma Plasma, available at https://octapharmaplasma.com/home/privacy (last
  accessed Feb. 2, 2022) ...................................................................................................... 9

## I.     INTRODUCTION

Plaintiff Mary Crumpton ("Plaintiff") filed this class action against Defendant Octapharma Plasma, Inc. ("Octapharma") for violating the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq*. Specifically, Plaintiff alleged that Octapharma collected her and thousands of other Illinois plasma donors' fingerprints without their consent, failed to create (and abide by) a retention policy for biometric data, and disclosed donors' biometric data to third-party Haemonetics Corporation without their consent, all in violation of BIPA. After almost two years of active litigation, the Parties reached a Settlement, which the Court preliminarily approved on November 4, 2021. The Settlement provides substantial monetary relief, distributed equitably through a simple claims process, and an expansive direct notice program. Now, with notice to the Settlement Class completed and not a single objection or opt out received, Plaintiff submits this excellent Settlement for final approval.[1]

In terms of monetary relief, the Settlement creates a $9,987,380 non-reversionary Settlement Fund for the class to be split *pro rata* among those who file claims. And the claims rate here has been extraordinary: of the 76,824 Class Members, 15,860 of them have submitted a Claim Form to date (with one day left until the Claims Deadline), for an outstanding claims rate of over 20%. This far exceeds typical claims rates in consumer class actions, which rarely see rates exceed even 12%. After any approved fees and costs are paid, each claimant stands to receive a cash payment of approximately $400, if the Settlement is finally approved. On top of that, the Settlement provides strong prospective relief: Octapharma has agreed to comply with BIPA going forward and to destroy the biometric data of all Illinois donors who haven't visited

---

[1]     The capitalized terms used in this motion are those used in the Stipulation of Class Action Settlement (the "Settlement" or "Agreement"), attached hereto as Exhibit 1.

an Octapharma facility in three or more years.

In accordance with the Court's Preliminary Approval Order, on December 2, 2021, direct notice was disseminated to *every* member of the Settlement Class via U.S. Mail and/or email, and successfully reached an address or email for over 99% of the Settlement Class. The Settlement Website has been available 24/7 since November 18, 2021, with the long-form notice and key documents, including the Settlement Agreement itself. Class Counsel filed their fee brief on January 13, 2022, which was also posted to the Settlement Website. By the Objection/Exclusion Deadline of January 27, 2022, not a single member of the 76,824-person Settlement Class asked to be excluded or objected.

This complete lack of opposition is no surprise, considering the amount of monetary relief provided under the Settlement and how favorably it compares against other privacy class action settlements. Far too many privacy class actions settle without monetary relief to the class and resolve claims for only *cy pres* relief. *See, e.g.*, *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL 1288377, at *11–14 (N.D. Cal. Mar. 18, 2020) *affirmed* No. 20-15616, 2021 WL 6111383 (9th Cir. Dec. 27, 2021) (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of a federal privacy statute where $10,000 in statutory damages were available per claim). Indeed, even some settlements under BIPA have provided zero monetary relief to the class and only given class members an offer of free credit monitoring. *See Carroll v. Crème de la Crème, Inc.*, No. 2017-CH-01624 (Cir. Ct. Cook Cnty., Ill. 2018). Other finally-approved claims-made BIPA settlements have provided only small cash payments, often with the remaining funds reverting to the defendant. *E.g.*, *Rosenbach v. Six Flags Ent. Corp.*, 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) (granting final approval to claims-made settlement with a cap of $200

or $60 per class member). In stark contrast, the leading consumer BIPA settlements of this size—including tens of thousands of class members—create a non-reversionary fund to be split among claimants *pro rata* without predetermined caps. That's precisely what this Settlement does, and its per-person monetary relief falls in line with—and, in many instances, exceeds—similar BIPA settlements that came before it. *E.g.*, *Roach v. Walmart, Inc.*, No. 19-CH-01107 (Cir. Ct. Cook Cnty. Ill. June 16, 2021) ($10 million fund for 21,677 class members); *Thome v. NOVAtime Tech., Inc.*, No. 19-cv-6256, dkt. 90 (N.D. Ill. Mar. 8, 2021) ($4.1 million fund for 62,000 class members); *see also In re Facebook Biometric Info. Priv. Litig.,* 522 F. Supp. 3d 617 (N.D. Cal. 2021), *appeal dismissed*, No. 21-15555, 2021 WL 2660668 (9th Cir. June 22, 2021) ($650 million fund for approximately 6.9 million class members).

For these reasons, and as detailed below, this Settlement is exceptional. The factors to be considered under Rule 23 when determining whether to grant final approval to a class settlement weigh in favor of approving this one. Thus, the Court can appropriately grant final approval.

## II.     BACKGROUND

Though Plaintiff has detailed the case background in her preliminary approval motion and motion for attorneys' fees (dkts. 78, 84)*,* it is set forth in brief below for ease of reference.

### A.     Nature of the Litigation

BIPA was passed after the bankruptcy of a company called Pay By Touch, which had partnered with gas stations and grocery stores in Illinois to install checkout terminals that used fingerprint scanners linked to bank accounts to make purchases. (Dkt. 65 ¶¶ 13–14.) When Pay By Touch's parent company declared bankruptcy at the end of 2007, it began shopping its database of Illinois consumers' fingerprints as an asset to its creditors. (*Id.* ¶ 14.) This decision was met with public backlash, and while a bankruptcy court ultimately ordered the destruction of

the database, the Illinois legislature recognized the "very serious need" to protect Illinois

citizens' biometric data. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276. Therefore, in

2008, the Illinois legislature passed BIPA, which makes it unlawful for any private entity to

collect and store consumers' biometric data unless it first (i) obtains their informed written

consent, (ii) provides details related to the data's purpose and storage, and (iii) establishes and

complies with a publicly-available retention and destruction policy. *See id.*; 740 ILCS 14/15(a),

(b). The statute also prohibits companies from disclosing or disseminating biometric data except

with consent or under limited circumstances not at issue here. 740 ILCS 14/15(d). If a company

fails to comply with BIPA's provisions, the statute provides for a civil private right of action

allowing consumers to recover $1,000 for negligent violations or $5,000 for willful violations,

plus costs and reasonable attorneys' fees. 740 ILCS 14/20.

### B.    The Claims

Plaintiff brought this suit against Octapharma, a company that operates several

plasmapheresis facilities in Illinois. (Dkt. 65 ¶ 1.) She is a former blood plasma donor at one of

Octapharma's facilities, and alleges that it collected her—and other donors'—biometric data

when it required her to scan her fingerprint to enroll in Octapharma's donor database. (*Id.* ¶ 32.)

Plaintiff alleges that Octapharma then required her and other donors to use their fingerprints to

identify themselves before each subsequent blood plasma donation. (*Id.* ¶ 33.) Plaintiff further

alleges that Octapharma disclosed her biometric data to Haemonetics Corporation, a third-party

company that provided the software running on Octapharma's donor management system. (*Id.* ¶

37.) Though Octapharma collected, stored, and disclosed Plaintiff's biometric data, she alleges, it

failed to obtain her informed written consent to do so and failed to implement or comply with

any BIPA-compliant policies. (*Id.* ¶¶ 34–37.) As a result, Plaintiff alleges that Octapharma

violated § 15(a) of BIPA by (i) failing to develop a data-retention policy and guidelines for permanently destroying biometric data, (ii) failing to publicly disclose any such policy, and (iii) failing to comply with any such policy. (*Id*. ¶¶ 27, 35, 45–46, 49–50.) Plaintiff also alleges that Octapharma violated § 15(b) of BIPA by collecting, using, and storing its donors' biometric data without obtaining informed written consent. (*Id.* ¶¶ 36, 54, 57–60.) Finally, Plaintiff alleges that Octapharma violated § 15(d) of BIPA by disclosing her and other donors' biometric data to Haemonetics without ever obtaining consent to do so. (*Id.* ¶¶ 28, 37 64, 67–69.) Plaintiff filed this lawsuit to vindicate her and the Settlement Class' rights under BIPA.

### C.    Procedural History

Plaintiff filed this suit in the Circuit Court of Cook County on December 2, 2019. Shortly after, Octapharma removed the case to this Court, (dkt. 1), and answered the complaint, denying liability and asserting twelve affirmative defenses (dkt. 16). On June 18, 2020, Plaintiff moved to strike Octapharma's first and second affirmative defenses, arguing, first, that BIPA is preempted by federal law and, second, that Octapharma is exempt from BIPA because (i) some of its record-keeping obligations are subject to HIPAA, (ii) the biometric data it collected was from "patient[s] in a health care setting," and (iii) the biometric data was used to "further validate scientific testing or screening." (Dkt. 43.) After full briefing, the Court ultimately granted Plaintiff's motion in part, striking Defendant's federal preemption defense with prejudice, striking its defenses related to HIPAA and "scientific testing or screening" without prejudice, but leaving Defendant's "patient in a health care setting" defense intact. (Dkt. 58.)

The Parties also engaged in over a year of fact discovery. As to written discovery, Plaintiff served Defendant with two sets of interrogatories and document requests, to which Defendant responded and supplemented several times, ultimately producing over 43,000 pages

of documents and ESI. (Declaration of Schuyler Ufkes ("Ufkes Decl."), attached hereto as Exhibit 2, at ¶ 3.) Plaintiff also answered Defendant's interrogatories and document requests. Upon learning the identities of two companies who provided the software running on Octapharma's donor management system and on its finger scanners—Haemonetics and Fulcrum Biometrics, respectively—Plaintiff subpoenaed both for documents, and both produced thousands of pages of documents. (*Id*. ¶¶ 6, 7.) The written discovery Plaintiff obtained confirmed that Octapharma had disclosed Plaintiff's and the class's biometric fingerprint data to Haemonetics, which prompted Plaintiff to amend her complaint on February 5, 2021, to add a § 15(d) claim against Octapharma for disclosing her and the class's biometric data to Haemonetics without consent. (Dkt. 65.) Defendant answered on February 26, 2021, denying liability and reasserting several affirmative defenses. (Dkt. 66.)

The Parties then began taking oral discovery. Defendant deposed Plaintiff Mary Crumpton on June 8, 2021, and Plaintiff deposed the first of two of Defendant's Rule 30(b)(6) representatives on June 23, 2021. (Ufkes Decl. ¶ 9.) With four more depositions soon approaching—of a second Rule 30(b)(6) deponent of Octapharma, two employees of Octapharma, and a Rule 30(b)(6) deponent of Haemonetics—the Parties decided to participate in a full-day, formal mediation with Judge Holderman on August 26, 2021. (*Id*. ¶ 10.) This mediation resulted in the Parties executing a binding Memorandum of Understanding, which detailed the material points of their class-wide settlement. (*Id*.) After negotiating the finer details of their settlement for over a month, the Parties eventually executed the Settlement Agreement on October 20, 2021, and promptly moved for preliminary approval, (dkt. 78), which the Court granted on November 4, 2021. (Dkt. 81.)

### III.    TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement are set forth in the Stipulation of Class Action Settlement, (dkt. 84-1), and are briefly summarized here:

**A.    Class Definition:** In the Preliminary Approval Order, the Court certified a Settlement Class of "[a]ll persons who scanned their finger and provided an Illinois address at an Octapharma plasma donation facility located in Illinois between December 2, 2014 and February 4, 2020." (Dkt. 81 at ¶ 3.) Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest; (3) persons who properly execute and file a timely request for exclusion from the Settlement Class; and (4) the legal representatives, successors, heirs, or assigns of any such excluded persons. (*Id.*)

**B.    Monetary Relief:** Octapharma has established a non-reversionary Settlement Fund of $9,987,380.00 for the benefit of the Settlement Class. Each Class Member who submits a valid claim will be entitled to a *pro rata* portion after payment of notice costs, administrative expenses, and any attorneys' fees and incentive award approved by the Court. (Agreement § 1.12, 1.28, 1.29, 2.1(a).) Should the Court approve Plaintiff's requested attorneys' fees and incentive award, and given the exceptional 20% claims rate, each Class Member can expect to receive a Settlement Payment for approximately $400. Any uncashed checks or electronic payments unable to be processed within 90 days of issuance will be provided to the American Civil Liberties Union of Illinois, earmarked to support its Government Accountability and Personal Privacy efforts (a non-profit organization that advocates to protect Illinoisans' privacy

rights) as *cy pres* recipient, or any alternative *cy pres* recipient the Court may select. (*Id*. § 2.1(h).)

**C.** **Prospective Relief:** Shortly after Plaintiff filed this suit, Octapharma began obtaining donors' informed written consent to collect their biometric data and established a publicly-available retention and deletion schedule for biometric data.[2] The Settlement Agreement memorializes these practices, and requires Octapharma to maintain them going forward. (*Id*. § 2.2.) Octapharma has further agreed to destroy any biometric data in its possession that belongs to Illinois donors who have not visited an Octapharma facility in three or more years. (*Id*.)

**D.** **Payment of Settlement Notice and Administrative Costs:** Defendant has agreed to pay from the Settlement Fund all expenses incurred by the Settlement Administrator in providing notice, administering the Settlement, creating and maintaining the Settlement Website, receiving and processing Claim Forms, dispersing Settlement Payments, and any other related expenses. (*Id*. § 1.24.)

**E.** **Attorneys' Fees and Incentive Award:** Defendant has agreed to pay reasonable attorneys' fees in an amount determined by this Court, to be paid from the Settlement Fund. (*Id*. § 8.1.) In the Settlement Agreement, Plaintiff's counsel voluntarily agreed to limit its request to 35% of the Settlement Fund, (*id*.), and ultimately requested one-third (33.3%) of the Settlement Fund in attorneys' fees by a separate motion on January 13, 2022. (*See* dkt. 84.) Defendant has also agreed to pay Plaintiff an incentive award from the Settlement Fund in the amount of $5,000, subject to Court approval, in recognition of her efforts in serving as Class Representative. (Agreement § 8.2; *see* dkt. 84, at 21-22.)

---

[2] *See Privacy Statement,* available at https://octapharmaplasma.com/home/privacy (last accessed Feb. 2, 2022)

**F.** **Release:** In exchange for the relief described above, the Class Members will release Octapharma Plasma, Inc., and its related entities from all claims relating to Octapharma's alleged collection, possession, capture, purchase, receipt through trade, obtaining, sale, profit from, disclosure, rediscolosure, dissemination, storage, transmittal, and/or protection from disclosure of biometric data through the use of finger scanners or kiosks at Octapharma's Illinois facilities. (Agreement §§ 1.20, 1.21, 3.) The Class Members do not release any claims against Haemonetics Corporation under the Settlement Agreement. (*Id*. § 1.21.)

## IV. THE CLASS NOTICE FULLY SATISFIED DUE PROCESS

Prior to granting final approval to this Settlement, the Court must consider whether the Class Members received "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011) ("*Schulte I*"). The "best notice practicable" does not necessarily require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process. In general, a notice plan that reaches at least 70% of class members is considered reasonable. *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 3 (2010), available at www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

Here, Octapharma possessed a U.S. Mail address for *all* 76,824 members of the Settlement Class and an email address for nearly half of them. (*See* Declaration of James Prutsman ("Prutsman Decl."), attached hereto as Exhibit 3, at ¶ 4.) Accordingly, the Court-approved Notice plan called for direct notice to all members of the Settlement Class via First-Class U.S. Mail and, additionally, via email to those members with an available email address,

plus the creation of a detailed Settlement Website. (Dkt. 81, ¶ 9, Agreement § 4.1.) Pursuant to the Notice plan outlined in the Agreement, Octapharma provided Kroll Settlement Administration—the professional Settlement Administrator appointed by the Court—with a class list containing the Class Members' names, last known U.S. Mail addresses, and email addresses (where available). (Prutsman Decl. ¶ 4.) Once provided, the Settlement Administrator updated the U.S. Mail addresses through the National Change of Address database to ensure the most up-to-date addresses as possible. (*Id.* ¶ 10.) The Settlement Administrator then sent the Court-approved direct notice via U.S. Mail to all 76,824 addresses on the class list, without exception, and also via email to 32,654 of those class members. (*Id.*) More than 77% of the email notices were delivered, 99.7% of the postcard notices were delivered as addressed, and of the 233 undelivered postcard notices, 178 were re-mailed. (*Id.* ¶ 12.) In the end, Notice was successfully delivered to a mailing address or email address associated with over 99% of the Settlement Class.

These summary notices directed class members to the Settlement Website, www.OPIBIPASettlement.com, which has been and continues to be available 24/7 and features the "long form" notice and important court filings—including Plaintiff's Motion and Memorandum of Law for Attorneys' Fees, Expenses, and Incentive Award—important deadlines, instructions on how to appear at the Final Approval Hearing telephonically, and answers to frequently asked questions. (*Id.* ¶ 7; Agreement § 4.1(b)(iii).)

Overall, the Notice program was highly successful, as Notice reached nearly every member of the class and produced an outstanding 20% claims rate. This far exceeds what is required for due process.

## V.     THE SETTLEMENT WARRANTS FINAL APPROVAL

When analyzing class action settlements, "the law quite rightly requires more than a judicial rubber stamp[.]" *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). To that end, the Seventh Circuit has established "the district judge as a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotations omitted).

Federal Rule of Civil Procedure 23(e) governs court approval of class action settlements and mandates that "claims, issues, or defenses of a certified class . . . may be settled . . . only with the court's approval . . . after a hearing and only on finding that it is fair, reasonable, and adequate[.]" Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28 2012); *Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002). Rule 23(e)(2) sets out that a court must consider whether (1) the class representative and class counsel have adequately represented the class; (2) the settlement was negotiated at arm's length; (3) the settlement treats class members equitably relative to each other; and (4) the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2) (eff. Dec. 1, 2018); *see, e.g.*, *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 c 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019).

As the Advisory Committee for the 2018 amendments to Rule 23 recognized that "each circuit has developed its own vocabulary for expressing these concerns[,]" the Court should also take into account the factors set out by the Seventh Circuit. Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment. These factors are: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the

reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (internal quotations omitted); *accord Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). Courts in the Seventh Circuit continue to analyze these factors in tandem with the Rule 23(e)(2) factors to ensure that a settlement is fair, reasonable, and adequate. *See, e.g.*, *In re NCAA Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 217 (N.D. Ill. 2019); *Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932, at *5 (N.D. Ill. Oct. 28, 2019).

The following discussion of the factors set out in Rule 23(e)(2) and their corresponding factors set out by the Seventh Circuit demonstrates that the Settlement is fair, reasonable, adequate, and deserving of final approval.

### A. Plaintiff and Class Counsel have Adequately Represented the Class.

The first Rule 23(e)(2) factor, whether the class representative and class counsel have adequately represented the class, focuses on class counsel's and the class representative's performance as it relates to the "conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e), Advisory Committee's Note to 2018 Amendment. This factor is generally satisfied where the named plaintiff participated in the case diligently, and class counsel fought vigorously in the litigation. *Snyder*, 2018 WL 4659274, at *4; *see also Chambers v. Together Credit Union*, No. 19-CV-00842-SPM, 2021 WL 1948453, at *2 (S.D. Ill. May 14, 2021) (finding this factor satisfied when class counsel vigorously litigated the case "both through motion practice on the legal merits and through discovery of facts and potential damages"). In considering this factor, courts are to examine whether the plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account the

12

nature and amount of discovery completed, whether formally or informally. *See Snyder*, 2018 WL 4659274 at *4. This inquiry is coextensive with the Seventh Circuit's direction to consider the "stage of the proceedings and the amount of discovery completed." *Wong*, 773 F.3d at 863 (internal quotations omitted).

The knowledge and negotiating position, vigor, participation, and conduct of the Class Representative and Class Counsel have not changed since this Court granted preliminary approval. (Dkt. 81.) Plaintiff Crumpton's interests have remained aligned with the Settlement Class through the Notice process and preparation for final approval. Without Ms. Crumpton stepping up to represent the class and taking on these tasks as the lead plaintiff, including by sitting for her deposition, the relief secured for the Settlement Class wouldn't have been possible. Given her efforts and aligned interest with the class, there can be no doubt that Ms. Crumpton has only acted in the best interest of the Settlement Class and has adequately represented them.

Likewise, Class Counsel worked vigorously to protect the interests of the class and ensure that the class was represented beyond the simple "adequate" measure. First, the immense amount of investigation and discovery undertaken by Plaintiff's counsel ensured that they had adequate information to assess the strength of the case and engage in settlement discussions. In particular, Class Counsel engaged in extensive formal written discovery with Octapharma, securing detailed answers to interrogatories and over 43,000 pages of responsive documents and ESI. (Ufkes Decl. ¶ 3.) That discovery led Class Counsel to subpoena third parties Haemonetics and Fulcrum Biometrics, who also produced thousands of pages of responsive documents. (*Id.* ¶¶ 9, 10.) Written discovery revealed that Plaintiff had an additional BIPA claim against Octapharma under § 15(d) for allegedly disclosing her and the class's biometric data to Haemonetics, prompting Plaintiff to file her First Amended Complaint alleging that claim. (Dkt.

65.) In addition to written discovery, Class Counsel deposed one of Octapharma's designated Rule 30(b)(6) corporate representatives. (Ufkes Decl. ¶ 9.) Had the parties not settled, Class Counsel was prepared to take—and had scheduled—four more depositions, including three Octapharma employees and a Haemonetics' corporate representative.

The facts underlying Plaintiff's allegations in this case—though by no means their legal import—are now substantially undisputed: Octapharma used fingerprint scanners at its Illinois plasma donation facilities to identify and re-identify donors; those scanners collected a biometric template of each donor's fingerprint; those templates were stored by Haemonetics; and Octapharma neither obtained informed written consent to collect and disclose donors' biometric data, nor established a retention policy for biometric data, let alone a publicly available one. The discovery completed has amounted to a clarity of issues in the case that is sufficient for the Parties to assess their negotiating positions (based upon the litigation to date, the anticipated outcomes of further fact and expert discovery, and additional motion practice) and evaluate the appropriateness of any proposed resolutions.

Therefore, the Settlement unequivocally meets the Rule 23(e)(2)(C) requirement.

**B.    The Settlement Is the Product of Arm's-Length, Non-Collusive Negotiations.**

The second factor in Rule 23(e)(2) requires the court to consider whether the proposed settlement is the result of arm's-length negotiations. *See Wong*, 773 F.3d at 864. The record here demonstrates nothing but good-faith, non-collusive bargaining between the Parties. After almost two years of active litigation—which included, *inter alia*, Plaintiff moving to strike Octapharma's key affirmative defenses, extensive written discovery, and two depositions—the Parties finally agreed to participate in a formal mediation in August 2021, just as four more depositions were soon approaching. (Ufkes Decl. ¶¶ 9, 10.) The Parties attended a full-day, formal mediation via Zoom with the Honorable James F. Holderman (Ret.) of JAMS in Chicago,

where their negotiations lasted throughout the entire eight-hour session. (*Id.* ¶ 10.) Ultimately, with the assistance of Judge Holderman, the Parties reached agreement on the material points of the settlement at the end of the mediation session and executed a binding Memorandum of Understanding that evening. (*Id.*) Over the course of the next month and a half, the Parties negotiated the remaining, non-material terms of the deal before executing the Settlement Agreement now before the Court. (*Id.*) That the Parties negotiations occurred during a formal mediation, governed by an experienced third-party mediator, supports that the Settlement was the product of arms-length, non-collusive negotiations. *See Wong,* 773 F.3d at 864 (affirming settlement approval and finding no "suspicious circumstances" where the parties negotiated with the assistance of an experienced third-party mediator); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) ("The parties' participation in mediation 'tends to support the conclusion that the settlement process was not collusive.'").

The arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, provides significant cash payments to Class Members, and contains no provisions that might suggest fraud or collusion, such as "clear sailing" or "kicker" clauses regarding attorneys' fees. *See Snyder*, 2019 WL 2103379, at *4 (approving settlement where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's length negotiation"). For these reasons, there should be no question that the Settlement here was the result of good-faith, arm's-length negotiations and is entirely free from fraud or collusion. *See Schulte v. Fifth Third Bank*, No. 09-CV-6655, 2010 WL 8816289, at *4 n.5 (N.D. Ill. Sept. 10, 2010) (noting that courts "presume the absence of fraud or

collusion in negotiating the settlement, unless evidence to the contrary is offered") (internal quotations omitted).

### C. The Settlement Treats Class Members Equally.

Next, Rule 23(e)(2) requires the proposed settlement to treat class members "equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Given that the Settlement Class here has nearly identical BIPA claims, the Settlement treats each of them identically. Defendant has established a fund of $9,987,380.00, from which each Class Member who submits a valid claim will receive a single, *pro rata* cash payment after fees and costs are paid. (Agreement §§ 1.29, 2.1); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (where class members are similarly situated with similar claims, equitable treatment is "assured by straightforward pro rata distribution of the limited fund").

The prospective relief also treats Class Members equally, as the Settlement requires Octapharma to obtain informed written consent from all Illinois donors going forward before collecting their biometric data and also requires Octapharma to maintain a publicly-available retention policy relating to that data, (Agreement § 2.2)—all Class Members can access the retention policy on Octapharma's website.

Finally, in terms of the release, each Class Member will be releasing the same claims against Octapharma relating to the collection, storage, and disclosure of their biometric data, and all Class Members will retain any claims they have against Haemonetics. (*Id.* §§ 1.20, 1.21, 3.1.) Because the Settlement treats each Class Member equally, this factor is well satisfied.

### D. The Relief Secured for the Settlement Class is Adequate and Warrants Final Approval.

The final and most important factor under Rule 23(e)(2) examines whether the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making this determination,

Rule 23 instructs courts to take into account several sub-factors, including (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class; and (iii) the terms of any proposed award of attorneys' fees, including timing of payment. *Id.*[3] This analysis necessarily encompasses two of the Seventh Circuit's factors: "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; [and] (2) the complexity, length, and expense of further litigation[.]" *Wong*, 773 F.3d at 863. Because the first Seventh Circuit factor "[is the] most important factor relevant to the fairness of a class action settlement[,]" it is critically important for a settlement to meet this standard. *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (internal quotations omitted). This Settlement does so.

### 1. The Relief Provided by the Settlement is Outstanding.

The benefits of this Settlement represent an excellent recovery for the class and simply excel when compared to other class action settlements, including those under BIPA. Based on the outstanding 20% claims rate, after any approved fees and costs are paid, each Class Member who submitted an Approved Claim will be paid approximately $400 from the $9,987,380 Settlement Fund. At trial, Class Members theoretically stood to recover statutory damages of $1,000 per negligent violation of the statute or $5,000 per intentional or reckless violation. 740 ILCS 14/20.

Settlements in other statutory privacy class actions frequently don't come near this amount, either in terms of raw numbers or percentage of available relief. Such settlements all too often secure *cy pres* relief without any individual payments to class members. *See, e.g.*, *In re*

---

[3] The fourth sub-factor, which requires the parties to identify any side agreements made in connection with the settlement, Fed. R. Civ. P. 23(e)(2)(C)(iv), is not applicable here as the written Settlement Agreement provided to the Court represents the entirety of the proposed Settlement. (Ufkes Decl. ¶ 11.)

*Google LLC Street View Elec. Commc'ns Litig.*, 2020 WL 1288377, at \*11–14 (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of a federal privacy statute, where $10,000 in statutory damages were available per claim). This has been true in finally-approved settlements in the BIPA context as well, where some settlements have provided only credit monitoring and *no* monetary relief for the class. *See Carroll*, No. 2017-CH-01624. Other BIPA settlements have capped the amount class members can receive and reverted the inevitable remaining funds back to the defendant. *E.g., Rosenbach,* 2016-CH-00013 (Cir. Ct. Lake Cnty. Oct. 29, 2021) (approving $36 million reversionary fund for approximately 1,110,000 class members, which capped class member payments at $200 or $60 depending on date of finger scan and reverted unclaimed funds to defendants); *Lark, et al v. McDonald's USA, LLC, et al.,* No 17-L-559 (Cir. Ct. St. Clair Cnty. Nov. 29, 2021) (preliminarily approving $50 million reversionary fund for more than 175,000 class members, which caps class member payments at $375 or $190 depending on date of finger scan and reverts unclaimed funds to defendants); *Marshall v. Lifetime Fitness, Inc.*, 2017-CH-14262 (Cir. Ct. Cook Cnty.) (paying a cap of $270 to individuals who filed claims and reverting the remainder to defendant).

Even narrowing the comparison to the better BIPA settlements that create non-reversionary funds, this Settlement excels. Indeed, the per-person monetary relief achieved here is among the best in a BIPA case of this size—*i.e.*, those with at least tens of thousands of class members. *See, e.g.*, *Roach*, No. 19-CH-01107 (Cir. Ct. Cook Cnty. Ill. June 16, 2021) ($10 million fund for 21,677 class members); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) ($7 million fund for approximately 260,000 class members); *Miracle-Pond v. Shutterfly*, 2019-CH- 07050 (Cir. Ct. Cook Cnty. Sept. 9, 2021) ($6.75 million fund for

potentially millions of class members); *Thome*, No. 19-cv-6256, dkt. 90 ($4.1 million fund for 62,000 class members, and assignment of insurance policy); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617 ($650 million fund for approximately 6.9 million class members). Though this case is much smaller than the ground-breaking *Facebook* BIPA settlement cited above, it shares many similarities: it will put about $400 cash into the hands of every class member interested in participating (compared to *Facebook's* $345 which was also an "excellent result for the class"), and, like *Facebook*, it achieved an "impressive" and "unprecedented" claims rate of over 20%. *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d at 620, 629, 632. All in all, that Plaintiff here secured a $9.987 million Settlement Fund for the 76,824 Class Members, and that an extraordinary portion of those Class Members will enjoy its monetary benefits, is an exceptional outcome.

And critically, in addition to providing a significant sum of money from Octapharma, the Settlement leaves in place any claims that the Class Members might have against Haemonetics for its collection and storage of the same biometric data without consent. Plaintiff Crumpton has already initiated a separate BIPA case against Haemonetics, *see Crumpton v. Haemonetics Corp.*, No. 1:21-cv-1402 (N.D. Ill.), and if she is successful in pursuing her class claims, the Class Members here stand to receive additional compensation.

Finally, the non-monetary benefits created by Plaintiff's pursuit of this case and the Settlement are also significant. Shortly after Plaintiff filed this suit, Defendant established a publicly-available retention and destruction schedule for donors' biometric data and rolled out a consent program at its facilities to ensure that every donor provides informed written consent prior to the collection of their fingerprint data. Going forward, the Settlement Agreement requires that Octapharma maintain and comply with these policies and procedures when handling

19

any Illinois donors' biometric data. (Agreement § 2.2.) The Agreement further requires

Octapharma to destroy any biometric data in its possession collected from Illinois donors who

haven't visited an Octapharma facility in three or more years. (*Id.*) This prospective relief

protects the biometric privacy of past, present, and future donors, and aligns clearly with BIPA's

statutory goals and the goals of this lawsuit.

## 2. *The Cost, Risk, and Delay of Further Litigation Compared to the Settlement's Benefits Favors Final Approval.*

"As courts recognize, a dollar obtained in settlement today is worth more than a dollar

obtained after a trial and appeals years later." *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995

WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995). In evaluating the adequacy of the relief provided

to the class, courts should first compare the cost, risks, and delay of pursing a litigated outcome

to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to

2018 amendment.

The Settlement here meets both the 23(e)(2)(C) requirements and the Seventh Circuit's

first and second factors because it provides immediate relief to the Settlement Class while

avoiding potentially years of litigation and appeals, with both Plaintiff and Defendant believing

that they have strong cases for their side. *See Schulte I*, 805 F. Supp. 2d at 586 ("Settlement

allows the class to avoid the inherent risk, complexity, time, and cost associated with continued

litigation."). For instance, the outcome of this case likely hinged on whether Octapharma could

prove that its donors were "patient[s]" and that its facilities were "heath care setting[s]" within

the meaning of BIPA's statutory exemption. (Dkt. 66 at 31 ¶ 41.) The Court denied Plaintiff's

motion to strike this affirmative defense, (dkt. 43), and had Defendant succeeded on this

argument at summary judgment and/or trial, Plaintiff and the class would have recovered

nothing. Though Plaintiff strongly believes she would have prevailed, this was a novel issue

based on a statutory exemption that, to date, no court has considered beyond the pleading stage. Further, the applicable statute of limitations for BIPA claims is still in the balance, as just last week, the Illinois Supreme Court granted a petition for leave to appeal in *Tims v. Black Horse Carriers, Inc.*, 2021 IL App (1st) 200563, to finally resolve whether a one- or five-year limitations period applies to the various claims under § 15 of BIPA. If the high court were to hold that a one-year period applies to claims under §§ 15(a), (b) *and* (d), the vast majority of the class's BIPA claims would be time barred. (*See* Agreement § 1.26 (settling a five-year class period).) Finally, on the merits, Defendant would have continued to assert—like nearly every other BIPA defendant—that the fingerprint data collected by its scanners are neither "biometric identifiers" nor "biometric information" covered by BIPA. (*See* dkt. 66 at 33.) Plaintiff intended to defeat these arguments at summary judgment and/or trial, and is confident she could have done so, but these arguments posed a serious threat to her and the class's recovery. The Settlement provides excellent to the Settlement Class without the delay necessitated by briefing and a trial on these questions, and without the inherent risk of presenting such matters to a jury.

Plaintiff would also be required to use significant resources to litigate the issue of class certification. The Advisory Committee notes to amended Rule 23(e) suggest that courts should consider the likelihood of certifying a class for litigation in evaluating this sub-factor because the issue of litigating class certification is a salient one. While Plaintiff believes that she would ultimately prevail on certification issues given Defendant's uniform conduct, class certification is still a significant hurdle and presents a risk to any class recovery. Were adversarial class certification to be granted, the possibility of an interlocutory appeal would still risk causing significant delay to any recovery. *Cf. Patel v. Facebook, Inc.*, 932 F.3d 1264, 1277 (9th Cir. 2019) (affirming class certification on interlocutory appeal in BIPA case filed four years earlier).

21

Even if Plaintiff had succeeded at summary judgment and/or trial, Plaintiff recognizes that Defendant would have the ability to appeal the merits of any adverse decision on the myriad issues of first impression posed by BIPA cases in general, and this case in particular. Ultimately, failure at any one of these points could strip Plaintiff and the class of most or all recovery, making further litigation a risky endeavor. While Plaintiff does not believe that any of the arguments above are viable, she recognizes that, to her knowledge, no BIPA case has ever been tried. This Settlement factors in that uncertainty, as well as the delays that would necessarily accompany briefing the arguments before this Court and the Seventh Circuit.

Finally, there is no guarantee that the Class Members would receive any benefit from protracted litigation. Protracted litigation is costly and time consuming, and it is possible that it "would provide Class Members with either no in-court recovery or some recovery many years from now . . ." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. at 964. This Settlement provides immediate relief to Class Members, without the risk of protracted litigation. Thus, given the substantial risks, expense, and delay that would accompany further litigation, and in comparison to other BIPA class action settlements, the Settlement offers substantial value relative to the strength of Plaintiff's case. The most important factor therefore strongly supports final approval.

### 3. *The Method of Distributing Relief to the Class Members is Effective and Supports Final Approval.*

The "effectiveness of [the]…method of distributing relief to the class" weighs strongly in favor of the adequacy of this Settlement under Rule 23(e)(2)(C)(ii). An effective distribution method "get[s] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." 4 NEWBERG ON CLASS ACTIONS § 13:53. Settlement distribution here is straightforward. Class Members can submit a claim either by mail or online.

22

Those who submit online have the option to select to receive their Settlement Payment by Venmo, Zelle, Paypal, Prepaid Mastercard, ACH Direct Deposit, or check; those who submit an approved claim by mail will receive a check in the mail and can update their address at any time on the Settlement Website. Once the Settlement is approved, the Settlement Administrator will distribute Settlement Payments to each Class Member for their *pro rata* portion of the Fund.[4] *See Lea v. Tal Educ. Grp.*, 2021WL 5578665 at *11 (S.D.N.Y. Nov. 30, 2020) (approving settlement where settlement administrator processed claims under lead counsel's oversight and mailed *pro rata* shares to class members with valid claims). This well-recognized method of distributing monetary relief fully satisfies this aspect of Rule 23(e)(2)(C)(ii).

### 4. The Terms of the Requested Attorneys' Fees are Reasonable.

The third and final relevant sub-factor considers the adequacy of the relief provided to the class taking into account "the terms of [the] proposed award of attorney's fees, including timing of payment[.]" Fed. R. Civ. P. 23(e)(2)(C)(iii).

Class Counsel petitioned the Court for an award of reasonable attorneys' fees after the Settlement Class received notice of the Settlement. (Dkt. 84.) The Settlement's contemplated method of calculating attorneys' fees (i.e., the percentage-of-the-fund method) and Class Counsel's request for one-third (33.3%) of the non-reversionary Settlement Fund—despite Class Counsel's self-imposed cap in the Settlement Agreement of 35%—are reasonable and predicated on the outstanding relief provided to the Settlement Class. (Agreement § 8.1.) To be sure, the percentage-of-the-fund method has been used to determine a reasonable fee award in every BIPA class action settlement creating a common fund to date, and the requested percentage fee award is well in line with—if not on the low end of—common fund fee awards in BIPA cases in this

---

[4] If, after 90 days of issuance, any electronic payments are unable to be processed or any checks go uncashed, those residual funds will revert to the Court-appointed *cy pres* recipient.

District. *See, e.g.*, *Davis v. Heartland Emp. Servs., LLC*, No. 1:19-cv-00680, dkt. 130 (N.D. Ill. Oct. 25, 2021) (awarding 33.3% of fund) (Valderrama, J.); *Thome*, No. 19-cv-6256, dkt. 90 (same) (Kennelly, J.); *Jones v. CBC Restaurants Corp*., No. 19-cv-6736, dkt. 53 (N.D. Ill. Oct. 22, 2020) (same) (Alonso, J.); *Alvarado v. Int'l Laser Prods., Inc.*, No. 18-cv-7756, dkt. 70 (N.D. Ill. Jan. 24, 2020) (awarding 35% of the fund) (Pallmeyer, J.); *Lopez-McNear v. Superior Health Linens, LLC*, No. 19-cv-2390, dkt. 69 (N.D. Ill. Apr. 27, 2021) (same) (Pallmeyer, J.); *Cornejo v. Amcor Rigid Plastics USA, LLC*, No. 18-cv-7018, dkt. 57 (N.D. Ill Sept. 20, 2020) (same) (Pacold, J.). Accordingly, Class Counsel's request of 33.3% of the fund in attorneys' fees is reasonable.

Finally, if approved, the Settlement provides that attorneys' fees will be paid within six business days after final judgment, including any appeals. (Agreement §§ 1.11, 8.1.) These terms are reasonable and should be approved.

### E. The Remaining Considerations Set Forth by the Seventh Circuit Support Approval of the Settlement.

In addition to the requirements that overlap with those now required by Rule 23(e), the Seventh Circuit requires a few additional considerations: the class's reaction to the settlement, the opinion of competent counsel, and whether the settlement raises any red flags that courts should be wary of. *Wong*, 773 F.3d at 863. Here, the positive reaction of the Settlement Class, the support of counsel, and the lack of red flags all favor approval.

#### 1. The Reaction of the Settlement Class Favors Approval.

Lack of opposition to a class action settlement "indicates that the class members consider the settlement to be in their best interest." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *6. Here, the Court-approved Settlement Administrator diligently implemented the Notice plan outlined in the Agreement, and the objection and exclusion deadlines have passed without a single person

objecting to the Settlement or opting out of participating. That not one person has objected to or requested to be excluded from the Settlement is powerful evidence of the Settlement Class's support for the Settlement. *See McDaniel v. Qwest Commc'ns Corp.*, No. CV 05 C 1008, 2011 WL 13257336, at *4 (N.D. Ill. Aug. 29, 2011) (finally approving settlement with no objections and noting that "[a]n absence of objection is a 'rare phenomenon[]' and 'indicates the appropriateness of the request[]'") (citations omitted); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (stating that "[t]he absence of objection to a proposed class settlement is evidence that the settlement is fair, reasonable and adequate").

Similarly, the extraordinarily high 20% claims rate also indicates a strong positive reaction from the Settlement Class. *See In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d at 629 (describing 22% claims rate in BIPA case as "an unprecedentedly positive reaction by the class"); *see also Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 290 (6th Cir. 2016) (discussing expert testimony that response rates in claims-made class action settlements "generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent[.]"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3rd Cir. 2011) (*en banc*) (noting that claims rate in consumer class action settlements "rarely exceed seven percent"). Indeed, the rate at which Class Members are participating in this Settlement surpasses nearly every other finally-approved BIPA settlement to date. *See Sekura v. L.A. Tan Enters., Inc.*, 2015-CH-16694 (Cir. Ct. Cook Cnty. Dec. 1, 2016) (15% claims rate); *Kusinski v. ADP LLC*, 2017-CH-12364 (Cir. Ct. Cook Cnty. Feb. 10, 2021) (12.7% claims rate,); *Thome*, No. 19-cv-6256, dkt. 90 (10% claims rate); *Prelipceanu*, 2018-CH-15883 (5% claims rate); *see also In re TikTok, Inc., Consumer Priv. Litig.*, No. 20-cv-4699, dkts. 122 at 24, 161 at 25 (N.D. Ill.) (granting preliminary approval

despite a predicted 1.5% claims rate). The strong response rate combined with a total lack of objections or exclusions thus strongly supports granting final approval to the Settlement.

### 2. Experienced Counsel's Belief that the Settlement is Beneficial to the Class Weighs in Favor of Final Approval.

The opinion of competent counsel also supports final approval of the Settlement. Where class counsel has "extensive experience in consumer class actions and complex litigation[,]" their "belie[f] that the [s]ettlement is beneficial to the [c]lass" supports approval of the settlement. *Schulte I*, 805 F. Supp. 2d at 586; *see also Retsky Family Ltd. P'ship*, 2001 WL 1568856, at *3 (finding plaintiff's counsel competent, and their endorsement of a settlement thus supporting approval, where counsel were "experienced and skilled practitioners in the [relevant] field, and [were] responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted") (internal quotations omitted).

First, Class Counsel, Edelson PC and Fish Potter Bolaños, P.C., are competent to give their opinion on this Settlement. Edelson PC is a national leader in high stakes' plaintiffs' work, including class actions, as well as mass actions and public client investigations and prosecutions. The firm filed the first-ever class action under BIPA against Facebook, *Licata v. Facebook, Inc.*, 2015-CH-05427 (Cir. Ct. Cook Cnty. Apr. 1, 2015), secured the first-ever adversarially-certified BIPA class in that case and defended the ruling in the Ninth Circuit, *Patel v. Facebook, Inc.*, 932 F.3d at 1277 (upholding adversarial BIPA class certification), *cert. denied Facebook, Inc. v. Patel*, 140 S. Ct. 937 (2020), and resolved the case for $650 million—the largest consumer privacy settlement in history. *In re Facebook Biometric Info. Priv. Litig.*, No. 15-CV-03747-JD, 2021 WL 757025 (N.D. Cal. Feb. 26, 2021) (granting final settlement approval).

Edelson PC has also achieved many of the seminal appellate rulings on the matters of first impression under BIPA. *See Patel*, 932 F.3d 1264 (9th Cir. 2019) (defending class

certification and standing on appeal); *Sekura v. Krishna Schaumburg Tan*, *Inc.*, 2018 IL App (1st) 180175 (holding, pre-*Rosenbach*, that a person did not need to plead additional harm to be "aggrieved" within the meaning of BIPA's damages provision); *Rottner v. Palm Beach Tan, Inc.*, 2019 IL App (1st) 180691-U (holding that a violation of BIPA is sufficient to claim liquidated damages); *McDonald v. Symphony Bronzeville Park LLC*, 2020 IL App (1st) 192398, *appeal allowed*, 163 N.E.3d 746 (Ill. 2021) (holding that the exclusivity provisions of the IWCA do not bar employee BIPA claims against employers). Thus, Class Counsel is more than competent to provide their opinion on the strength of the Settlement.

Put simply, and for the reasons discussed in detail above, Class Counsel believe that the Settlement provides outstanding monetary and prospective relief without the uncertainty and delay that years of litigation would bring. (Ufkes Decl. ¶ 12.) That is certainly in the best interest of the Settlement Class. (*Id.*)

For these reasons, the opinion of Class Counsel weighs in favor of final approval.

### 3. *The Settlement Raises No Red Flags.*

Finally, the Settlement raises none of the red flags identified by the Seventh Circuit in analyzing class settlements. In *Eubank v. Pella Corp.*, the Seventh Circuit identified "almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for[.]" 753 F.3d 718, 728 (7th Cir. 2014). Those signs included (i) a single class containing two adverse subgroups, (ii) a familial relationship between class counsel and the class representative, (iii) failure to establish the amount of class member recovery, (iv) the reversion of any unawarded attorneys' fees to defendant, (v) an advance of attorneys' fees before notice of the settlement was provided to class members, (vi) a provision in the settlement agreement denying incentive awards to class representatives who objected to the settlement, (vii)

27

providing some class members only coupons, and (viii) a complicated claims procedure creating substantial obstacles to recovery. *Id.* at 721-28.

Here, none of those red flags are present. There are no subgroups to this class, and the Class Representative, Ms. Crumpton, has no familial relationship with Class Counsel or any member of their respective law firms. The claims process here is simple and straightforward: Class Members may submit the short, one-page Claim Form either online through the Settlement Website, or by mail by submitting the postage-prepaid Claim Form that was attached to their postcard notice. Any unawarded attorneys' fees will be distributed to the Class Members, not revert to Octapharma (Agreement § 8.1); there has been no advance of attorneys' fees to Class Counsel; and there is no provision in the Settlement Agreement denying an incentive award to a named plaintiff who does not support the Settlement.

The Settlement here is beneficial to Class Members and displays no warning signs that should give this Court pause. The Settlement should therefore be approved.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter an order finally approving the Parties' Settlement and ordering such other relief as this Court deems reasonable and just.[5]

<div style="margin-left:40%">

Respectfully submitted,

**MARY CRUMPTON,** individually and on behalf of the Settlement Class,

</div>

Dated: February 2, 2022

<div style="margin-left:50%">

By: /s/ Schuyler Ufkes
One of Plaintiff's attorneys

</div>

---

[5] For the Court's convenience, Plaintiff will submit a proposed final approval order to the Court's designated email address prior to the February 16, 2022 final approval hearing.

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

David J. Fish
dfish@fishlawfirm.com
FISH POTTER BOLAÑOS, P.C.
200 East 5th Avenue, Suite 123
Naperville, Illinois 60563
Tel.: 630.355.7590
Fax: 630.778.0400